**Nos. 21-16506 & 21-16695**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff, Counter-Defendant — Appellant, Cross-Appellee*,

v.

APPLE, INC.,

*Defendant, Counterclaimant — Appellee, Cross-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR-TSH, Hon. Yvonne Gonzalez Rogers

**BRIEF OF MICROSOFT CORP. AS *AMICUS CURIAE*
IN SUPPORT OF EPIC GAMES, INC., PLAINTIFF,
COUNTER-DEFENDANT — APPELLANT, CROSS-APPELLEE**

Aaron M. Panner
Julius P. Taranto
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*

January 27, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Microsoft Corporation states that it does not have a parent corporation and that no publicly held corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................i

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF *AMICUS CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

BACKGROUND ........................................................................................4

    A.    Apple's Extraordinary Gatekeeper Power ....................................4

    B.    Apple's Roles in Adjacent Markets ..............................................7

ARGUMENT ...........................................................................................11

I.    THE DISTRICT COURT INADEQUATELY TESTED LESS RESTRICTIVE ALTERNATIVES TO APPLE'S RESTRICTIONS ..........13

    A.    AT&T's Equipment Restrictions ..................................................14

    B.    Apple's Similar Conduct ............................................................18

II.    THE DISTRICT COURT MISAPPLIED TYING LAW ..............................21

    A.    The Separate Demand Test ..........................................................22

    B.    Rule of Reason Tying ..................................................................25

    C.    Apple's IAP Requirement ............................................................27

CONCLUSION ........................................................................................30

CERTIFICATE OF COMPLIANCE ..............................................................31

CERTIFICATE OF SERVICE ....................................................................32

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bhan v. NME Hosps., Inc.*,
929 F.2d 1404 (9th Cir. 1991) .......................................................................14

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ..........................................................................25

*Digidyne Corp. v. Data Gen. Corp.*,
734 F.2d 1336 (9th Cir. 1984) .........................................................................29

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)..........................................................................................25

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ...........................................................................13

*Grappone, Inc. v. Subaru of New England, Inc.*,
858 F.2d 792 (1st Cir. 1988)............................................................................26

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)................................................................................22, 23, 24

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
532 F.3d 963 (9th Cir. 2008) .......................................................................22, 23

*Use of the Carterfone Device in Message Toll Tel. Serv., In re*,
13 F.C.C.2d 420 (1968) ...................................................................................15

*United States v. Am. Tel. & Tel. Co.*,
524 F. Supp. 1336 (D.D.C. 1981)....................................................................15

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001).......................................................4, 22, 23, 24, 25, 29

**RULE**

Fed. R. App. P. 29(a)(4)(E)................................................................................1

**OTHER MATERIALS**

Anita Balakrishnan, *Tim Cook: Goal is to double Apple's services revenue by 2020*, CNBC (Jan. 31, 2017), https://www.cnbc.com/2017/01/31/tim-cook-on-apple-earnings-call-double-services-revenue-by-2020.html ................................... 21

David Bloom, *Apple Doubled Services Revenue in Just Three Years, and That's Before Arcade and TV+ Kick In*, FORBES (Oct. 31, 2019), https://www.forbes.com/sites/dbloom/2019/10/31/apple-doubled-services-revenue-in-just-three-years-and-thats-before-arcade-and-tv-kick-in/?sh=442642b22be9 ...................................................................... 21

Jonathan Borck et al., *How Large Is the Apple App Store Ecosystem? – A Global Perspective for 2019*, Analysis Grp. (June 15, 2020), https://www.apple.com/newsroom/pdfs/app-store-study-2019.pdf ............................................................................................ 13

Eric Enge, *Mobile vs. Desktop Usage in 2020*, Perficient (Mar. 23, 2021) https://www.perficient.com/insights/research-hub/mobile-vs-desktop-usage ......................................................... 4

IDG Consulting, State of the Games Industry 2020 Annual White Paper (Apr. 13, 2020) ....................................................................... 9

*Meeting pandemic challenges, Apple developers grow total billings and sales in the App Store ecosystem by 24 percent to $643 billion in 2020Apple developers grow App Store ecosystem billings and sales by 24 percent in 2020*, Apple (June 2, 2021), https://www.apple.com/newsroom/2021/06/apple-developers-grow-app-store-ecosystem-billings-and-sales-by-24-percent-in-2020/ ................................................................. 13

*Mobile Fact Sheet*, Pew Research. Ctr. (Apr. 7, 2021), https://www.pewresearch.org/internet/fact-sheet/mobile/ ............................... 4

Netherlands Auth. for Consumers & Mkts., *Summary of decision on abuse of dominant position by Apple* ¶¶ 15-18 (Aug. 24, 2021), https://www.acm.nl/sites/defau lt/files/documents/summary-of-decision-on-abuse-of-dominant-position-by-apple.pdf ...................................................................28

S. O'Dea, *Marketshare held by smartphone operating systems in the United States from 2012 to 2021*, Statista (Aug. 11, 2021), https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/ .............................4

Malcom Owen, *Apple Search Ads grows during App Tracking Transparency push*, Apple Insider (Oct. 17, 2021), https://appleinsider.com/articles/21/10/17/apple-search-ads-grows-during-app-tracking-transparency-push ...............................................10

Christo Petrov, *65 Wowing M-Commerce Statistics for 2021*, Techjury (Dec. 7, 2021), https://techjury.net/blog/mcommerce-statistics/#gref. ....................................4

UK Competition & Mkts. Auth., *Mobile Ecosystems: Market Study Interim Report* (Dec. 14, 2021) ("CMA Report"), https://www.gov.uk/government/publications/mobile-ecosystems-market-study-interim-report.........................................................5

Yoram Wurmser, *US Time Spent with Mobile 2021*, Insider Intelligence (June 2, 2021), https://www.emarketer.com/content/us-time-spent-with-mobile-2021.......................................................................................4

## INTEREST OF *AMICUS CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer software; it has been creating software platforms and application programming interfaces ("APIs") for application developers for more than forty years. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate. Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft Office 365, Surface, Xbox and Xbox Game Pass, and Bing. It invests billions of dollars on research, development, and promotion of new technologies, products, and services to compete in dynamic technology markets.

This case presents important antitrust issues arising from the explosion in mobile computing. In particular, this case addresses the extent to which Apple Inc. ("Apple"), the dominant provider of U.S. smartphones and mobile operating systems, will be permitted to leverage its power in those markets to foreclose competition in other, adjacent markets. The potential antitrust issues stretch far

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party to this appeal has authored this Amicus Brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this Brief. All parties consented to its filing.

beyond gaming. Online commerce and interpersonal connection funnels significantly, and sometimes predominantly, through iOS devices. Few companies, perhaps none since AT&T Inc. ("AT&T") at the height of its telephone monopoly, have controlled the pipe through which such an enormous range of economic activity flows. And fewer still (not even AT&T) have held such gatekeeper power while simultaneously competing in so many adjacent markets. Beyond app distribution and in-app payment solutions – the adjacent markets directly at issue in this case – Apple offers mobile payments, music, movies and television, advertising, games, health tracking, web browsing, messaging, video chat, news, cloud storage, e-books, smart-home devices, wearables, and more besides.

Microsoft brings a unique – and balanced – perspective to the legal, economic, and technological issues this case implicates. In part of its business, Microsoft sells hardware devices and one of the leading operating systems for personal computers. Microsoft also provides an online store for applications that run on its operating system. In other parts of its business, Microsoft sells applications and services that run on operating systems and devices built by other companies, like Apple. It offers products that compete with Apple and, like Epic Games, Inc. ("Epic"), it offers games. It has an interest in ensuring that antitrust law both polices a dominant firm's improper foreclosure of competition and

preserves incentives for innovation, investment, and beneficial technological integration.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

First, this brief addresses the district court's assessment of less restrictive alternatives to Apple's app distribution restrictions. An instructive analogy is the Department of Justice case that ended AT&T's decades-long monopoly of the national telephone network. As Apple does now, AT&T leveraged its control of an essential communications channel to interfere with or entirely foreclose its customers' dealing with third parties in other markets – in that case, the markets for equipment that connected to the telephone network. As the district court did in the government's case against AT&T, the district court here should have rigorously tested the necessity of Apple's restrictions and the viability of less anticompetitive alternatives. Any less robust assessment poses risks to competition across the economy.

Second, this brief discusses Epic's tying claim. Tying is one common framework courts use to assess a dominant firm's efforts to harm competition in adjacent markets. The district court rejected the argument that requiring developers to use Apple's in-app payment system as a condition of App Store distribution was tying at all. But distribution and in-app payment processing are separate products, and Apple's conditioning is properly evaluated as potentially

unlawful tying. At a minimum, Epic's tying claim should have been assessed under the rule of reason, as the D.C. Circuit did in *United States v. Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir. 2001) (en banc) (per curiam) – another case that involved "the technological integration of added functionality into software that serves as a platform for third-party applications." That rule-of-reason approach ensures fair consideration of potentially procompetitive bundling of software functions.

## BACKGROUND

### A.     Apple's Extraordinary Gatekeeper Power

Mobile devices and their operating systems have become the primary way that people access the internet.[2] On average, U.S. adults spend more than four hours a day on their mobile devices,[3] and they do more than half of all online shopping there.[4] Eighty-five percent of Americans own a smartphone.[5] Most of those smartphone users use Apple's iPhones with its iOS operating system.[6]

---

[2] Eric Enge, Mobile vs. Desktop Usage in 2020, Perficient (Mar. 23, 2021) https://www.perficient.com/insights/research-hub/mobile-vs-desktop-usage.

[3] Yoram Wurmser, US Time Spent with Mobile 2021, Insider Intelligence (June 2, 2021), https://www.emarketer.com/content/us-time-spent-with-mobile-2021.

[4] Christo Petrov, 65 Wowing M-Commerce Statistics for 2021, Techjury (Dec. 7, 2021), https://techjury.net/blog/mcommerce-statistics/#gref.

[5] *Mobile Fact Sheet*, Pew Research. Ctr. (Apr. 7, 2021), https://www.pewresearch.org/internet/fact-sheet/mobile/.

[6] S. O'Dea, *Marketshare held by smartphone operating systems in the United States from 2012 to 2021*, Statista (Aug. 11, 2021),

The United Kingdom's Competition and Markets Authority ("CMA") recently released a comprehensive report addressing the same markets at issue in this case, including many findings that apply at least as strongly in the United States. The CMA found that "any developments in the competitive dynamics of these [mobile ecosystem] markets can have far reaching ripple effects across our economy and society." UK Competition & Mkts. Auth., *Mobile Ecosystems: Market Study Interim Report* ¶ 2.3 (Dec. 14, 2021) ("CMA Report"), https://www.gov.uk/government/publications/mobile-ecosystems-market-study-interim-report.

"Operating systems, app stores, and browsers each act as a gateway between consumers and the businesses that want to reach them online." *Id.* ¶ 2.31. Apple (and, to a lesser extent in the United States, Google LLC ("Google")) "can make decisions affecting the type of features on a user's device that apps can access and utili[z]e," "control which apps are pre-installed on devices," and "control the terms of access between consumers and developers of native apps." *Id.* Apple and Google "decide which apps are allowed in their store, how apps are ranked and discovered, and the commission that will be taken from app developers' revenues." *Id.* They have "each captured such a large proportion and volume of

---

https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/.

consumers . . . that their ecosystems are, for practical purposes, indispensable to online businesses." *Id.* ¶ 2.32.

Apple's smartphone and mobile operating system market share is high. There are few industries (let alone industries as large and central to the overall economy as smartphones and mobile operating systems) where the market leader enjoys a majority share of sales, as Apple does in the United States. Yet even this high market share understates its power over its users and developers. Few end users switch between iOS and Android – and even fewer switch from iOS to Android than vice versa. The CMA estimates that "in 2020 users' switching away from Apple (to Android) were 2.5% of Apple's user base and that users' switching to Apple (away from Android) were 8.0%." *Id.* ¶ 3.27. The very limited churn (and lack of multi-homing) between mobile operating systems shows that iOS is protected by barriers to switching, limited price competition, and no serious threat of entry by new mobile OS providers. *Id.* at ¶¶ 3.187-3.191.

Apple's pricing reflects its power. The CMA also found that "Apple is likely to be charging above a competitive price for its mobile devices – a cost that is borne directly by consumers" – in addition to "charging above a competitive rate of commission to app developers, which will ultimately mean users paying higher prices for subscriptions and in-app purchases such as within games." *Id.* ¶ 2.70. The district court in this case similarly found that "Apple's maintenance of its

commission rate stems from market power, not competition in changing markets."
1-ER-147 (emphasis omitted).

### B. Apple's Roles in Adjacent Markets

Beyond its control of the pipe between so many people and businesses, Apple makes itself a major player in many other services that rely on smartphones. Epic's claims in this case center on two markets that depend on Apple's devices and operating system: the market for iOS app distribution – in which Apple's App Store is the only participant – and the market for in-app payment processing solutions – in which Apple In-App Purchase ("IAP") is the only option for businesses selling certain kinds of digital goods, like games, to people with Apple devices. Apple ensures its control of those markets through contractual provisions with developers (who must agree not to use competitive alternatives in either field when they develop for iOS) and users (who must agree not to direct-download applications when they license iOS).

Apple is in many other lines of business too – and it often uses its control of iOS and iPhones to favor other Apple products. To list a few areas where Apple's conduct has already generated antitrust concerns:

*1. Games.* Apple Arcade (a game subscription service) competes with Epic and with Microsoft's Xbox Game Pass Ultimate – all of which offer mobile gaming. Apple Arcade receives unparalleled prominence in the App Store,

including its own "storefront," a separate tab on the main menu bar titled "Arcade" that users may select to access included games. In addition to generating revenue, Apple's game subscription model reinforces barriers to switching away from Apple's ecosystem, because Arcade is not available on any non-Apple mobile device.

In addition to preventing Epic from introducing its own Epic Games Store to iOS, Apple has "used its control over app distribution on iOS to block the emergence of cloud gaming apps." CMA Report ¶ 6.305. "Cloud gaming services," like Microsoft's Xbox Game Pass Ultimate, "provide mobile device users access to games which are far beyond the capabilities of even the top end of mobile devices. It achieves this by using the processing power of the cloud, instead of the user's device, to run games." *Id.* ¶ 6.307. Cloud gaming applications offer users a wide variety of games through a single subscription – effectively, Netflix for games. Cloud gaming affects Apple's power over iOS users in at least two ways: it reduces users' dependence on Apple's generally high-end hardware; and "[c]ross-platform, or platform-agnostic services such as cloud gaming services can be purchased on one device and accessed across various devices and platforms. The emergence of such services may serve to reduce switching costs between mobile devices." *Id.* ¶¶ 6.308-6.309.

8

The stakes in gaming alone are large. By revenue, the gaming industry is larger than the music, box office, and home entertainment (DVD and streaming) industries combined.[7] Mobile gaming is both the largest *and* the fastest-growing segment of the gaming industry. Game transactions overall accounted for 76% of Apple's total App Store revenues in 2017, 62.9% in 2018, and 68% in 2020. 1-ER-127.

2.      *Mobile payments and digital wallets.* Apple Pay comes preinstalled with iOS and is "the only mobile wallet on the iPhone that can make use of the NFC chip," which enables contactless payments. CMA Report ¶ 6.33. "This is in contrast to GMS-enabled Android devices where third-party mobile wallets can and do make use of NFC chips." *Id.* Developers have told the CMA that "NFC access could be provided to third-party mobile wallets without jeopardi[z]ing security," *id.* ¶ 6.36, and that Apple's restriction "effectively deprecates the quality of rival mobile wallets and gives itself a competitive advantage in mobile payments," *id.* ¶ 6.34.

3.      *Music.* Apple Music competes with Spotify, Amazon Music, Google, Pandora, and other music streaming services. Apple Music comes preinstalled with iOS and is prominently integrated into the operating system. Meanwhile,

---

[7] IDG Consulting, State of the Games Industry 2020 Annual White Paper 11 (Apr. 13, 2020).

some rivals claim that Apple has abused its control of the review process for updates of apps in the App Store to disadvantage competing services. For instance, Spotify told the CMA that "Apple has 'constantly sought opportunities to re-interpret [the App Store guidelines'] meaning to restrict its rivals' conduct' and that since May 2016 it has 'rejected the Spotify iOS app for newly invented, pretextual reasons at the start of nearly every promotional campaign season.'" *Id.* ¶ 6.75.

4.   *Digital advertising.* Apple also has a digital advertising business. This business, which Apple told the CMA was "extremely limited," currently generates $1.5-2 billion per year through ads in Apple's App Store, News, and Stocks apps. *Id.* ¶ 6.231. After Apple's recent "App Tracking Transparency" changes, which altered the way that third-party apps could monitor users' activity across apps, Apple offered developers new APIs that "app developers, ad networks and industry commentators" say are inferior to both prior attribution capabilities and "to the Apple Search Ads Attribution API Apple makes available to users of its own advertising services." *Id.* ¶ 6.237. Since those changes, Apple's advertising revenue has grown rapidly.[8]

---

[8] *See*, *e.g.*, Malcom Owen, *Apple Search Ads grows during App Tracking Transparency push*, Apple Insider (Oct. 17, 2021), https://appleinsider.com/articles/21/10/17/apple-search-ads-grows-during-app-tracking-transparency-push.

Apple also offers products for messaging, news, maps, video streaming, health tracking, cloud storage, and other connected devices (like wearables and smart speakers).  Apple's numerous services within and relying on its iOS illustrate its potential to affect competition throughout huge swaths of the economy far beyond gaming – and the way that Apple's business in other areas can reinforce its power over smartphone users and developers.

## ARGUMENT

The legal issues implicated by this appeal pose significant risks to competition across the economy, far beyond gaming and in-app payments.  A broad ruling for Apple could leave little room for a limiting principle to prevent Apple from leveraging its control of iOS to foreclose competition in countless adjacent markets.  Google, the only other mobile operating system provider, could be empowered to do the same.  The stakes are high for Microsoft and other businesses that depend on antitrust laws to protect competition on the merits.  As the seller of Windows, Microsoft knows the importance of being able to innovate and add new and complementary features to its products.  U.S. antitrust law rightly gives even large businesses the right and the incentive to improve their products, cut prices, and increase output to compete with rivals big and small.

11

But a dominant firm's discretion in how it competes does not give a firm free rein to exploit its market power to interfere with the dealings between rivals and third parties.

Besides its operating system, Microsoft also sells applications – like games and its suite of Office products – that its customers want to use on other platforms, like iOS. For instance, Microsoft wants to bring Xbox Game Pass Ultimate, an innovative cloud gaming capability, to iPhone users around the world. Apple's decision to block this step-change in mobile gaming technology and quality – all while offering Apple Arcade, a gaming product of its own – harms competition and consumers in mobile gaming. It also harms competition and consumers in smartphone markets more broadly, where consumers' inability to use innovative cross-platform services like Xbox Game Pass Ultimate helps protect Apple's market power.

If Apple is allowed to step between any company with online services and users of iPhones, few areas of the vast mobile economy will be safe from Apple's interference and eventual dominance. Consumers and innovation will suffer – indeed, they already have. The district court's reasoning failed to give sufficient weight to these immense competitive risks and, if broadly affirmed, could insulate Apple from meritorious antitrust scrutiny and embolden further harmful conduct.

12

Irrespective of result, any decision in this appeal should be confined to the necessarily limited record from this accelerated trial – something that the district court appropriately took pains to do. Apple's conduct is under investigation around the world, including in the United States. Any decision that suggests broad immunity from scrutiny when Apple uses its control of iPhones and iOS to suppress competition in other markets – or uses its products in other markets to protect its power in mobile devices and operating systems – could have serious competitive consequences across the economy.[9] The economic stakes here are exceedingly high, so any judicial decision should be correspondingly modest.

## I. THE DISTRICT COURT INADEQUATELY TESTED LESS RESTRICTIVE ALTERNATIVES TO APPLE'S RESTRICTIONS

Given both anticompetitive effects and non-pretextual procompetitive rationales for harmful conduct, Sherman Act plaintiffs must show that "procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir.

---

[9] Apple estimated that the Apple App Store ecosystem facilitated more than $500 billion in billings and sales worldwide in 2019, and $643 billion in 2020. *See* Jonathan Borck et al., *How Large Is the Apple App Store Ecosystem? – A Global Perspective for 2019*, Analysis Grp. (June 15, 2020), https://www.apple.com/news room/pdfs/app-store-study-2019.pdf; *Meeting pandemic challenges, Apple developers grow total billings and sales in the App Store ecosystem by 24 percent to $643 billion in 2020*, Apple (June 2, 2021), https://www.apple.com/newsro om/2021/06/apple-developers-grow-app-store-ecosystem-billings-and-sales-by-24-percent-in-2020/.

2020). The district court's analysis of these less restrictive alternatives – which determined that no alternatives to Apple's app distribution and IAP rules would permit more competition while achieving Apple's legitimate, procompetitive goals – shied away from the analysis that the rule of reason requires. *See Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991); Epic Br. at 39-40, 48-50 (explaining legal requirements of rule of reason analysis). Beyond the arguments Epic raises, one particularly instructive analogy is the Department of Justice case that ended AT&T's decades-long monopoly of the national telephone network.

## A. AT&T's Equipment Restrictions

As Apple does now, at the height of its telephone monopoly AT&T leveraged its control of an essential communications channel to foreclose competition in adjacent markets. In that case, AT&T effectively required all consumers and businesses to buy equipment from AT&T (rather than third parties), which foreclosed competition in markets for equipment (like phones) that connected to the telephone network. Shortly before AT&T agreed to a breakup, the district court found that the government had met its initial burden at trial to demonstrate that AT&T's conduct was anticompetitive in violation of Section 2 – and that AT&T's concededly valid interest in protecting the telephone network was not, on its own, sufficient to support its onerous restrictions on adjacent markets.

14

Until 1968, AT&T imposed a "foreign attachment provision" on customers and businesses. This provision stated that "No equipment, apparatus, circuit or device not furnished by the telephone company shall be attached to or connected with the facilities furnished by the telephone company, whether physically, by induction or otherwise." *United States v. Am. Tel. & Tel. Co.*, 524 F. Supp. 1336, 1348 & n.37 (D.D.C. 1981). Consumers and businesses had to rent their physical phones and hardware from AT&T, rather than buying their own. AT&T's "principal rationale for this ban was that the interconnection of equipment of undetermined origin and quality might injure the network as a whole." *Id.* at 1348.

The Federal Communications Commission eventually struck down AT&T's foreign attachments rule in *In re Use of the Carterfone Device in Message Toll Telephone Service*, 13 F.C.C.2d 420 (1968), "which determined the practice of prohibiting equipment interconnection 'without regard to its effect upon the telephone system' to be unlawful and unreasonably discriminatory." *Am. Tel. & Tel.*, 524 F. Supp. at 1348 (quoting 13 F.C.C. 2d at 425). "The FCC held that customers had a right to the unimpeded use of their own equipment, and that the Bell System could more appropriately protect the telephone network from harm (1) by preventing of the use of devices 'which actually cause harm,' and (2) by establishing 'reasonable standards to be met by interconnection devices.'" *Id.* (quoting 13 F.C.C. 2d at 424).

15

AT&T's post-*Carterphone* policies became the basis for part of the government's antitrust suit. No longer able to flatly prohibit customer-provided equipment, AT&T's new rules stated that customer-provided equipment could be connected to the phone network only "through a protective connecting arrangement (PCA)" – equipment that had to be "provided (and leased to the customer for a fee) by the Bell System." *Id.* at 1349. The question in the government's antitrust case was "whether this requirement and its implementation were intended unreasonably and anticompetitively to ensure that Western Electric [an AT&T subsidiary] would remain the dominant supplier of telecommunications equipment in the United States, and whether, in fact, they had that effect." *Id.*

After the government put on its case in chief, but before AT&T presented its rebuttal case, AT&T moved for judgment as a matter of law, challenging both the factual basis for the government's conclusions and the legal framework under which the government sought to hold AT&T liable. The district court denied AT&T's motion – even while recognizing that, as the government conceded, AT&T had a valid interest in protecting its network. Whether AT&T could adequately protect its network through means that were less harmful to competition was a detailed factual question that the court could not resolve simply because AT&T's asserted interest was, indeed, legitimate.

16

On the facts, the district court found that the government had credibly demonstrated, through testimony and other evidence: "that the PCA requirement was unnecessary" to protect the telephone network and "that the PCAs imposed by Bell were overly engineered and that their cost, when added to that of the terminal equipment itself, either foreclosed non-Bell manufacturers from the particular equipment market or made it difficult for them to compete with Western Electric." *Id.* The court also relied on evidence that AT&T had "decided to oppose any liberalization of [its] interconnection policy (whether by certification or otherwise) out of concern over the effect on their revenues and market position," and that it was "also aware of (and . . . encouraged) the barrier to competition created by the unavailability and inadequate maintenance of the PCAs as well as of the additional economic barrier these devices created because of their added cost." *Id.* at 1350. AT&T was "unable ever to find empirical support for the proposition that the PCA policy was necessary to prevent actual harm to the telecommunications network." *Id.*

AT&T's primary legal defense – relevant here, and analogous to Apple's "security" justifications – was that it had a legitimate interest in "protect[ing] the telephone network from harm" and that even "the government's own witnesses conceded that at least a potential for harm to the network exists from the interconnection of substandard telephone equipment." *Id*. at 1351.

17

But the court rejected the idea that AT&T's interest in protecting its network was a categorical defense, holding that the harm to competition in equipment markets – the substantial foreclosure of competing manufacturers – had to be weighed against any legitimate benefits. The court explained that AT&T's interests, while not without potential validity, "must be examined in light of the overriding consideration that, by controlling who could obtain PCAs, when, and at what cost, Bell was in a position to control the entry of potential competitors into the market." *Id.* The court held that "[a]lthough the record at this point," after the government's evidence but before AT&T's, "contains many suggestions that the interconnection of inferior equipment may cause harm to the network, it does not show that the actual, or even the potential, harms associated with such interconnection were sufficiently substantial to render a practice so fraught with anticompetitive implications as the PCA tariffs reasonable under the antitrust laws." *Id*. (footnotes omitted).

### B.   Apple's Similar Conduct

Apple's conduct is strikingly similar to AT&T's. Like AT&T, Apple uses its control over an essential component of modern communications technology – now the phones, rather than the phone network – to interfere with how its customers may deal with third parties in other markets. AT&T told customers that they could not buy equipment from third parties without buying additional,

18

unnecessary services from AT&T. In similar fashion, Apple tells users and developers that they cannot interact on iPhones – which belong wholly to the users themselves – unless Apple distributes the app and unless the developer uses IAP when Apple demands it, neither of which is necessary for apps to function on iOS. Like AT&T's rules, Apple's rules are imposed through contract, not because technical features of Apple's product will not work if others distribute apps or process payments. And like AT&T's rules, Apple's rules foreclose competition and innovation based on relatively thin evidence that "security" requires such onerous restrictions rather than alternative mechanisms for achieving security that would permit more competition.

Subjecting Apple's restrictions to careful scrutiny, including by evaluating alternatives that may place less burden on competition, is critical to effective enforcement of the antitrust laws. Beyond the risks to competition in the supply of mobile devices and operating systems, where Apple and Google enjoy a stable and well-protected duopoly, *see* CMA Report ¶¶ 3.187-3.191, Apple's control of iOS threatens a vast array of adjacent markets where businesses reach customers on their smartphones.

The common thread of Epic's claims is that Apple has leveraged iOS to set contract terms that allow it to monopolize both iOS app distribution (where there would otherwise be alternative app stores) and iOS in-app payment processing

19

(where businesses would otherwise use alternative, less expensive, and higher quality payment processing for certain digital goods). The CMA Report largely affirms Epic's view of these markets. *See id.* ¶¶ 4.240-4.245 (discussing app distribution markets); *id.* ¶¶ 6.149-6.224 (discussing in-app payment restrictions).

Moreover, the danger of similar conduct – leveraging of iOS to dominate adjacent markets – extends far beyond app distribution and in-app payments. As the CMA's market study explains, Apple's control of iPhones, iOS, and the App Store gives it broad power to drive consumers to its own first-party products over rivals' products in other lines of business. Apple can do this through a range of mechanisms, including:

- Flatly forbidding competition, as it has done with competing app stores and competing in-app payment solutions for digital goods;

- "raising rivals' costs through the fees charged for use of [its] platform[] or through making it more costly in other ways for those rivals to access the platform compared to their own first-party products";

- "giving [Apple's] own products a (non-replicable) quality advantage: either by degrading rivals' quality or by improving [Apple's] own products in ways that are not accessible to rivals (eg better integration with the platform)";

- and "biasing consumer choice: using choice architecture to make consumers more likely to choose their products even if these products do not best meet consumers' preferences."

*Id.* ¶ 6.11.

20

Given Apple's unique gatekeeper position, its ability to harm competition may extend to any line of business that Apple enters and to any line of business with the potential to undercut consumers' dependence on iOS. Apple's fastest-growing lines of business are not the device sales from which Apple still earns most of its revenue, but rather the adjacent digital services markets into which Apple is expanding.[10]

Any broad decision for Apple – and in particular any decision that affirms the district court's failure to seriously test less restrictive alternatives for an acknowledged competitive harm, *see* Epic Br. at 39-55 – would give Apple latitude to employ its market power to exclude competition in adjacent markets and reinforce its existing market power, posing enormous risks to competition in countless markets where businesses reach customers on their smartphones.

## II. THE DISTRICT COURT MISAPPLIED TYING LAW

Tying is one common framework courts use to assess a dominant firm's dealings in adjacent markets. For that reason, it is particularly important that this Court correct the district court's misapplication of that doctrine and subject

---

[10] *See* Anita Balakrishnan, *Tim Cook: Goal is to double Apple's services revenue by 2020*, CNBC (Jan. 31, 2017), https://www.cnbc.com/2017/01/31/tim-cook-on-apple-earnings-call-double-services-revenue-by-2020.html.; David Bloom, *Apple Doubled Services Revenue in Just Three Years, and That's Before Arcade and TV+ Kick In*, FORBES (Oct. 31, 2019), https://www.forbes.com/sites/dbloom/2019/10/31/apple-doubled-services-revenue-in-just-three-years-and-thats-before-arcade-and-tv-kick-in/?sh=442642b22be9.

Apple's conduct to scrutiny under the proper standards, which look to whether the two purported products actually have separate demand and, if so, whether the tie hurts competition and consumers. The D.C. Circuit's *Microsoft* decision illustrates one way that courts can assess combinations of software functionality under tying law without unduly chilling procompetitive bundling and product improvements.

### A.     The Separate Demand Test

The decision on review concluded that in-app payment processing on iOS is functionally integrated with and not separable from app distribution. That application of the "separate products" test was in error, and the court's conclusion short-circuited its analysis of Apple's conditioning of access to app distribution on use of Apple's in-app payment processing.

A tying claim requires the plaintiff to prove that the alleged *tying* product and the alleged *tied* product are "separate and distinct" products. *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 974 (9th Cir. 2008); *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984); *Microsoft*, 253 F.3d at 85. "[W]hether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19; *see also Rick-Mik*, 532 F.3d at 975. There must be "sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer

[the tied product] separately from [the tying product]." *Jefferson Parish*, 466 U.S. at 21-22; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992); *Rick-Mik*, 532 F.3d at 975.

Courts answer the separate products inquiry using direct and indirect evidence. "Direct evidence addresses the question whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms." *Microsoft*, 253 F.3d at 86. The *Jefferson Parish* Court "took note, for example, of testimony that patients and surgeons often requested specific anesthesiologists not associated with a hospital" to assess a potential tie between the two. *Id.* (citing *Jefferson Parish*, 466 U.S. at 22). "Indirect evidence includes the behavior of firms without market power in the tying good market, presumably on the notion that (competitive) supply follows demand." *Id*.

Rather than looking to the nature of consumer demand, the decision on review relied on the functional relationship between the products – an analysis that *Jefferson Parish* and *Microsoft* rejected. Epic's asserted tied product is in-app payment processing solutions, not (as the district court said) every function that Apple includes in IAP along with payment processing. This difference is important because, in *Jefferson Parish*, the Court explained that the "functional relation between" products does not matter on its own. *Id*. "[T]he mere fact that two items are complements," that they are technically integrated, or even "that one

23

is useless without the other, does not make them a single 'product' for purposes of tying law." *Microsoft*, 253 F.3d at 86 (ellipses and internal quotation marks and citation omitted) (citing *Jefferson Parish*, 466 U.S. at 19).

The district court incorrectly focused on "integration," 1-ER-157, the combination of IAP (which includes in-app payment processing solutions in addition to other features) with other iOS functions, rather than whether there is separate developer demand for the purported tied good (in-app payment processing solutions). *See id.* (finding no separate product because "IAP is not merely a payment processing system, as Epic Games suggests, but a comprehensive system to collect commission and manage in-app payments. This IAP system is not bought or sold but it is integrated into the iOS devices."). The district court's reasoning also mistakenly focused on whether bundling IAP with app distribution was efficient *for Apple* and disregarded the relevant question: whether the arrangement was efficient for *consumers* (iOS developers and users). *See* 1-ER-68-70; 1-ER-157-58. The district court's conclusion that in-app payment processing is not a separate product from app distribution falls out of step with both governing standards in the United States and with competition regulators elsewhere. *See* CMA Report ¶ 6.183.

24

## B.  Rule of Reason Tying

A monopolist's tie between separate products is not always per se unlawful. A per se claim requires a showing of conduct and power but not separate proof of market-wide anticompetitive effects. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).  But courts assess some ties under the rule of reason and determine the actual competitive effects of a challenged tying arrangement.  As the D.C. Circuit recognized in *Microsoft* – another notable tying case involving "the technological integration of added functionality into software that serves as a platform for third-party applications" – the per se rule against tying can be ill-suited to the evaluation of technological integration of software functionalities. *Microsoft*, 253 F.3d at 84.  This Court should consider *Microsoft*'s approach here.  The challenged conduct, the proffered defenses, and the legal rationale for not using per se shortcuts to liability are all similar.

In applying a rule-of-reason approach to the conduct challenged as a tie in *Microsoft*, the D.C. Circuit first explained that *Jefferson Parish*'s separate products test was an attempt to "screen out false positives under per se analysis" by using "consumer demand" as a "rough proxy for whether a tying arrangement may, on balance, be welfare-enhancing, and unsuited to per se condemnation." *Id.* at 87.

But bundling of different software functions did not fit neatly with well-established categories of per se unlawful tying, because of the novel nature of

25

software markets and the real possibility of efficiencies and consumer benefits from the technological integration of software. *Id.* at 92-95. "Rule of reason analysis" was preferable to per se treatment in that context because it "affords the first mover [in an industry] an opportunity to demonstrate that an efficiency gain from its 'tie' adequately offsets any distortion of consumer choice." *Id.* at 92 (citing *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 799 (1st Cir. 1988) (Breyer, J.)). Analyzing Microsoft's alleged tie under rule of reason rather than per se standards, the court explained, would avoid chilling beneficial bundling in markets "where the tying product is software whose major purpose is to serve as a platform for third-party applications and the tied product is complementary software functionality." *Id.* at 95.

At the same time, the D.C. Circuit recognized that the mere fact that a challenged arrangement involves integration of software functionalities does not mean that the arrangement is immune from scrutiny as a potentially unlawful tie. Like Apple here, Microsoft argued that its operating system, "Windows (the tying good) and IE [Internet Explorer] browsers (the tied good) [we]re not 'separate products,'" *id.* at 85, "because no other firm ha[d] invested the resources to integrate web browsing as deeply into its OS as Microsoft has," *id.* at 88. Like Apple here, Microsoft claimed "not only that its integration of IE into Windows is innovative and beneficial but also that it requires non-removal of IE" – that is, that

26

obtaining certain consumer benefits required that Microsoft customers (like Apple customers) have no ability to opt out of IE by uninstalling it. *Id.* at 89. The court held that these potential justifications for the challenged arrangement did not mean that IE and Windows were not two products nor that the tie was necessarily lawful. Accordingly, the D.C. Circuit remanded to district court to assess the tie under the rule of reason. *Id.* at 95-97.

### C.    Apple's IAP Requirement

Apple does not merely bundle IAP with iOS, as Microsoft did with Windows and IE. Apple's conditions are far more restrictive. Apple forces sellers of digital goods to use IAP – and prohibits them from using any other in-app payment processing system. This goes beyond a typical tie, which requires purchase of the tied good but does not in itself preclude purchase of a competing good. Apple does this as a matter of contract. IAP is not automatically or technologically integrated into any developer's app: developers who sell digital goods must affirmatively build Apple's IAP (instead of competing functionality offered by someone else) into their iOS apps, because their contracts with Apple require it. Notably, sellers of physical goods and certain services like Amazon, Uber, and AirBnB, face no such requirement. Its IAP requirement reflects business strategy, not any technological limitation or security imperative.

Notably, both the British CMA and the Netherlands Authority for Consumers and Markets, based on similar factual findings about Apple's IAP rule, have reached legal conclusions different from the district court's. *See* CMA Report ¶ 6.183 (Apple's "rules on in-app purchase effectively combine the provision of a distribution platform to app developers through their app stores with a payment service for in-app transactions."); *id.* ¶¶ 6.180-6.215 (discussing competitive harms from Apple's IAP rule); Netherlands Auth. for Consumers & Mkts., *Summary of decision on abuse of dominant position by Apple* ¶¶ 15-18 (Aug. 24, 2021), https://www.acm.nl/sites/default/files/documents/summary-of-decision-on-abuse-of-dominant-position-by-apple.pdf (rejecting Apple's claims that procompetitive reasons justify the IAP rule and enjoining the IAP requirement).

The district court acknowledged clear harm to competition and consumers. *See* Epic Br. at 17, 44-47. Alternative providers of in-app payment processing services are entirely foreclosed from selling their product to developers that sell digital goods to people with iPhones. And many of those developers – the consumers in this market – chafe at the inability to directly manage their relationships with their customers or to obtain customized risk management and fraud protection tools, more flexible pricing structures, access to relevant commerce and payments data, and visibility into the developer's payments stream.

Microsoft is one of them. *See* 1-ER-26-27; 1-ER-96; 2-ER-402 ("a number of large developers . . . includ[ing] Facebook, Microsoft, Epic, obviously Spotify, and so forth" "have come to Apple and have sought to use their own payment solution"). Developers and users pay too much for a low-quality service, and the lack of competition for such services stifles innovation and improvement. *See* Epic Br. at 17 (citing 1-ER-43; 1-ER-95; 1-ER103-04; 1-ER-119). Such clear-cut harm to competition from a tie requires, even under rule of reason analysis, powerful procompetitive justifications *for the tie itself* to make the tie lawful. *See Microsoft*, 253 F.3d at 95-97.

The district court did not undertake the proper justifications inquiry because it ruled that Apple had not engaged in tying at all; full evaluation of any justifications for tying may have to await remand. To the extent Apple intends to rely on security justifications, it will have to confront the reality that its practice is inconsistent; it broadly permits use of alternative in-app payments systems for non-digital goods but not digital goods. *See* Epic Br. at 45-46. And, to the extent Apple intends to argue that its tying arrangement is justified by its desire to reap greater compensation for its intellectual property, such a justification faces both legal and factual barriers in light of the skepticism with which courts historically view a firm's use of tying to monetize intellectual property, *see Microsoft*, 253 F.3d at 63, 90; *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1338, 1343-44

(9th Cir. 1984), and in light of the district court's findings that Apple's commission rate is arbitrary and that it has other, less restrictive ways to be compensated for its intellectual property, *see* Epic Br. at 46, 51-52.

## CONCLUSION

The district court's mistaken approach to less restrictive alternatives and to tying would, if affirmed, create significant risks to competition across the mobile economy in the United States. This Court should correct those errors and reverse.

Respectfully submitted,

 /s/ *Aaron M. Panner*
Aaron M. Panner
Julius P. Taranto
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*

January 27, 2022

30

**CERTIFICATE OF COMPLIANCE**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** 21-16506, 21-16695

I am the attorney or self-represented party.

**This brief contains** 6,500 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Aaron M. Panner        **Date** January 27, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 27, 2022, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Aaron M. Panner*
Aaron M. Panner