Nos. 21-16506 & 21-16695

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

EPIC GAMES, INC.,

*Plaintiff/counter-defendant,
Appellant/cross-appellee*;

*v.*

APPLE INC.,

*Defendant/counter-claimant,
Appellee/cross-appellant.*

---

On Appeal from the United States District Court
for the Northern District of California (Hon. Yvonne Gonzalez Rogers)
No. 4:20-cv-05640-YGR

---

**PRINCIPAL AND RESPONSE BRIEF FOR
APPELLEE/CROSS-APPELLANT APPLE INC.**

---

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105

Mark A. Perry
Cynthia Richman
Joshua M. Wesneski
Anna Casey
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
MPerry@gibsondunn.com

*Attorneys for Apple Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel of record certifies that Apple Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated:  March 24, 2022

s/ *Mark A. Perry*
Mark A. Perry

**Page**

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ....................................5

STATEMENT OF ISSUES ..................................................5

STATUTORY PROVISIONS .................................................6

BACKGROUND .......................................................................6

    I.    Factual Background.........................................................6

        A.    Apple's Revolutionary Innovations ...........................7

            1.    The App Store...................................................7

            2.    IAP .......................................................................8

            3.    Security, Privacy, Reliability, Fraud Protection, And App Quality.................................................9

            4.    Intellectual Property .......................................12

            5.    The Challenged Limitations ...........................13

        B.    Competition For Digital Game Transactions............14

        C.    Epic's "Project Liberty".............................................18

    II.    Proceedings Below..........................................................20

    III.    The District Court's Decision .........................................23

        A.    Epic's Claims ............................................................25

            1.    Sherman Act .....................................................25

            2.    Cartwright Act .................................................29

            3.    UCL ...................................................................29

B.      Apple's Counterclaims ................................................. 30

        1.     Breach of Contract ........................................ 31

        2.     Indemnity ..................................................... 31

STANDARDS OF REVIEW ................................................. 31

SUMMARY OF ARGUMENT ............................................. 33

ARGUMENT ON EPIC'S APPEAL ....................................... 37

I.     Epic Failed To Prove Its Market Definitions Or Monopoly Power ................................................................................ 38

    A.     Epic's Proposed iOS-Only Markets Are Defective ................. 39

        1.     Epic's Market Definition Arguments Are Untenable Under *Amex* ................................... 41

        2.     Epic Failed to Prove Lock-In On Either Side Of Its Alleged Markets ............................................ 45

    B.     Apple Is Not A Monopolist ........................................ 49

        1.     There Is No Direct Evidence Of Monopoly Power ........ 50

        2.     Epic Failed To Produce Circumstantial Evidence Of Monopoly Power ....................................... 54

II.     Epic Challenged Only Unilateral Conduct By Apple ........................ 56

    A.     The District Court Correctly Found No Concerted Action ...... 57

    B.     Apple's Unilateral Conduct Is Lawful ...................................... 62

III.     Apple's Distribution Model Is Lawful Under the Rule of Reason ............................................................................... 66

    A.     The App Store Distribution Requirement Is Reasonable Under Section 1 ....................................................... 66

        1.     Epic Failed To Prove Substantial Anticompetitive Effects ........................................................ 67

2.      Procompetitive Justifications Defeat Epic's Claims ......74

3.      Epic Did Not Prove Viable Less Restrictive Alternatives.....................................................80

4.      The Court Undertook Every Step Required By The Rule Of Reason ...............................................85

B.     The App Store Distribution Requirement Is Reasonable Under Section 2 .........................................................90

IV.     Apple's IAP Requirement Is Lawful Under The Rule Of Reason .........................................................................92

A.     There Is No Unlawful "Tie" ....................................92

B.     There Is No Unreasonable Restraint ........................96

V.      Epic Cannot Escape Liability For Its Breaches Of Contract. ...........100

ARGUMENT ON APPLE'S CROSS-APPEAL ...................................................101

I.      The UCL Injunction Cannot Stand ...................................................101

A.     Epic Lacks Standing ...............................................102

B.     UCL Liability Is Foreclosed As A Matter Of Law.................104

C.     The Injunction Is Beyond The Authority Of The Court.........109

II.     Epic Must Pay Apple's Attorneys' Fees ...........................................112

CONCLUSION .................................................................................................115

# TABLE OF AUTHORITIES

CASES

*1-800 Contacts, Inc. v. FTC*,
    1 F.4th 102 (2d Cir. 2021) ...................................................................52, 68, 85

*Aerotec Int'l Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ............................................................58, 79, 95

*Alki Partners, LP v. DB Fund Servs., LLC*,
    4 Cal. App. 5th 574 (2016) ...............................................................................112

*Allied Orthopedic v. Tyco*,
    592 F.3d 991 (9th Cir. 2010) ...............................................................66, 87, 91

*Am. Ad Mgmt. Inc. v. GTE Corp.*,
    92 F.3d 781 (9th Cir. 1996) ...............................................................................87

*Am. Needle, Inc. v. NFL*,
    560 U.S. 183 (2010).................................................................57, 58, 59, 61, 66

*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008)..............................................................39

*Arizonans for Official English v. Arizona*,
    520 U.S. 43 (1997)............................................................................................103

*Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021) ...............................................................72, 74, 87

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ...................................................................53, 54

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ...............................................................................65

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995). .............................................................................53

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir. 1987) .........................................................................111

*Brooke Grp. Ltd v. Brown & Williamson Tobacco Corp.*,
 509 U.S. 209 (1993)......................................................................51, 54, 69

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962)......................................................................44

*Cal. Dental Ass'n v. FTC*,
 526 U.S. 756 (1999)......................................................70, 107, 108

*Cal. Dental Ass'n  v. FTC*,
 224 F.3d 942 (9th Cir. 2000) ......................................67, 107, 109

*Califano v. Yamasaki*,
 442 U.S. 682 (1979)......................................................................110

*Chavez v. Whirlpool Corp.*,
 93 Cal. App. 4th 363 (2001) .......................................................105

*City of San Jose v. Off. of the Comm'r of Baseball*,
 776 F.3d 686 (9th Cir. 2015) ...............................................32, 105

*Columbia Pictures Indus., Inc. v. Fung*,
 710 F.3d 1020 (9th Cir. 2013) ....................................................32

*Cont'l Auto. Sys., Inc. v. Avanci, L.L.C.*,
 — F.4th —, 2022 WL 594324 (5th Cir. Feb. 28, 2022)...................104

*Copperweld Corp. v. Indep. Tube Corp.*,
 467 U.S. 752 (1984).........................................56, 57, 58, 60, 62

*County of Tuolumne v. Sonora Cmty. Hosp.*,
 236 F.3d 1148 (9th Cir. 2001) ..............................................84, 88, 90

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
 610 F.3d 820 (3d Cir. 2010) ........................................................39

*Digidyne Corp. v. Data Gen. Corp.*,
 734 F.3d 1336 (9th Cir. 1984) ....................................................45

*Dream Theater, Inc. v. Dream Theater*,
 124 Cal. App. 4th 547 (2004) .....................................................113

*Dunn v. Phoenix Newspapers, Inc.*,
   735 F.2d 1184 (9th Cir. 1984) ...........................................................38

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)............................................................................47

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
   92 F.3d 1486 (9th Cir. 1996) ...........................................................111

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006)..........................................................................111

*Eberle v. City of Anaheim*,
   901 F.2d 814 (9th Cir. 1990) .............................................................57

*Facebook, Inc. v. BrandTotal Ltd.*,
   No. 20-CV-7182, 2021 WL 2354751 (N.D. Cal. June 9, 2021) .....................108

*Forsyth v. Humana*,
   114 F.3d 1467 (9th Cir. 1997) ...........................................................54

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .... 25, 39, 54, 62, 63, 65, 67, 70, 71, 74, 75, 87, 90,
   ...............................................................................................96, 106, 109

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
   305 U.S. 124 (1938)............................................................................64

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997) .....................................................49

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
   723 F.3d 1019 (9th Cir. 2013) ...........................................................77

*Gough v. Rossmoor Corp.*,
   585 F.2d 381 (9th Cir. 1978) .............................................................40

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
   371 F.3d 1275 (10th Cir. 2004) .........................................................39

*Greyhound Comput. Corp., Inc. v. IBM*,
   559 F.2d 488 (9th Cir. 1977) .............................................................52

*Hairston v. Pac 10 Conf.*,
  101 F.3d 1315 (9th Cir. 1996) ......................................................85

*Hangarter v. Provident Life & Accident Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) .......................................................103

*Hansberry v. Lee*,
  311 U.S. 32 (1940)........................................................................111

*Haro v. Sebelius*,
  747 F.3d 1099 (9th Cir. 2014) ......................................................32

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
  423 F.3d 374 (3d Cir. 2005) .........................................................47

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006) .........................................................50

*Hodges v. Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021) .......................................................110

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ................................ 39, 55, 62, 63, 65, 76, 77, 91

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990) ........................................................91

*In re ISO Antitrust Litig.*,
  203 F.3d 1322 (Fed. Cir. 2000) ....................................................64

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
  407 F.3d 1027 (9th Cir. 2005) ..................................................56, 60

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)..............................................................60, 74, 92

*Kaiser Steel Corp. v. Mullins*,
  455 U.S. 72 (1982)......................................................................100

*Kec v. Super. Ct. of Orange Cnty.*,
  51 Cal. App. 5th 972 (2020) ........................................................100

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
  748 F.3d 160 (4th Cir. 2014) ............................................................55

*Krehl v. Baskin-Robbins Ice Cream Co.*,
  664 F.2d 1348 (9th Cir. 1982) .........................................................92

*L.A. Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) .........................................................110

*L.A. Land Co. v. Brunswick Corp.*,
  6 F.3d 1422 (9th Cir. 1993) .............................................................32

*L.A. Mem'l Coliseum Comm'n v. NFL*,
  726 F.2d 1381 (9th Cir. 1984) .........................................................87

*Law v. NCAA*,
  134 F.3d 1010 (10th Cir. 1998) ..................................................78, 89

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)...............................................................66, 79, 87

*Levi Case Co. v. ATS Prods., Inc.*,
  788 F. Supp. 428 (N.D. Cal. 1992) ..................................................60

*Lewis v. Ayers*,
  681 F.3d 992 (9th Cir. 2012) .....................................................47, 49

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008) ...................................................105

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) .........................................................104

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................102

*M.A.P. Oil Co. v. Texaco Inc.*,
  691 F.2d 1303 (9th Cir. 1982) .........................................................40

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016) ...............................................68, 73, 74

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
 571 F.3d 873 (9th Cir. 2009) ................................................................32

*McGill v. Citibank, N.A.*,
 2 Cal. 5th 945 (2017) .....................................................................110

*McWane v. FTC*,
 783 F.3d 814 (11th Cir. 2015) ...........................................................52

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
 465 U.S. 752 (1984)..........................................................................57

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
 435 U.S. 679 (1978).....................................................................78, 79

*NCAA v. Alston*,
 141 S. Ct. 2141 (2021)....................... 66, 81, 82, 84, 86, 87, 88, 89, 90, 102, 103

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*,
 958 F.3d 1239 (9th Cir. 2020) ...............................................37, 84, 98

*New York v. Facebook, Inc.*,
 — F. Supp. 3d —, 2021 WL 2643724 (D.D.C. June 28, 2021).........................63

*Newcal Indus., Inc. v. IKON Office Solution*,
 513 F.3d 1038 (9th Cir. 2008) ...........................................43, 45, 46

*Novell, Inc. v. Microsoft Corp.*,
 731 F.3d 1064 (10th Cir. 2013) ..........................................59, 63

*O'Bannon v. NCAA*,
 802 F.3d 1049 (9th Cir. 2015) ................................ 31, 77, 80, 81, 82, 85, 97, 99

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
 838 F.2d 360 (9th Cir. 1988) ...........................................76, 91

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018)........ 21, 41, 42, 50, 51, 52, 67, 70, 71, 72, 73, 74, 79, 86,
 ...........................................................................98, 106, 109

*Oliver v. SD-3C LLC*,
 751 F.3d 1081 (9th Cir. 2014) ...........................................................61

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir. 1988) ...........................................................68

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009)..........................................................................62

*People's Choice Wireless, Inc. v. Verizon Wireless*,
   131 Cal. App. 4th 656 (2005) ..........................................................108

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
   392 U.S. 134 (1968).........................................................................60

*Plush Lounge Las Vegas v. Hotspur Resorts Nevada*,
   371 F. App'x 719 (9th Cir. 2010) .....................................................40

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) .......................................................58

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) ......................................................46, 47

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ........................................50, 51, 52, 54

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
   532 F.3d 963 (9th Cir. 2008) ......................................................92, 93

*Ross v. Citigroup, Inc.*,
   630 F. App'x 79 (2d Cir. 2015) .......................................................38

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986)..........................................................87

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
   28 F.3d 1379 (5th Cir. 1994) ...........................................................51

*Russian River Watershed Prot. Comm. v. City of Santa Rosa*,
   142 F.3d 1136 (9th Cir. 1998) .........................................................55

*Smith v. Marsh*,
   194 F.3d 1045 (9th Cir. 1999) .........................................................78

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999) .................................................................47

*Snapkeys, Ltd. v. Google LLC*,
No. 19-CV-2658, 2020 WL 6381354 (N.D. Cal. Oct. 21, 2020) ....................108

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ....................................................110, 111

*Sullivan v. NFL*,
34 F.3d 1091 (1st Cir. 1994) .................................................................89

*Tarrant Serv. Agency v. Am. Standard, Inc.*,
12 F.3d 609 (6th Cir. 1993) ..................................................................44

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989) ..........................................................39, 43

*Tompkins v. 23andMe, Inc.*,
840 F.3d 1016 (9th Cir. 2016) ..............................................................32

*Toscano v. Pro. Golfers Ass'n*,
258 F.3d 978 (9th Cir. 2001) ................................................................60

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021).................................................................102, 103

*Verizon Commc'ns Inc. v. Law Offs. Of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004).....................................................................83, 91

*United States v. Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016) .................................................................51

*United States v. Dentsply*,
399 F.3d 181 (3d Cir. 2005) .................................................................52

*United States v. Engelhard Corp.*,
126 F.3d 1302 (11th Cir. 1997) .............................................................40

*United States v. Gen. Motors Corp.*,
384 U.S. 127 (1966).........................................................................37

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)......................................45, 50, 64, 96

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948)........................................................56

*United States v. Westinghouse Elec. Corp.*,
648 F.2d 642 (9th Cir. 1981) ...........................................61, 62, 63

*United States v. Yacoubian*,
24 F.3d 1 (9th Cir. 1994) ...................................................32

*Valley Drug Co. v. Geneva Pharm., Inc.*,
344 F.3d 1294 (11th Cir. 2003) ............................................65

*Viazis v. Am. Assoc. of Orthodontists*,
314 F.3d 758 (5th Cir. 2002) ..............................................108

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
815 F.2d 522 (9th Cir. 1987) ...............................................72

*WildEarth Guardians v. EPA*,
759 F.3d 1064 (9th Cir. 2014) .............................................84

*Yazzie v. Hobbs*,
977 F.3d 964 (9th Cir. 2020) .............................................103

*Yu v. Idaho State Univ.*,
15 F.4th 1236 (9th Cir. 2021) ..............................................37

*Yukon Recovery, L.L.C. v. Certain Abandoned Prop.*,
205 F.3d 1189 (9th Cir. 2000) ..........................................78, 86

*Zalkind v. Ceradyne, Inc.*,
194 Cal. App. 4th 1010 (2011) ...........................................113

**STATUTES**

15 U.S.C. § 1 ........................................................*passim*

15 U.S.C. § 2 ........................................................*passim*

Cal. Bus. & Prof. Code § 17200 ............................................6

Cal. Bus. & Prof. Code § 17535 ...........................................................109

Cal. Civ. Code § 382 .........................................................................110

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2021) ...............64

Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (2017)............................................63

Erika Douglas, *Data Privacy Protection as a Procompetitive Justification*, Antitrust Mag. (Dec. 2021)..........................................80

David S. Evans & Richard Schmalensee, *Markets with Two-Sided Platforms*, 1 Issues in Competition L. & Pol'y 667 (2008)...............................11

David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms* (Harv. Bus. Rev. Press 2016)...............7, 41

Herbert Hovenkamp et al., *IP and Antitrust* (3d ed. 2021) .....................................64

Herbert Hovenkamp, *The NCAA and the Rule of Reason*, 52 Rev. Indus. Org. 323 (2016)..........................................................88

*South Korea Approves Rules on App Store Law Targeting Apple, Google*, Reuters (Mar. 8, 2022), https://tinyurl.com/ydknbxyr.........................99

William L. Stern, *Business & Professions Code Section 17200 Practice* (updated March 2021) ......................................................105

# INTRODUCTION

Epic did not lose the trial due to any legal error. Epic lost because it "overreached" (1-ER-182) by asserting claims on the "frontier edges of antitrust law" (3-ER-518). Epic's accusations of anticompetitive conduct were not just unprecedented but unfounded. Epic built its case on witnesses who "lack[ed] credibility" and were "unreliable," whose testimony was "wholly lacking in an evidentiary basis," and who were "willing to stretch the truth in support of [Epic's] desired outcome." 1-ER-53; 1-ER-59; 1-ER-60; 1-ER-65 n.316. At trial, its theories were revealed to be "artificial," "misconceived," and "litigation driven." 1-ER-48. At every turn, Epic "failed to demonstrate," "failed to convince," "failed to produce," "failed to present," "failed to show," "failed to persuade," and "failed to prove" the *facts* of its case. 1-ER-53; 1-ER-54; 1-ER-134; 1-ER-140; 1-ER-150; 1-ER-155; 1-ER-161.

In this Court, Epic tries to change the narrative because it can show no clear error in the decision below. Epic caricatures the court's 180-page opinion and reduces the robust evidentiary record to a handful of misleading and out-of-context quotations. Epic ignores the deferential standard of review applicable to the court's factual findings, on which every one of its antitrust theories foundered. Epic also refuses to acknowledge that the court applied settled precedent from the Supreme

Court and this Court on every material point. On the facts *and* the law, the court correctly decided every issue presented in Epic's appeal.

This litigation arose out of Epic's coordinated global crusade, dubbed "Project Liberty," through which Epic seeks to influence courts, regulators, and legislators to fundamentally change Apple's App Store so that Epic can make more money selling virtual currency to gamers. Epic challenged two specific limitations that Apple implemented over a decade ago: The requirement that all native iOS apps developed using Apple's proprietary software be distributed through the App Store, and the requirement that transactions in digital content within such apps use Apple's "IAP" functionality. The objective of this lawsuit "[f]irst and foremost" was to obtain "tremendous monetary gain and wealth" for Epic (1-ER-22), a multi-billion-dollar software developer that earned over $700 million from its game *Fortnite* in less than two years on the App Store.

Epic promised "war" against Apple and conducted the ensuing campaign dishonorably. Epic "decided it would rush to court with its own plan to protect its self-avowed interests" (1-ER-27), and intentionally broke Apple's rules using deception and sabotage. Epic then held its own customers hostage in an effort to gain a litigation advantage and orchestrated a media blitz designed to shift the blame to Apple. 1-ER-25–28. Epic could not, however, make good on its accusations.

Epic had the burden to prove, among other things, that the challenged limitations were unreasonable restraints of trade under a framework the parties agreed on before trial began.  After a 16-day bench trial, the district court found that Epic had failed to carry its burden of proof on every one of its antitrust claims.  That should not surprise:  Throughout the history of the App Store, it is undisputed that prices have only gone down, while output has exploded.  Those are the hallmarks of competition, not monopolization.  To reverse, this Court would have to depart from settled law *and* ignore the district court's detailed findings of fact.

Epic's *amici* are also litigating a different case on appeal than the one Epic tried, and lost, in the district court.  Essentially ignoring the extensive factual record, they ask this Court to *change* the law.  The Department of Justice and State Attorneys General advocate new legal positions that, if accepted, would make it easier for them to win antitrust lawsuits.  Microsoft is pursuing a self-interested business strategy of distinguishing itself from other platforms even while making "hundreds of millions of dollars" from its partnership with Epic.  1-ER-11.  And the three developer *amici* are members of the Coalition for App Fairness, a front group created by Epic for purposes of this litigation; this Court has already rejected one *amicus* brief from them.  Each of Epic's *amici* is advancing its own agenda rather than providing objective legal analysis for the Court.

Apple's cross-appeal is the inverse of Epic's appeal. It raises pure legal issues and does not ask the Court to second-guess any factual finding based on the trial evidence. This Court already recognized that Apple is likely to succeed on the principal issue—whether conduct that does not violate the antitrust statutes can be enjoined as "unfair" under California law—in staying the injunction pending appeal. Reversal on this point would confirm that the rules Apple adopted more than a decade before this suit was filed are lawful under settled precedent.

Since its creation by Apple in 2008, the App Store has facilitated billions of transactions between developers and consumers, to the enormous benefit of all participants in the iOS ecosystem. In this lawsuit, Epic asks the Judiciary to fundamentally change the App Store by forcing Apple to abandon the integrated distribution and digital-content delivery model that, among many other procompetitive benefits, helps safeguard user security and privacy. Epic thereby seeks to free-ride on Apple's massive investment in iOS, while exposing millions of other developers and a billion users to unnecessary risks. Epic's theories are dangerously unmoored from established law and irreconcilable with the district court's factual findings. While these appeals are both important and complex, resolving the issues should not be difficult: Applying settled precedent to the adjudicated facts requires ruling for Apple across the board.

# JURISDICTIONAL STATEMENT

Apple concurs with Epic's jurisdictional statement. Apple timely noticed its cross-appeal on October 8, 2021. 4-SER-1096–97.

# STATEMENT OF ISSUES

## Epic's Appeal

**I.** Whether the court correctly found that Epic failed to prove (A) its proposed market definitions and (B) that Apple has monopoly power.

**II.** Whether (A) the court correctly found that the two challenged limitations constitute unilateral conduct rather than concerted action and (B) such unilateral conduct is lawful.

**III.** Whether the court correctly found that Epic failed to prove that the App Store distribution requirement is an unreasonable restraint of trade under either (A) Section 1 or (B) Section 2 of the Sherman Act.

**IV.** Whether the court correctly found that Epic failed to prove that the IAP requirement is (A) an unlawful "tie" or (B) an unreasonable restraint of trade.

**V.** Whether the court correctly found that Epic is liable for its intentional and admitted breaches of contract.

**Apple's Cross-Appeal**

I.  Whether the court committed legal error in imposing liability and an injunction under the California Unfair Competition Law based on Apple's "anti-steering" provisions.

II.  Whether the court committed legal error in construing the indemnification provision as not requiring Epic to pay Apple's attorneys' fees.

## STATUTORY PROVISIONS

Except for the following, all applicable statutory provisions are contained in the addendum to Epic's brief. Apple's addendum reproduces the statutory provision pertinent to its cross-appeal (Cal. Bus. & Prof. Code § 17200).

## BACKGROUND

### I.    Factual Background

Although smartphones are ubiquitous today, the iPhone and App Store were "revolutionary" when introduced more than a decade ago (1-ER-30)—the products of "novel, sophisticated, time-consuming and expensive" work by Apple (1-ER-31). From the outset, Apple prioritized security, privacy, reliability, and trustworthiness through an integrated model that differentiated its products from competitive offerings and allowed efficient monetization of Apple's investment. Since the App Store's debut, output has increased exponentially while prices have declined.

## A.    Apple's Revolutionary Innovations

In June 2007, Apple "fundamentally changed the cellular device market" by releasing the iPhone, powered by Apple's proprietary iOS operating system. 1-ER-30.  In addition to making phone calls, users could access email, browse the web, and use a variety of software applications ("apps") such as a calculator or a compass.  1-ER-30.  At that time, the iPhone came with a few preinstalled apps developed by Apple, while third-party developers could distribute web apps through an internet browser (as many still do today).  1-ER-30; 1-SER-281; 1-SER-284–85; 1-SER-288–89.

### 1.    The App Store

Developers soon sought to develop apps that could run directly (or "natively") on iOS.  2-SER-504.  Apple decided to license its technology and intellectual property to third-party developers for specified uses and set out to create a suite of tools to enable them to create native iOS apps.  1-ER-31; *see also* 2-SER-504–05. This effort culminated in the launch of the App Store.  1-ER-37–39.

The App Store is a platform that connects one group of customers, app developers, with another group of customers, users, through simultaneous transactions.  1-ER-97–98; 1-ER-124.  This is called a two-sided transaction platform (1-ER-97–98; 1-ER-124)—recognized by economists, including Epic's, as "one of the toughest business models to get right."  David S. Evans & Richard

7

Schmalensee, *Matchmakers: The New Economics of Multisided Platforms* 9 (Harv. Bus. Rev. Press 2016). Apple got it right. *See id.* at 101–19.

Apple described the App Store's mechanics and business terms when the platform launched in 2008. 3-ER-708. To gain access to Apple's proprietary tools, developers must join the Developer Program. 1-ER-96 n.462; 3-ER-729. To submit apps for distribution through the App Store, developers must also sign the Developer Program License Agreement ("DPLA") and pay a $99 annual fee. 1-ER-31–32. Apple does not preclude developers from transacting through non-iOS platforms (1-SER-103), or dictate to developers whether and how to monetize their apps (1-ER-236; 3-ER-728). The vast majority of apps are entirely free to download and use. 1-ER-126. Other apps charge for initial downloads, and Apple explained from the start that it would charge a 30% commission on such transactions. 3-ER-728. These core tenets remain in place today.

### 2.    IAP

In 2009, Apple introduced a new monetization model for developers called In-App Purchase ("IAP"). IAP is not a payment processing system (1-ER-69–70); it is "a collection of software programs working together to perform several functions at once in the specific context of a transaction." 1-ER-68; *see also* 1-ER-6 n.3. Through IAP, developers can transmit digital content directly to app users and receive payment for that content. 1-ER-10. IAP enables users to "view their

purchase history, share subscriptions with family members, . . . manage spending by implementing parental controls, and challenge and restore purchases." 1-ER-68. Apple uses IAP to "manage transactions, payments, and commissions within the App Store," including "track[ing] and verif[ying] digital purchases," "determin[ing] and collect[ing] the appropriate commission," and "conduct[ing] fraud-related checks." 1-ER-68. IAP thus protects user security and privacy and ensures efficient collection of Apple's commission. 1-ER-10; 1-ER-34; 2-SER-529; 2-SER-553; 3-SER-599–600; 2-ER-469. Apple initially charged a 30% commission on all in-app transactions involving digital content. 1-ER-36.

### 3. Security, Privacy, Reliability, Fraud Protection, And App Quality

From the outset, Apple determined that the App Store should not diminish the stability, reliability, or security of the iPhone. 1-ER-31. Apple wanted the App Store to be a "safe and trusted" place for users to get great apps. 2-SER-316; 3-SER-612; 4-SER-973. This approach also benefits developers by encouraging transactions. 1-ER-148.

Apple built technical restrictions into iOS to prevent the installation of software from third-party sources ("sideloading"). 2-SER-577–78. Apple designed iOS with more security layers than macOS (which powers Apple's computers) because "the threat profile" for mobile devices was "much greater": Phones are portable, contain highly sensitive personal and financial information, and must

9

provide "instant service" *as a phone*. 1-ER-31; 2-SER-499–501; 2-SER-561–62; 3-SER-596. Apple explained at the App Store's launch that it was "trying to do two diametrically opposed things at once—provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc." 4-SER-952.

Apple's decision to require distribution of native iOS apps through the App Store (1-ER-21 n.124) was a natural extension of these core principles. By integrating app distribution (and, later, in-app transactions for digital content), Apple resorted "to its historic model: user-friendly, reliable, safe, private, and secure." 1-ER-86. For example, every app and update distributed through the App Store is not only scanned by automated tools for malware and other malicious features, but also reviewed for functionality and content by a large and knowledgeable team of human reviewers. 1-ER-38; 1-ER-105; 1-SER-336; 2-SER-321–27; 2-SER-331– 32. This process, known as App Review, "helps protect against fraud, privacy intrusion, and objectionable content beyond levels achievable by purely technical measures" (1-ER-148), and "may also provide some benefit against novel and well-hidden malware attacks" (1-ER-110 n.523). Apple's multi-layered approach to security is effective because some types of attacks may circumvent one layer of review. 2-SER-569.

Apple publishes App Store Review Guidelines to explain the principles of App Review. 1-ER-39; 3-ER-683–707. Developers who wish to enjoy the advantages of the App Store must follow the Guidelines; "[f]or everything else there is always the open Internet." 3-ER-683. The Guidelines implement "[t]he guiding principle of the App Store[:] . . . to provide a safe experience for users to get apps and a great opportunity for all developers to be successful." 3-ER-683. Such rules are common for multi-sided platforms, which must unilaterally ensure that the self-interests of one group do not harm the integrity of the platform overall. *See* David S. Evans & Richard Schmalensee, *Markets with Two-Sided Platforms*, 1 Issues in Competition L. & Pol'y 667, 677–78 (2008); 1-SER-124; 1-SER-129. Accordingly, several Guidelines "address issues of safety, privacy, performance, and reliability"—"much to some developers' chagrin." 1-ER-40. These rules enabled Apple "to create a high-quality app ecosystem." 2-SER-393.

Apple's integrated distribution model "differentiates Apple from Google," whose Android platform allows sideloading and other functionalities prohibited by Apple. 1-ER-149. This competitive differentiation "allow[s] users who value open distribution to purchase Android devices, while those who value security and the protection of a 'walled garden' to purchase iOS devices." 1-ER-5; 1-ER-149. In particular, users value the heightened privacy and security Apple offers. 1-ER-114.

It is undisputed that the Android ecosystem has "higher malware rates." 1-ER-48 n.250; 1-ER-61 n.298; 1-ER-110.

### 4. Intellectual Property

Apple has invested billions of dollars to create tools for developing iOS apps, including software development kits ("SDKs") and application programming interfaces ("APIs"), which permit developers to code software programs to run on iOS. 1-ER-31; 2-SER-500–07; *see also* 1-SER-195–99. Developers *cannot* develop native iOS apps without using these proprietary resources. 1-SER-277–78; 4-SER-943. Epic, for instance, used thousands of Apple's software programs to develop the iOS version of *Fortnite* (1-ER-9; 1-ER-12; 1-ER-14; 2-SER-297; 2-SER-300; 2-SER-303)—tools Epic's developers admitted "bl[ew] away" competitors' "in every way" (4-SER-1094). Apple also provides marketing and other support to Epic and other developers. 1-ER-21–22; 1-ER-99.

Apple has many patents, copyrights, trademarks, and other intellectual property assets that cover and protect iOS, the App Store, and associated functionalities, including its SDKs and APIs, for which it enjoys statutory rights of exclusivity. 1-ER-31; 1-SER-195–96. Apple has chosen to license its technology and intellectual property on a limited use basis, and it has never given developers unrestricted access. 2-ER-426–27; 1-SER-195. Developers must adhere to the "standardized and nonnegotiable" terms of the DPLA, a "portfolio licensing

agreement" addressing "intellectual property rights" related to iOS.  1-ER-31–32;
1-ER-96.

### 5.     The Challenged Limitations

Both limitations challenged by Epic in this litigation—the requirements that
native iOS apps be distributed through the App Store and use IAP for digital in-app
transactions—are technical requirements that Apple engineered into iOS before
unilaterally including them in the DPLA.  Apple precludes sideloading "by granting
certificates" to apps; "no certificate means the code will not run."  1-ER-95–96.  The
DPLA mirrors that limitation:

> Applications for iOS Products … developed using the Apple Software
> may be distributed only if selected by Apple (in its sole discretion) for
> distribution via the App Store[.]

3-ER-618.  Similarly, IAP is a proprietary software suite that allows developers to
transact with users for digital content within iOS apps.  2-SER-526.  The Guidelines
reflect that restriction:

> If you want to unlock features or functionality within your app, (by way
> of example: subscriptions, in-game currencies, game levels, access to
> premium content, or unlocking a full version), you must use [IAP].

1-ER-34 (quoting 3-ER-692); *see also* 3-ER-608.  Regardless of whether they are
called "requirements," "rules," "restraints," "restrictions," or something else, Apple
made these two product-design decisions when the App Store and IAP were
introduced, and they have not changed materially since.

13

## B.  Competition For Digital Game Transactions

The App Store divides apps into 27 categories (4-SER-948–51), including Games—the largest category both in number of apps and revenue (1-ER-32; 1-ER-127).  The App Store supplies only one product relevant to this litigation: Digital game transactions.  1-ER-125.

When the App Store debuted in 2008, there were well-established competitors for game transactions.  1-ER-75.  Steam, launched in 2003 on personal computers, was "[t]he first successful online platform focused on game distribution" and remains a "dominant player in the space."  1-ER-74.  Console companies like Microsoft, Sony, and Nintendo also "created their own digital marketplaces" (1-ER-74), each of which used (and still uses) a "walled garden" model analogous to the App Store's (1-ER-74).

Competitors, including Google, Nokia, Samsung, and Amazon, launched their own app stores shortly after Apple's.  1-ER-75.  More recently, others have introduced cloud-based streaming platforms, which compete with the App Store by allowing users to play games without downloading an app (because the software is hosted on remote servers and accessed through the internet).  1-ER-83; 1-ER-88. Developers choose among these "numerous alternative distribution options" in deciding which "platforms to utilize in creating game apps."  1-ER-67.

The standard commission charged by game transaction platforms when the App Store launched was 30%. 1-ER-74. Apple matched this market rate for paid downloads, and, later, in-app transactions in digital content. 1-ER-94. Most other platforms followed suit:



*See* 1-SER-127. Thus, 30% was historically the predominant rate for commissions on app transactions, and remains the "prevalent rate" today. 1-SER-265–68.

As it competed in an ever-more-crowded market, Apple adopted rules (for "reader" apps including books and music content, subscriptions, video apps, and small developers) that lowered the rate for particular transactions to 15% or zero:



**Apple's Commissions Have Only Decreased Over Time**

2007
Apple introduces iPhone

2008
Apple launches App Store with 30% commission on initial downloads

2009
Apple introduces IAP

2011
Apple introduces Reader Rule exempting reader apps from commission

Apple introduces Multi-Platform Rule exempting purchases on other platforms consumed in iOS from commission

2016
Apple reduces commissions to 15% for subscriptions after first year

2016
Apple reduces commissions to 15% for participants in Video Partner Program

2021
Apple reduces commission to 15% for participants in Small Business Developer Program

2007  2008  2009  2010  2011  2012  2013  2014  2015  2016  2017  2018  2019  2020  2021

1-SER-116; 2-SER-447–48; 2-SER-497; 2-SER-532–33; 4-SER-916; *see also* 1-ER-94; 1-ER-126 & n.571. Apple has never increased its commission. 2-ER-431; 2-SER-510. On the contrary, Apple's effective commission rates—for initial downloads and in-app transactions—have only declined over time. 4-SER-1042.

The App Store opened in 2008 with 452 apps. 1-ER-32. This figure has increased by orders of magnitude, from 75,000 at the end of the App Store's first year (4-SER-964) to over 1.8 million in 2020 (1-SER-195). The vast majority of apps on the App Store are free. 1-ER-4. At the same time, the quality and utility of apps have dramatically improved. 1-ER-116–17; *see also* 1-SER-69–70; 1-SER-219–26; 4-SER-1054–72; .

Output of digital game transactions has also exploded.  In the first year after launch, there were around 250 million such transactions; by 2019, there were over 3.52 *billion*:



Figure 43
*App Store initial game downloads and in-app purchases (July 10, 2008 – September 30, 2019)*

4-SER-1037.   The App Store has generated enormous revenue for game-app developers, who earned $6.3 billion on commissioned transactions in 2019 alone.  4-SER-1038.

Apple drove this "ever-increasing innovation and growth" in output through enormous expenditures.  1-ER-6.  It invested approximately $100 billion into research and development in the 15 years before trial.  1-SER-195; 2-SER-546; 2-SER-588.   These investments produced a plethora of new device features and "thousands of developer tools, SDKs, and APIs (150,000 today), many of which are

directed specifically at game developers." 1-ER-116–17. Without Apple's hardware and software advancements, Epic could not have brought *Fortnite* to the iPhone. 1-SER-69; 2-SER-460–61.

### C. Epic's "Project Liberty"

Epic is a software developer recently valued at $28.7 billion. 1-ER-7. Tencent, a Chinese gaming company whose business includes app development and distribution, owns approximately 40% of Epic's equity. 1-ER-7. Epic also has business relationships with other game developers and platform operators, including Sony, Samsung, and Microsoft. 1-ER-26.

Epic "primarily generates revenue by selling V-Bucks," a virtual currency that can be used in *Fortnite* across a range of game-transaction platforms. 1-ER-9; 1-ER-12; 1-ER-14. Even while other platforms resisted, Apple helped Epic operationalize "cross-platform" play (*e.g.*, a player on an Android device can compete against a player on an Xbox console) and "cross-wallet" play (*e.g.*, a player can purchase V-Bucks on her PC and access them on an iOS device, in which case Apple collects no commission). 1-ER-15–17. Epic charges the same price for V-Bucks, and has generally agreed to pay a 30% commission for transactions, across platforms, including the Microsoft (Xbox) Store, the Sony PlayStation Store, the Nintendo eShop, Google Play, and, before this lawsuit, the App Store. 1-ER-16.

In 2018, Epic launched the Epic Games Store ("EGS"). 1-ER-9. EGS charges a 12% commission on in-app transactions executed using its proprietary payment solution. 1-ER-17–20. EGS is not profitable; it projects hundreds of millions of dollars in losses through at least 2027. 1-ER-20.

In late 2019, Epic wanted "to revive and reinvigorate *Fortnite*" and hatched a "plan called 'Project Liberty,'" a "highly choreographed attack on Apple and Google" to challenge and circumvent the 30% commission paid to those two platforms (but no others). 1-ER-22; 1-ER-24. Epic's aim was simple: It wanted to make more money while posing as a crusader. 1-ER-22.

The cornerstone of Epic's plan was a surreptitious "hotfix" that Epic "introduced . . . into the *Fortnite* version 13.40 update [submitted for App Review] on August 3, 2020." 1-ER-28. This secret code "clandestinely enabled substantive features in willful violation of [Epic's] contractual obligations" under the DPLA (1-ER-24), including "a direct pay option to Epic Games that would be activated when signaled by Epic Games' servers" (1-ER-28). The hotfix, in short, would "circumvent Apple's IAP system." 1-ER-28.

After "intentionally omitt[ing] the full extent" of the changes in its "disclosure" to Apple—even as it tipped off other game transaction platforms, including Microsoft—Epic triggered the hotfix on August 13, 2020, just hours before filing this lawsuit. 1-ER-26; 1-ER-28. Knowing that it was "not

19

sympathetic," Epic launched a simultaneous media barrage designed to make Apple look like "bad guys."  1-ER-25.  This effort was spearheaded by the Coalition for App Fairness, a front group Epic created to "generat[e] continuous media and campaign tactic pressure" against Apple.  1-ER-25–26.

As Epic expected, Apple promptly removed *Fortnite* from the App Store and later terminated the developer account of Epic Games, Inc. when it refused to comply with the DPLA and Guidelines.  1-ER-26; 1-ER-28.

## II.    Proceedings Below

The same day Epic triggered the hotfix, it sued Apple under Sections 1 and 2 of the Sherman Act, the Cartwright Act, and California's Unfair Competition Law ("UCL"), primarily alleging that Apple unlawfully maintained a monopoly over the alleged "iOS App Distribution" and "iOS In-App Payment Processing" (later redubbed "iOS In-App Payment Solutions") markets through its App Store distribution and IAP requirements.  4-SER-896.  Epic artfully defined these proposed markets to permit litigation against Apple (and Google as a second "monopolist") while excluding Epic's owners and business partners (including Tencent, Sony, and Microsoft), who engage in similar conduct and charge similar commissions.  *See* 1-ER-4; 1-ER-26 (Epic "alleged an antitrust market of one").

Forgoing damages, Epic requested a sweeping injunction that would require Apple to alter the fundamental technical design of iOS and the App Store by

mandating sideloading and other functionalities, and would give Epic access to Apple's extensive technology and intellectual property at no cost. 3-SER-802–10. In rejecting Epic's pretrial effort to return *Fortnite* to the App Store, the district court recognized that Epic's claims were "at the frontier edges of antitrust law" and not likely to succeed. 3-ER-518; 3-ER-535. Apple asserted counterclaims against Epic for breach of contract and indemnification. 4-SER-885–93.

Before trial, the court directed the parties to file a joint submission on legal issues that would act "like joint jury instructions" and provide the district court with the "legal framework" for deciding the case. 3-SER-814. The parties agreed on many aspects of the legal framework (3-SER-635–801), including the centrality of the Supreme Court's seminal decision in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex*"), with respect to two-sided transaction platforms. 3-SER-649; 3-SER-651; 3-SER-659.

In May 2021, the district court held a 16-day bench trial featuring 26 witnesses and 520 exhibits. 4-ER-864–83. Epic staked much of its case on its experts. They did not fare well:

- Economist Susan Athey's ties to Microsoft disabled her from reviewing most relevant documents. 1-ER-51; 2-SER-407–11. Unable to "cite *any evidence* beyond a news article, a European journal, and a biography of

Steve Jobs," the court found her opinions "weak," "[u]nexplained," and "wholly lacking in an evidentiary basis." 1-ER-51–53 & n.263; 1-ER-106.

- Also tied to Microsoft (2-SER-464–67), economist Michael Cragg "was willing to stretch the truth in support of [the] desired outcome for his client" (1-ER-65 n.316). He even "contradicted" Epic's other experts to try to rehabilitate Epic's case—a tactic the court did not find "credible." 1-ER-65.

- The analyses advanced by Epic's principal economist, David Evans, were "fatally flawed by several standards, including his own." 1-ER-60. That included his "unreliable" empirical work in support of Epic's market definition, which did "not follow[] the methodology" set out in Dr. Evans's own academic writings. 1-ER-60.

Apple's experts, in contrast, presented a detailed and credible explanation of the unprecedented benefits the App Store has conferred on developers and users:

- Recognized by the court as a "world-renowned expert" (2-SER-434), MIT Professor Richard Schmalensee explained how transaction platforms work and how Epic and its experts ignored the unique economics of two-sided markets (1-SER-120–58; 4-SER-1044–53).

- Francine Lafontaine, the former director of the FTC's Bureau of Economics, canvassed the evidence about the relevant market and Apple's lack of power within it.  1-SER-94–118.

- Professor Avi Rubin described the threats Apple's mobile ecosystem faces and analyzed the efficacy of its requirements in enhancing security and privacy.  1-SER-161–90.

- James Malackowski evaluated Apple's intellectual property portfolio, analyzing Apple's investment in innovation and the myriad problems with Epic's proposed injunction.  1-SER-192–207.

- And a leading expert on the app economy, Wharton Professor Lorin Hitt, offered detailed empirical studies that showed, among many other things, that prices declined while output soared in the market for digital game transactions.  1-SER-3–92; 4-SER-1033–43.

The court also heard from (and questioned) Phil Schiller, one of the executives leading the creation of the App Store; Craig Federighi, Apple's Senior Vice President of Software Engineering; and Tim Cook, Apple's CEO—among other fact witnesses.  *See*, *e.g.*, 2-SER-512–13; 2-SER-579–80; 3-SER-622.

## III.    The District Court's Decision

The district court issued a 180-page decision ruling for Apple on all of Epic's claims under the Sherman Act and the Cartwright Act, as well as Apple's claim for

breach of contract. 1-ER-182–83. The court awarded partial relief to Epic under the California UCL and denied Apple's request for attorneys' fees. 1-ER-162–71; 1-ER-178–80.

The court recognized that assessment of the digital game "industry and the market in that industry" was "a heavily *factual* inquiry." 1-ER-5. The court painstakingly surveyed the extensive trial evidence and made detailed findings of fact on every issue Epic raises on appeal. The court repeatedly emphasized the weaknesses in Epic's witnesses, finding their testimony "suspect," "lack[ing in] credibility," "bias[ed]," and "internally inconsistent." 1-ER-18; 1-ER-62; 1-ER-63; 1-ER-83 n.408; 1-ER-124. And applying the legal framework urged by Epic, the court found, over and over again, that Epic had failed to carry its burden of proof on essential elements of its claims. *E.g.*, 1-ER-4 ("Epic Games failed in its burden to demonstrate Apple is an illegal monopolist"); 1-ER-134 ("Epic Games failed to prove lock-in"); 1-ER-152 ("Epic Games has not met its burden to show that its proposed alternatives are 'virtually as effective'"); 1-ER-155 ("Epic Games failed to prove the first element of a Section 2 claim: the possession of monopoly power"); 1-ER-159 ("Epic Games has not met its burden to show that it can prevail on its Cartwright Act claims"); 1-ER-161 ("Epic Games has failed to prove [its essential facilities] claim for myriad reasons").

### A. Epic's Claims

#### 1. Sherman Act

To establish liability under the federal antitrust laws, Epic had the burden to prove, among other things, the relevant markets; that Apple had monopoly (or market) power in those markets; and that the challenged conduct constituted an unlawful (*i.e.*, unreasonable) exercise of such power. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989–90 (9th Cir. 2020); 3-SER-648–722. At every turn, Epic's case was wanting.

*No Single-Brand Market.* Epic proposed three markets: A "Smartphone OS" foremarket and two "aftermarkets" for "iOS App Distribution" and "iOS In-App Payment Solutions." *See* D.C. Dkt. 777-3 COL ¶¶ 30, 67, 279. The district court found that Epic failed to prove its proposed markets. Epic's proposed foremarket was "entirely litigation driven, misconceived, and b[ore] little relationship to the reality of the marketplace." 1-ER-48. With respect to Epic's iOS-only "distribution" aftermarket, the court rejected Epic's economic evidence as "fatally flawed" (1-ER-60) and found that Epic failed to prove that users or developers are "locked in" to iOS (1-ER-47–88; 1-ER-123–36). The court also rejected Epic's single-brand "payment processing" aftermarket, crediting evidence that IAP is not just a "payment processor[]," but instead a "seamless system to manage all [of Apple's] e-commerce." 1-ER-69–70.

Apple, in contrast, proposed a two-sided market for digital game transactions on all platforms. 1-SER-234. The district court largely agreed with Apple, finding that the App Store is a two-sided transaction platform and that there was a market for digital game transactions. The court recognized that there was considerable competition between Apple and other mobile platforms; it did not, however, resolve whether that same competition existed between mobile platforms and platforms for consoles like Xbox or PC/Mac computers. The court therefore defined a two-sided market for *mobile* game transactions. 1-ER-89; 1-ER-124; 1-ER-129.

***No Monopoly Power.*** The district court found that Apple is not a monopolist. 1-ER-4. Epic did not prove the "necessary restriction in . . . output," market share, or barriers to entry. 1-ER-140–42; 1-ER-155; *see also* 1-ER-89–92. After observing that the evidence of market power was "both undeveloped and mixed" (1-ER-141), the court concluded that "Apple exercises market power in the mobile gaming market" (1-ER-142).

***No Concerted Action.*** Apple unilaterally imposed technical restrictions requiring App Store distribution and IAP before these requirements were reflected in the DPLA, and they have not changed materially in over a decade. 1-ER-133. Epic did not dispute that these limitations were imposed unilaterally; instead, to prove concerted action under Section 1, Epic relied entirely on the existence of the DPLA. The district court found that under settled antitrust jurisprudence, "the

26

DPLA is a unilateral contract" and that "a developer must accept its provisions (including the challenged restrictions) to distribute games on iOS." 1-ER-145. The existence of the DPLA was therefore insufficient, as a factual matter, to transform the challenged limitations from unilateral conduct into concerted action.

*No Unreasonable Restraints.* Although Epic had failed to prove its market definition (fatal to all its claims), monopoly power (fatal to its Section 2 claims), or concerted action (fatal to its Section 1 claims), the court nonetheless analyzed Apple's challenged conduct under the rule of reason to "inform the issues relating to anticompetitive and incipient antitrust conduct." 1-ER-146. The court applied a "three-step" framework under which Epic had to prove substantial anticompetitive effects, Apple could then prove procompetitive justifications, and Epic had to prove less restrictive alternatives. 1-ER-143–53; *see also* 3-SER-665. Epic failed to carry its burden. 1-ER-146–53.

The court "recognize[d] significant challenges in assessing the anticompetitive effects" of the challenged conduct. 1-ER-147. Based almost entirely on its view that Apple's headline 30% commission—the "standard" for platforms of its kind (1-ER-82)—was "artificially high" (1-ER-147), the court hazarded only that the challenged limitations have "*some* anticompetitive effects" (1-ER-147).

27

The court further found that Apple proved multiple nonpretextual business justifications for the requirement of App Store distribution, including malware security, reliability, fraud protection, privacy, higher quality selection of apps, and protecting intellectual property, all of which "promote interbrand competition." 1-ER-148–50. The court likewise found Apple's IAP requirement was justified by user security, user convenience, and the efficient collection of Apple's commission. 1-ER-152–53.

Epic failed to prove any less restrictive alternatives for Apple's app distribution and IAP requirements. 1-ER-151–53. The court found Epic's proposed alternative models lacking (1-ER-107), crediting testimony that they would force Apple to "either add human review," incurring large costs, "or leave app review to third-party app stores" (1-ER-151). The court likewise found that Epic had not even proffered an alternative to IAP besides barring Apple from "restricting or deterring in any way" the use of other payment solutions. 1-ER-153. This was no alternative: IAP facilitated Apple's collection of its commission, provided better security, and improved user experience; Epic's "alternative" did none of these things. 1-ER-153.

Finally, with respect to Epic's tying claim, the court found that Epic had presented no evidence that IAP is "a separate product from iOS app distribution" such that the two could be "tied" together. 1-ER-158.

### 2.    Cartwright Act

Epic's claims under the Cartwright Act mirrored its claims under Section 1 of the Sherman Act, and the district court rejected those claims on the same basis. 1-ER-158–61. Epic has not challenged that decision in its appellate briefing.

### 3.    UCL

Apple has long prohibited developers from "steering" users away from IAP— and circumventing Apple's commission—through *in-app* links or messages regarding alternative payment solutions. Other digital transaction platforms, including platforms through which Epic sells V-Bucks, have similar requirements. 4-SER-997–1012. Epic introduced no evidence of harm to itself, or to any developer or competitor within the mobile game transaction market, traceable to the anti-steering provisions. Instead, Epic's grievance regarding those provisions was that they helped enforce the alleged IAP "tie" in Epic's proposed iOS-payment solutions market. 4-SER-902–03; 4-SER-906–07.

Despite a "less fulsome" record on these issues (1-ER-166), the court concluded that the anti-steering provisions were "unfair" under the UCL (1-ER-168–69). It then enjoined Apple from prohibiting developers from including *within* their

iOS apps "buttons, external links, or other calls to action" that direct customers to non-IAP purchasing mechanisms. 1-ER-171; *see* 3-ER-692 (3.1.1).[1]

This Court granted Apple's application to stay the injunction pending appeal, ruling that Apple's "[cross-]appeal raises serious questions on the merits of the district court's determination that [Epic] failed to show Apple's conduct violated any antitrust laws but did show that the same conduct violated California's Unfair Competition Law." 2-ER-189–90.

## B. Apple's Counterclaims

As the district court found, "the Project Liberty hotfix . . . clandestinely enabled substantive features in willful violation of [Epic's] contractual obligations and [Apple's] guidelines." 1-ER-24. Apple gave Epic multiple opportunities to cure the breaches and return *Fortnite* to the App Store, but Epic refused to do so before judgment was entered. 1-ER-29. Apple accordingly asked the court to enforce its contractual rights under the DPLA.

---

[1] Apple was also enjoined from enforcing a different Guideline that restricted developer communications *outside* the app. 2-ER-195; 3-ER-692 (3.1.3). Apple deleted that Guideline as part of a settlement resolving the antitrust claims of 99% of U.S. app developers. *See Cameron v. Apple Inc.*, No. 19-CV-3074 (N.D. Cal. Nov. 16, 2021), Dkt. 453. Among other things, those developers acknowledged "the appropriateness of Apple's commission structure." *Id.* Ex. A, § 5.2.

### 1. Breach of Contract

Epic "admitted that it breached the DPLA . . . and that Apple is entitled to relief." 1-ER-171; *see also* 3-SER-630–34. The court awarded Apple compensatory damages for Epic's breaches and upheld Apple's "contractual right to terminate its DPLA with any or all of Epic Games' wholly owned subsidiaries, affiliates, and/or other entities under Epic Games' control at any time at Apple's sole discretion." 1-ER-182.

### 2. Indemnity

The DPLA provides that Apple may recover attorneys' fees "arising from or related to" Epic's "breach of any certification, covenant, obligation, representation or warranty in this Agreement." 3-ER-642. Despite Epic's admitted breaches, the court declined to award Apple its attorneys' fees under this indemnity provision. 1-ER-180.

## STANDARDS OF REVIEW

**Epic's Appeal**

The district court's conclusions of law are reviewed *de novo* and its findings of fact are reviewed only for clear error. *O'Bannon v. NCAA*, 802 F.3d 1049, 1061 (9th Cir. 2015). This Court recently reiterated in the antitrust context that it "review[s] the district court's findings of fact after the bench trial for clear error" with "deferen[ce]" to the district court's findings in a "thorough opinion." *Id.* at 1052, 1061. Epic's failure to prove the elements of its antitrust claims—including

the relevant market (§ I below); concerted action (§ II below); less restrictive alternatives (§ III below); and separate products (§ IV below)—is reviewed only for clear error. *See*, *e.g.*, *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993). "If the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (alteration adopted); *see also infra* note 2.

**Apple's Cross-Appeal**

This Court "review[s] the legal conclusions de novo, the factual findings for clear error, and the decision to grant a permanent injunction, as well as its scope, for an abuse of discretion." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013); *see also United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir. 1994) (permanent injunction reviewed "for an abuse of discretion or application of erroneous legal principles"). Legal issues include Article III standing (*Haro v. Sebelius*, 747 F.3d 1099, 1107 (9th Cir. 2014)) and whether a UCL claim is cognizable (*City of San Jose v. Off. of Comm'r of Baseball*, 776 F.3d 686, 691–92 (9th Cir. 2015)). The Court "review[s] the interpretation and meaning of contract provisions de novo." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1021 (9th Cir. 2016) (alteration and quotation marks omitted).

## SUMMARY OF ARGUMENT

**Epic's Appeal**

Epic asks this Court to second-guess the district court's *factual* findings that it failed to prove one or more elements of every antitrust claim it asserted. That request should be rejected both because it misconceives this Court's role and because the district court's key findings are correct and amply supported.

**I.** Apple is not a monopolist in any relevant market (*see* Br. § II).

**A.** Epic failed to prove its proposed Apple-only, "single-brand" markets. That alone suffices to affirm the Sherman Act judgment, mooting the other arguments Epic raises. Epic's efforts to revive its market definitions fail because (1) Epic does not meaningfully address the substitutability of transactions on both sides of the App Store platform; and (2) the district court correctly found no basis for a single-brand "aftermarket" both because Epic's operating system "foremarket" was untenable and because Apple did not materially change its App Store policies, nor are customers on either side of the platform "locked in" to iOS devices.

**B.** Epic failed to prove that Apple is a monopolist in the market for mobile game transactions defined by the district court because (1) there is no direct evidence of monopoly power given that output increased while prices fell; and (2) Epic does not dispute that its circumstantial evidence was insufficient. Epic's failure to prove that Apple is a monopolist in a relevant market is fatal to its Section 2 claims.

**II.** Epic challenges lawful unilateral conduct (*see* Br. § I.A).

**A.** Although Epic criticizes the district court for supposedly concluding that the DPLA is not a "contract," what the court actually found was that the limitations challenged by Epic—App Store distribution and IAP—are unilateral conduct (the subject of Section 2) rather than concerted action (the subject of Section 1) under applicable antitrust jurisprudence. The factual finding that Apple engaged in no concerted action is fatal to Epic's Section 1 claims.

**B.** Apple's unilateral conduct is lawful under Section 2 both because Apple has no duty to deal with Epic on its preferred terms and because the challenged limitations are genuine product improvements.

**III.** The App Store distribution requirement is lawful under the rule of reason (*see* Br. § I.B).

**A.** On Epic's Section 1 claims, the district court made extensive factual findings establishing that the App Store distribution requirement is supported by numerous nonpretextual procompetitive justifications; the court further found that Epic failed to prove any viable less restrictive alternatives. Epic can show no clear error in these findings. Epic's argument that the court failed to "balance" the competitive effects contravenes binding precedent and ignores the proceedings below.

**B.** In the circumstances of this case, Epic's failure to carry its burden of proof at any step of the rule-of-reason analysis also dooms its Section 2 challenge to the distribution requirement.

**IV.** The IAP requirement is lawful under the rule of reason (*see* Br. §§ I.B & III).

**A.** Epic's "tying" claim fails because Epic failed to prove a standalone market for payment solutions or that IAP is a separate product. Epic can show no clear error in the district court's factual findings that IAP is integrated into iOS—providing a host of functions in connection with digital transactions beyond payment processing—and that Epic failed to show separate demand for IAP.

**B.** The court identified three nonpretextual procompetitive justifications for IAP, and Epic does not challenge those findings on appeal. Epic argues only that barring Apple from requiring IAP altogether would be a "less restrictive alternative," ignoring the express finding that doing so would harm both developers and users. The IAP requirement is not an unreasonable restraint of trade under either Section 1 or Section 2.

**V.** Epic cannot escape liability for its admitted and intentional breaches of contract (*see* Br. § IV).

**Apple's Cross-Appeal**

In contrast to Epic's appeal, Apple's cross-appeal presents purely legal issues on which this Court exercises *de novo* review and should reverse:

**I.** The UCL injunction cannot stand.

**A.** Epic lacks Article III standing. With the approval of the district court, Apple has terminated Epic's developer program account, and Epic has no apps on the App Store. It cannot benefit, directly or indirectly through non-party affiliates or licensees, from an injunction against the anti-steering provisions.

**B.** There is no basis for UCL liability. This Court has held that if conduct is not anticompetitive under the antitrust laws, it is not unfair under the UCL. The district court's express "disagree[ment]" with that line of authority is a clear signal that reversal is warranted. Moreover, the anti-steering provisions are supported by the same procompetitive benefits as the IAP requirement, and there is zero evidence that they caused harm to Epic in any relevant market. As a matter of law, those provisions cannot be condemned as "incipient" antitrust violations.

**C.** The injunction exceeds the district court's authority. Epic failed to prove irreparable injury to itself. Moreover, this is not a class action, and any injunctive relief must be limited to Epic as a matter of both state and federal law.

**II.** As a result of Project Liberty and its intentional breaches of contract, Epic must pay Apple's attorneys' fees under the contractual indemnity provision.

# ARGUMENT ON EPIC'S APPEAL

After an extensive trial, the district court found that Epic had "failed in its burden to demonstrate Apple is an illegal monopolist." 1-ER-4. The court applied decades of settled precedent to the evidentiary record amassed at trial. Epic has not identified any reversible legal error; instead, it effectively urges this Court to re-try the case by disputing a series of *factual findings* made by the district court. As this Court has explained, however, a factual finding "is not clearly erroneous unless it strike[s] [the Court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1253 (9th Cir. 2020) (first alteration in original; quotation marks omitted). Nothing in Epic's brief meets the "dead fish" test. Epic disagrees with the court's findings, contends that certain statements in the opinion should be given more weight than others, and urges its own view of the record evidence. That is not the test for clear error: A court's factual findings are clearly erroneous only if they reach "the point of being illogical, implausible, or without support in inferences from the record." *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241–42 (9th Cir. 2021) (quotation marks omitted). Epic does not even try to satisfy this standard.[2]

---

[2] Epic suggests that this Court may assess the competitive implications of Apple's conduct *de novo* based on the "facts found." Br. 32. But while "the legal standard required to be applied to the *undisputed facts* of the case" is an issue of law (*United States v. Gen. Motors Corp.*, 384 U.S. 127, 141 n.16 (1966)

Epic and its *amici* have submitted some 70,000 words across 11 briefs to this Court already.  Apple responds below to the principal arguments made by all of them:

| | Apple Br. | Epic Br. | U.S. Br. | State AG Br. | Microsoft Br. | CFA Br. | Carrier Br. | Kirkwood Br. | AAI Br. | COSAL Br. | Public Citizen Br. | FTF Br. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Market Definition | I.A | 55-67 | 27-38 | | | | | | | | | |
| Two-sided market | I.A.1 | | | | | | | | | 21-28 | | |
| Foremarket & aftermarkets | I.A.2 | 58-67 | | | | | | | 5-19 | | | 3-10 |
| Monopoly Power | I.B | 57 n.5 | 20-24 | | | | | 8-20 | 10-14 | | | |
| Unilateral conduct | II | 33-37 | 10-14 | 5-17 | | | | 20-23 | | 5-18 | 4-27 | |
| Distribution Requirement | III | 38-55 | 15-20 | | | | | | | | | 12-24 |
| Anticompetitive effects | III.A.1 | | | | | | 4-11 | 2-5 | | | | |
| Procompetitive justifications | III.A.2 | | | | | | | 6-14 | | | | 14-22 |
| Less restrictive alternatives | III.A.3 | 39-44 | | | | | 13-21 | 14-18 | | | | 23-24 |
| "Balancing" | III.A.4 | 47-55 | 17-18 | 18-25 | | | | 19-21 | | | | |
| IAP Requirement | IV | 44-47, 67-73 | | | | | | | | | | |
| Tying | IV.A | 67-73 | | | | 21-30 | | | 19-21 | | | 10-11 |
| Rule of Reason | IV.B | 44-47 | | | | 25-27 | 6-10 | | | | | |
| Counterclaims | V | 74 | | | | | | | | | | |

The judgment for Apple should be affirmed.

## I.    Epic Failed To Prove Its Market Definitions Or Monopoly Power

In this Court, Epic tries to whistle past the graveyard by ignoring the consequences of the court's *rejection* of its proposed market definitions.  1-ER-4; *see also* Br. 33–54.  On that basis alone, all of Epic's Sherman Act claims fall.  In addition, the court found that Apple does not have monopoly power in any relevant market, which is fatal to Epic's Section 2 claims.

---

(emphasis added)), an appellate court is not free to make its own findings where "the facts were hotly disputed" (*Ross v. Citigroup, Inc.*, 630 F. App'x 79, 81 n.2 (2d Cir. 2015); *see also*, *e.g.*, *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1186–90 (9th Cir. 1984)).

## A.   Epic's Proposed iOS-Only Markets Are Defective

Market definition is an essential element of a civil antitrust case on which the plaintiff bears the burden of proof.  *Qualcomm*, 969 F.3d at 992.  To define a market, the plaintiff must establish the "field in which meaningful competition is said to exist" (*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)) and include all relevant competitors  (*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)).

Epic "structured its lawsuit to argue that Apple does not compete with anyone; it is a monopoly of one."  1-ER-4.  It proposed two "litigation driven" and "misconceived" (1-ER-48) aftermarkets—"iOS App Distribution" and "iOS In-App Payment Processing" (or "Payment Solutions")—despite deep judicial and economic skepticism of single-brand markets.  *See*, *e.g.*, *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).  The district court rejected both of Epic's iOS-only aftermarkets based on extensive factual findings.  1-ER-49–88.  Epic does not argue on appeal that any of these findings are clearly erroneous, nor could it.  That should put an end to this litigation.

Epic's failure to prove its proposed markets at trial "defeats" its antitrust claims in their entirety.  *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010).  This Court has rejected antitrust claims where the plaintiff failed

to prove its proposed market before trial (*Plush Lounge Las Vegas v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010)) or at trial (*M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303, 1306–08 (9th Cir. 1982)). Standard model jury instructions likewise provide that if the jury rejects the plaintiff's proposed market, then it must return a verdict "in defendant's favor." ABA Model Jury Instr. §§ 1.C.2 & 2.A.4 (2016); *accord Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir. 1978). The same rule applies in a bench trial: A plaintiff's failure to prove its proposed market is fatal. *Cf. United States v. Engelhard Corp.*, 126 F.3d 1302, 1304–08 (11th Cir. 1997).

Epic carefully crafted its proposed markets so that it could accuse Apple (and Google) of being a monopolist without levying the same charge against its own owners and business partners, who employ limitations similar to those challenged here. 1-ER-26; 1-ER-135 n.588. Epic must be held to the consequence of that strategic choice. Affirming the district court's rejection of Epic's proposed markets would make it unnecessary to decide every other issue presented in Epic's appeal.[3]

---

[3] The government "take[s] no position on the fact-specific questions of the relevant market(s) supported by the record and their proper characterization under *Amex*" (U.S. Br. 37–38), rendering irrelevant its speculation about alternative markets that might (or might not) be advanced in other cases (*id.* at 28–31).

### 1. Epic's Market Definition Arguments Are Untenable Under *Amex*

Epic admits the App Store is a two-sided transaction platform and, therefore, the market is two-sided. D.C. Dkt. 777-3 COL ¶ 179; 1-ER-28; 1-ER-124; *see also* Evans & Schmalensee, *Matchmakers*, *supra*, at 101–21. Epic thus cannot "avoid" the reality that the App Store "facilitate[s] a single, simultaneous transaction" between app developers and iOS users (1-ER-124–25) and is characterized by "pronounced indirect network effects"—feedback loops through which changes to one side of the platform affect the other (*Amex*, 138 S. Ct. at 2286–87; *accord* 1-SER-128). Thus, the "relevant App Store product is transactions." 1-ER-125; *see also Amex*, 138 S. Ct. at 2286 (two-sided transaction platforms "suppl[y] only one product—transactions" (quotation marks omitted)). As the Supreme Court directed in *Amex*, the market must be analyzed "as a whole" (*id.* at 2287)—*i.e.*, with reference to *both* sides of the platform, with developers on one side and users on the other.

Despite agreeing that the App Store is a two-sided transaction platform (1-ER-124), Epic failed to analyze the competitive conditions on "*both sides* of the platform" (*Amex*, 138 S. Ct. at 2286 (emphasis added)). As the court observed, Epic's proposed market for "iOS App Distribution" "improperly impl[ied] that only developers consume Apple's products," thus ignoring the user side of the platform. 1-ER-125. On appeal, Epic commits the inverse error—looking only to the competitive conditions on the *user* side of the platform and ignoring the developer

41

side.  Br. 58–67.  Epic does not dispute on appeal that "the App Store competes against other platforms for both consumers *and developers*" and "neither consumers *nor developers* are 'locked-in' to the App Store for digital mobile game transactions."  1-ER-135 (emphases added).  This failure to address the competitive conditions on the developer side of the App Store and properly account for indirect network effects is a fatal failure of proof.  *See Amex*, 138 S. Ct. at 2280–81 & n.1.[4]

Although Epic asserts "the court nowhere analyzed whether one app store is substitutable with another" (Br. 26), the district court devoted an entire section to this very question (1-ER-85–88).  The evidence showed that the App Store faces robust competition on the developer side.  Developers are able to (and do) develop their games across different platforms, and "[n]o one disputes that when developers create an app for Android versus iOS, . . . much of the code can be ported across platforms."  1-ER-55.  Epic's own experience illustrates developer choice:  Apple helped Epic operationalize "cross-wallet" play, allowing gamers to purchase V-Bucks on one platform and use them on another.  Between March 2018 and July 2020, only 13.2% of *Fortnite* users made a purchase on an iOS device, "*meaning*

---

[4] Although one *amicus* criticizes this and other aspects of *Amex* (AAI Br. 21–28), Epic's own expert "agree[d]" that *Amex* "is sound as an economic matter" (2-SER-353–54).  Departing from that binding precedent would be not only legal error but also "contrary" to "[t]he evidence" in this case, in which "all of the experts agree[d] that both users and developers consume App Store transactions."  1-ER-124–25.

*that Epic Games was able to transact with 86.8% of paying Fortnite users without paying any commissions to Apple*." 1-ER-17.  Epic did not depend on the App Store for *Fortnite*'s success, while Apple has to compete with other platforms to attract developers like Epic to transact on the App Store.  This evidence (which Epic ignores) confirms that other platforms can "deprive [Apple] of significant levels" of business.  *Thurman Indus.*, 875 F.2d at 1374.

Tellingly, Epic has abandoned on appeal the central focus of its market definition presentation at trial.  Epic promised the district court that "quantitative work"—specifically, "small but statistically significant and non-transitory increase in price" ("SSNIP") tests—would answer "the critical question when defining a market." 1-SER-257–59.  The court found that this lynchpin of Epic's case was "fatally flawed" because Epic's expert relied on unreliable survey data, tested an incorrect time period, and "effectively dismisse[d] indirect network effects" by failing to adhere to his own methodology. 1-ER-59–60.  As a result, the court found "this evidence wholly unpersuasive [on the question] of substitution." 1-ER-61.  Epic tried to prove its proposed markets, but failed.

Epic's expert even admitted that other digital platforms and websites in fact "are alternative avenues and therefore substitutes" for gaming transactions. 2-SER-476.  That is the end for Epic's alleged single-brand markets.  *Newcal Indus., Inc. v. IKON Off. Sol.*, 513 F.3d 1038, 1051 (9th Cir. 2008) (no single-brand market

can exist where inconsistent with "indicia" of substitution); *see also Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 614 (6th Cir. 1993) (single-brand market can exist only where the plaintiff proves "no reasonable substitutes exist").

Equally fatal to Epic's appeal is the district court's finding of a mobile *game* transactions market—not a market spanning *all* iOS app transactions, as Epic proposed. 1-ER-64–67. Epic suggests in its statement of facts that this ruling was "mistaken[]" because the court did not adequately analyze substitutability (Br. 25–26), but does not return to this point in the argument section of its brief. Epic has therefore forfeited it; in any event, Epic cannot show clear error. Both parties referred the court to the same legal authority (*Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)), which directs courts to examine "practical indicia" of substitution. 2-SER-437–38; 2-SER-453–54. The court identified "nine indicia indicating a submarket for gaming apps as opposed to non-gaming apps" (1-ER-125–27), aided by another admission of Epic's own expert that game-app transactions are not substitutes for non-game-app transactions (1-ER-65). Epic contests *none* of these factual findings.[5]

---

[5] Although Apple had no burden to do so, it adduced evidence showing a relevant market even broader than *mobile* game transactions. The district court recognized such a "wider video game market" that is "dynamic, innovative and competitive" (1-ER-74), but in the end "proceed[ed] without resolving" the issue of substitution between game transactions across platforms in that wider market (1-ER-64; *see also* 1-ER-57 ("the *Fortnite* data *does* show substitution")). In the

## 2. Epic Failed to Prove Lock-In On Either Side Of Its Alleged Markets

Epic also failed to prove additional prerequisites to single-brand markets—including that there is a "foremarket" from which the alleged aftermarket derives and that "market imperfections . . . prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *Newcal*, 513 F.3d at 1050–51. Epic's arguments on appeal are nothing more than a disagreement with the district court's factual finding that users are not "'locked-in' to the App Store." 1-ER-135.

***Foremarket***. At the outset, the district court rightly rejected Epic's proffered "mobile operating systems" foremarket because "it is illogical to argue that there is a market for something that is not licensed or sold to anyone." 1-ER-48. Epic says this runs afoul of *Microsoft*, which "found that the relevant market consisted of the licensing of . . . operating systems." Br. 59. But unlike Apple, Microsoft *did* license and sell its operating system. *United States v. Microsoft Corp.*, 253 F.3d 34, 47–50 (D.C. Cir. 2001) (en banc); *see also Digidyne Corp. v. Data Gen. Corp.*, 734 F.3d 1336, 1338–43 (9th Cir. 1984) (similar). Neither Epic nor its *amici* cite a *single case*

unlikely event of a remand, any remaining issues would have to be evaluated within the context of this "wider market" in which platforms are subject "to unique and emerging competitive pressures"—including not only "new entrants" but also actual and proposed regulation and legislation. 1-ER-141–42 & nn.597–98; *see also infra* note 12; *cf.* 1-ER-38.

in which a market was defined for a product that "is not licensed or sold to anyone." 1-ER-48; *see also* Br. 59–60.

What Apple *does* sell is *phones*, yet Epic never proposed a foremarket for that product. That is because Apple has a modest share (about 15%) in that highly competitive market and indisputably competes with Samsung and others worldwide on a host of interrelated features, including operating system, "battery life, durability, ease of use, cameras, and performance." 1-ER-48–49. By dismissing the competition for the product Apple *does* sell, Epic confirms that its operating system foremarket was gerrymandered for litigation purposes. 2-SER-349.

*Aftermarkets*. Although Epic's failure to prove its foremarket is fatal to its aftermarket theory (*see Newcal*, 513 F.3d at 1049), Epic also failed to prove its proposed aftermarkets. Epic was required to "show evidence 'to rebut the economic presumption that [defendant's] consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to' purchase in the foremarket." 1-ER-132–33 (alteration in original) (quoting *Newcal*, 513 F.3d at 1050). Such a theory "cannot succeed . . . when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and . . . policies." *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *see also* 1-ER-131–33 (collecting cases).

As the court found, "the evidence shows no material change in the conditions for accessing the App Store for either side of the platform." 1-ER-133. Epic argues that because the late Steve Jobs speculated (before its launch) that it might not "make money," the fact that the App Store now is profitable is a "change" in policy. Br. 63. After taking testimony on the subject (2-SER-513–15), the district court rightly rejected Epic's tortured interpretation and found that Jobs's statement "[a]t best" reflected "Apple's initial expectation," not a policy commitment. 1-ER-133–34. Disagreeing with the court's interpretation of the evidence does not establish clear error. *Lewis v. Ayers*, 681 F.3d 992, 998 (9th Cir. 2012).

With no evidence of a "shift in policy," Epic argues it was legal error for the court to demand it. Br. 63. That too is wrong. No single-brand aftermarket can exist when the challenged policy is announced in advance and "is obvious to any purchaser in the primary market." *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477 n.24 (1992) (emphasizing lack of evidence that Kodak's policy was "generally known"); *PSI Repair*, 104 F.3d at 819–21; *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 383 (3d Cir. 2005). The district court found that the DPLA and Guidelines meet that standard. 1-ER-133; *see also* 3-ER-604; 3-ER-683–707.

47

In any event, the district court *also* found that Epic "failed to prove lock-in, even absent a policy shift." 1-ER-134. In attacking that finding, Epic once again advances single-sided arguments about users that were considered and rejected on the facts below, ignoring altogether that developers can and do distribute through other platforms. 1-ER-55; 1-ER-135. Epic's user-side arguments also are defective. Epic argues users are unable, *ex ante*, to estimate the future *costs* of the closed ecosystem (Br. 62), but the court found that Epic's "sole focus on iOS devices simply ignores the market reality that is available to consumers" (1-ER-135) given that "[c]onsumers frequently own multiple devices" (1-ER-62)—like an Android phone, an Apple iPad, or an Amazon Fire tablet—and the advent of "middleware like streaming services and cross-platform games ha[s] only made switching platforms and devices easier and more convenient" (1-ER-134–35).

The district court expressly found that Epic "failed to prove that [iPhone] users are 'locked-in' or would not switch to Android devices in response to a significant change in game app prices, availability, or quality." 1-ER-54; *see also* 1-SER-13; 1-SER-74. Rebuking Epic's principal witness, Dr. Athey, for "largely theoretical" opinions that "ma[de] no effort" to assess "barrier[s] to switching *in practice*" (1-ER-51–52 & n.263), the court found Epic's theory "wholly lacking in an evidentiary basis" (1-ER-53). Users "can and do pursue game transactions on a variety of other mobile platforms and increasingly other game platforms." 1-ER-135. Some iPhone

users do switch to Android devices.  1-ER-54; 1-SER-73.  And switching costs have *decreased* as new tools have made it easier for users to transfer their data and purchases to other platforms (1-ER-134).  That Epic wishes the court had "weighed th[is] evidence differently" is no basis for reversal.  *Lewis*, 681 F.3d at 998.

Ultimately, the evidence showed that users stick with Apple because they *like* the products—not because they are "locked in."  1-ER-54; *see also* 1-SER-74.  Apple excels at customer satisfaction, and the reward is loyalty.  That is evidence of success in the marketplace, not unlawful activity.  Unable to rebut this evidence, Epic seeks to dismiss it as irrelevant (Br. 65); but courts rightly recognize that consumer preference alone cannot support a single-brand market.  *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.).  If anything, Epic's position on appeal underscores the absurdity of Epic's single-brand markets—attracting and retaining users through superior products and services is the essence of *competition*.

## B.    Apple Is Not A Monopolist

Without its failed single-brand markets, Epic abandons the traditional method of proving monopoly power through circumstantial evidence.  Its limp suggestion of direct evidence (Br. 57–58) misrepresents both the facts and law.

### 1. There Is No Direct Evidence Of Monopoly Power

Monopoly power requires "the ability to *raise price* profitably *by restricting output.*" *Amex*, 138 S. Ct. at 2288 (first emphasis added); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also* 1-ER-140 (collecting cases). Direct evidence of monopoly power is "often difficult or impossible to prove" (*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006)), "rare[]" in general (*Microsoft*, 253 F.3d at 51), and nonexistent in this case.

***No output restrictions***. The district court found no "impact on output" in the relevant market. 1-ER-140. In fact, as Epic's experts conceded, "the output of the App Store has grown explosively by any reasonable measure." 2-SER-382–83; *see also* 2-SER-468; 2-SER-473 (additional concessions of "incredible" and "explosive growth"); 1-SER-64–66; 2-SER-430–31; 2-SER-441–44; 2-SER-454–55; 4-SER-1037 (similar).

Epic suggests that reduced "quality establish[es] a reduction of output." Br. 57 n.5 (internal citation omitted). But as Epic's economic expert affirmed, "there isn't much controversy that Apple's rules have enabled it to create a high-quality app ecosystem for the iPhone." 2-SER-393. Thus, the "final trial record did not include evidence of . . . decreasing output or decreasing innovation in the relevant market" (1-ER-4)—a point the district court emphasized time and again (1-ER-102; 1-ER-105; 1-ER-111; 1-ER-140). To be sure, the court noted that Apple's policies

"perhaps" reduce quality or "may reduce output" (1-ER-148 & n.606), but such "[s]peculation about anticompetitive effects" (*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994)) is not direct proof of "the *actual* exercise of market power" (*Rebel Oil*, 51 F.3d at 1434 (emphasis added)).

Epic half-heartedly suggests that proof of reduced output is not required because of the purported difficulty of adducing such evidence. Br. 57 n.5; *see also* U.S. Br. 22. The *Amex* dissent advanced the same point and was rebuffed by the majority. *Compare* 138 S. Ct. at 2288, *with id.* at 2302 (Breyer, J., dissenting). It is thus no excuse that "[s]uch a counterfactual proposition is difficult to prove." *Brooke Grp. Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993); *see also Rebel Oil*, 51 F.3d at 1434. Epic conceded as much below and cannot be heard to argue otherwise now. 3-SER-693. If anything, output is *more* significant in cases involving two-sided transaction platforms because output is an indicator of the net effect in the market "as a whole"—the only relevant inquiry. *Amex*, 138 S. Ct. at 2287; *United States v. Am. Express Co.*, 838 F.3d 179, 204 (2d Cir. 2016); *see also* 2-SER-379–85; 2-SER-429–30.

***No price increases***. With no reduction in output, Epic could not and did not prove supracompetitive pricing. Although the district court expressed "concern[]" (1-ER-140) that Apple's 30% commission is "artificially high" (1-ER-147), "[e]vidence of a price increase on one side of a two-sided transaction platform cannot

by itself demonstrate an anticompetitive exercise of market power" (*Amex*, 138 S. Ct. at 2287). And indeed, the court ultimately found that the pricing evidence "does not show . . . market power." 1-ER-95.[6]

"[D]irect evidence in the form of increased prices" requires proof of "an actual anticompetitive change in prices after the restraint was implemented." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021). It is undisputed, however, that Apple set its headline commission rate in line with other digital game transaction platforms when it had no market power (1-SER-127)—a decision that "does not establish any . . . sinister domination" as a matter of law (*Rebel Oil*, 51 F.3d at 1442). Since then, Apple's effective commission rate has only declined (1-SER-59; 2-SER-456–57): Apple *never* raised prices (2-ER-431; 2-SER-510) and decreased its rates for certain transactions several times, which the district court described as "highly probative" of competition (1-ER-94).

***Operating margins are not direct evidence***. Epic argues, with no supporting authority, that profitability is proof "on its own" of monopoly power. Br. 57–58. Epic relies on a handful of unaudited documents regarding the "operating

---

[6] The government suggests that pricing evidence alone may suffice (U.S. Br. 23), but none of its authorities relied solely on pricing. *McWane v. FTC*, 783 F.3d 814, 837–40 (11th Cir. 2015); *United States v. Dentsply*, 399 F.3d 181, 191–96 (3d Cir. 2005); *Greyhound Comput. Corp., Inc. v. IBM*, 559 F.2d 488, 499–502 (9th Cir. 1977). Moreover, all of these cases involved price *increases* in one-sided markets.

margins" of a single business unit, the App Store. 1-ER-45. Those merely reflect the App Store's revenues—commissions charged on transactions where developers set the price—less some direct costs of running the App Store but not all joint costs. *See* 2-SER-507–08; 2-SER-518–20; 23-SER-523; 3-SER-606–08; 3-SER-616; 3-SER-619; 1-SER-121. That evidence is not probative of anything, and the district court rightly refused to infer monopoly power from it. 1-ER-140–41. Apple "produces products in addition to the one under scrutiny" such that there was "serious dispute over the allocation of overhead and joint costs." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252–53 (11th Cir. 2002). Thus, the reported margins are at most "a reflection of various accounting conventions [rather] than true economic profit," "reveal[ing] very little about [Apple's] market power." *Id.* at 1252; *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995). After all, the same margins on the same commissions are attributed to the Mac App Store—a monopoly by no one's reckoning. *See* 2-SER-388–89; 4-SER-899. And when profits are evaluated over the integrated company (which removes the issue of cost allocation), the evidence was undisputed that Apple's profitability was modestly above 20%; that is far from excessive and in fact lower than Epic's for three of the four years before trial. 1-SER-144; 3-SER-603.

Regardless, Epic's own expert conceded that profit margin alone does not show monopoly power. 2-SER-395–99. No appellate court has inferred monopoly power from such evidence. *Bailey*, 284 F.3d at 1253; *see also Qualcomm*, 969 F.3d at 983, 994 n.15, 1003 (even "very profitable" conduct does not "establish antitrust liability"). And this Court has squarely held that profits cannot serve as direct evidence of monopoly power without an "accompanying showing of restricted output." *Forsyth v. Humana*, 114 F.3d 1467, 1476 (9th Cir. 1997); *see also Brooke Grp.*, 509 U.S. at 232–33. Where, as here, prices are flat or declining, higher profits are driven by expanding output—a "response to an excess of demand" indicating that "the market is functioning in a competitive manner." *Brooke Grp.*, 509 U.S. at 232. As the court found, Epic's failure to prove output restriction "is fatal in demonstrating monopoly power using direct evidence." 1-ER-140–41.

### 2. Epic Failed To Produce Circumstantial Evidence Of Monopoly Power

The district court correctly found that Epic failed to "show that [Apple] owns a dominant share of [the relevant] market" or "that there are significant barriers to entry and . . . that existing competitors lack the capacity to increase their output." *Rebel Oil*, 51 F.3d at 1434; *see* 1-ER-141–42. Epic neither challenges these findings on appeal nor disputes that it failed to adduce sufficient circumstantial evidence of monopoly power. For this reason, the government's suggestion (U.S. Br. 23–24) that the court erred in evaluating the circumstantial evidence is both wrong and

irrelevant. *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 (9th Cir. 1998) (this Court "do[es] not review issues raised only by an amicus curiae").

At trial, Epic advanced only the tautology that Apple would have a 100% share of an iOS-only market, and its own expert conceded that in a "two brand market," Apple is "not a monopolist in the sense of [market] share." 2-SER-357–58. Because the court defined its own market, it also undertook its own assessment (without evidence) for Apple's market share of that market, calculating a market share of between 52–57%—not "high enough to sustain a *prima facie* case of a monopoly." 1-ER-141; *see Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014); *Image Tech.*, 125 F.3d at 1206. Epic does not challenge that conclusion on appeal.

Epic's footnote asserting that Apple "indisputably" possesses the ability to exclude competition from iOS (Br. 57 n.5) assumes its conclusion—an iOS-only market. Epic also ignores the evidence, credited by the district court, that "the barriers of entry are not so high as to deter competitors in related markets." 1-ER-141–42; *see also* 1-ER-4; 1-ER-97; 1-SER-49; 1-SER-51–53. And on top of that, Apple faces "unique and emerging competitive pressures" from cloud-based streaming game platforms. 1-ER-67; 1-ER-83–85; 1-ER-88; 2-SER-558. Epic

cannot show clear error in the finding that "[t]he final trial record did not include evidence of . . . barriers to entry." 1-ER-4.

Epic's failure to prove that Apple possesses monopoly power in any relevant market defeats all of Epic's claims under Section 2.

## II. Epic Challenged Only Unilateral Conduct By Apple

Epic's principal argument on appeal—repeated by several *amici* (*e.g.*, U.S. Br. 10–14; State AG Br. 5–17)—is that the district court erred in concluding that the DPLA is not a "contract" within the meaning of Section 1 because it is a "contract of adhesion." Br. 34–35. This distorts the ruling below. The court actually found under binding "antitrust jurisprudence" that the App Store distribution and IAP requirements challenged by Epic are unilateral conduct (analyzed under Section 2) rather than concerted action (subject to Section 1). 1-ER-145.

The district court correctly focused on the *substance* of Epic's claims. *See Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) (requiring "functional" inquiry under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 773 n.21 (1984)). And the court's *factual* finding that the challenged limitations do not constitute concerted action is reviewed for clear error. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393–95 (1948). Epic does not even acknowledge the court's finding that the challenged restraints are unilateral conduct, let alone try to demonstrate that this finding was clearly

erroneous.  Epic instead *assumes* that the restraints constitute concerted action if the DPLA is a "contract."  That assumption is wrong.[7]

### A.    The District Court Correctly Found No Concerted Action

The Sherman Act recognizes a "basic distinction . . . between concerted and independent action that distinguishes § 1 of the Sherman Act from § 2." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (quotation marks omitted).  Although Section 1 could be read literally to cover "the entire body of private contract, that is not what the statute means." *Id.* at 189 (quotation marks omitted); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979) ("Literalness is overly simplistic and often overbroad.").  Section 1 requires concerted action, which occurs only when the challenged conduct "joins together independent centers of decisionmaking." *Am. Needle*, 560 U.S. at 196 (quotation marks omitted); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (requiring "a conscious commitment to a common scheme designed to achieve an unlawful objective" (quotation marks omitted)).  By contrast, "[t]he conduct of a single firm" is "governed by § 2 alone." *Copperweld*, 467 U.S. at 767.

---

[7]  The district court's opinion makes clear that the real issue is whether the challenged limitations constitute concerted action, not whether the DPLA is a contract.  *See* 1-ER-144 ("the Sherman Act distinguishes between concerted conduct and unilateral conduct").  Yet Epic nowhere addresses this foundational distinction, nor does it attempt to show that the court clearly erred in finding the challenged limitations unilateral.  It may not do so for the first time in its reply brief.  *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

The limitations challenged here—App Store distribution and IAP—are imposed unilaterally by Apple as part of the technical design of iOS and the App Store. From the start, Epic's case hinged on challenging "technical restrictions"— such as those that "prevent users from downloading app stores or apps directly from websites"—and not just "contractual restrictions." 4-SER-899; 4-SER-901; 4-SER-904; *see also* Br. 2. The ability of a native app to operate on iOS is dependent upon Apple "granting certificates" to apps; "no certificate means the code will not run." 1-ER-95–96. Similarly, developers' ability to transact with iOS app users for digital content is dependent on Apple's proprietary IAP technology. 2-SER-526.

The DPLA does not transmogrify these technical limitations into concerted action. While the DPLA *is* a contract, "the simple existence of [a] contract" is not sufficient "to satisfy the concerted action requirement" (*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016)), as this Court has recognized (*see, e.g.*, *Aerotec Int'l Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181–82 (9th Cir. 2016) ("Contracts, *simpliciter*, are not illegal under the Sherman Act."); *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983–84 (9th Cir. 2001) (no concerted action notwithstanding contract)). What matters is whether there is a "sudden joining of two independent sources of economic power previously pursuing separate interests" (*Copperweld*, 467 U.S. at 771) that "deprives the marketplace of . . . actual or potential competition" (*Am. Needle*, 560 U.S. at 195 (quotation marks omitted)).

The DPLA is a "portfolio licensing agreement" that offers a limited license to develop native apps "*using the Apple Software*" and distribute them, if accepted by Apple, "via the App Store" to iOS users. 1-ER-32–33 & n.186 (emphasis added). The terms of that license are set unilaterally by Apple (1-ER-145), allowing developers to "[u]se the [Apple] software in a manner consistent with Apple's legal rights" (1-ER-32). As the owner of the intellectual property that constitutes and implements iOS, Apple puts limitations on the scope of the license for use of its property. "Normally, this sort of unilateral behavior—choosing whom to deal with and on what terms—is protected by the antitrust laws. Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.). And as the district court found, "Apple is entitled to license its intellectual property for a fee, and to guard its intellectual property from uncompensated use by others." 1-ER-150.

In other words, the DPLA does not "eliminat[e]" competition that would otherwise exist. *Am. Needle*, 560 U.S. at 195–96. The DPLA defines the limited scope of the technology and intellectual property license Apple has granted to developers who, but for the license, would have no ability to develop or distribute native iOS apps (or in-app digital content) *at all*. 2-SER-389; 2-SER-506–07; *see also* Br. 9; 4-SER-943. In rejecting a similar claim that a patent license amounted

to concerted action under Section 1, one court explained that a licensor-licensee agreement "can be a 'conspiracy' in violation of the antitrust laws only if it deprives the marketplace of independent actors." *Levi Case Co. v. ATS Prods., Inc.*, 788 F. Supp. 428, 431 (N.D. Cal. 1992). But where one party has no right to compete with the other, there is no concerted action. *Id.* at 432; *see also Jack Russell*, 407 F.3d at 1034 (citing *Levi Case* with approval).

Epic seeks to analogize the DPLA to tying and exclusive dealing claims analyzed under Section 1. Br. 37. Epic of course did not prove that the DPLA is a tying or exclusive dealing agreement. And unlike the licensing terms at issue here, such agreements *do* deprive contracting parties of preexisting rights and eliminate competition that would otherwise exist by preventing the purchaser from buying the product from independent competitors. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Those were the circumstances in the case on which Epic and many *amici* place undue reliance (Br. 35 (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 136–37 (1968), *overruled by Copperweld*, 467 U.S. 752)), but they are not present here. Whether or not Epic "unwillingly complies" with the DPLA, it lacks the technical capacity and intellectual property rights to offer a competing iOS app store. Although a licensing agreement may "run afoul of the antitrust laws" in certain circumstances by eliminating competition that

would otherwise exist, merely exercising "'the untrammeled right'" to "license . . . exclusively or otherwise, or to refuse to license at all" does not amount to concerted action. *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981).

The injunction that Epic requested under the Sherman Act confirms that it challenges only unilateral conduct. *See* 1-SER-241–46.[8] Epic does not seek to terminate a purportedly anticompetitive "contract," but rather asks the Judiciary to *alter* the terms of the DPLA so that Apple would be required to license (apparently for free) its technology and intellectual property while changing the design of iOS and the App Store itself. A defining feature of concerted action is that it is "discrete and distinct" and "may be remedied simply through prohibition." *Am. Needle*, 560 U.S. at 190. That is not the case here: Epic indisputably could not develop or distribute native iOS apps, or digital content within such apps, *without* a license from Apple.

Epic and its *amici* foretell "disastrous consequences" from affirmance of the district court's finding that the challenged restraints are unilateral conduct. *E.g.*, Br. 37; U.S. Br. 12–13. They have it exactly backwards: It is Epic's effort to challenge

---

[8] The challenged App Store distribution and IAP limitations were implemented in 2008 and 2009, respectively, and Epic first "agreed to and signed" its DPLA in 2010. 1-ER-21. Accordingly, the injunction Epic seeks (4-SER-802–10) is barred by the doctrine of laches. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014); *see also* 1-SER-237–38.

Apple's unilateral decisions about licensing and technical product design under Section 1 that threatens to "obliterate the [Sherman] Act's distinction between unilateral and concerted conduct, contrary to the clear intent of Congress." *Copperweld*, 467 U.S. at 776. Epic failed to carry its burden of proving that Apple engaged in concerted action; the consequence of that *evidentiary* failure is that Epic's Section 1 claim fails.

### B. Apple's Unilateral Conduct Is Lawful

Epic and its *amici* devote so much effort to arguing that the DPLA is a "contract"—a strawman—because Apple's unilateral conduct is clearly lawful under Section 2.

A firm "has no duty to deal under the terms and conditions preferred by [its] rivals." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009). Likewise, that a firm has decided to reserve certain technology and intellectual property rights for itself does not give rise to antitrust liability. *Qualcomm*, 969 F.3d at 994. To hold otherwise would "detract from the advantages lawfully granted to the holders of patents or copyrights" and give rise to "serious concern" for the protection of intellectual property rights. *Image Tech.*, 125 F.3d at 1217–18. Indeed, "no court has held that a patentee must grant further licenses to potential competitors merely because he has granted them some licenses." *Westinghouse*, 648 F.2d at 648.

To the extent a "duty to deal" can ever be imposed by antitrust law, certain conditions must be met. *Qualcomm*, 969 F.3d at 993–94; *see also Novell*, 731 F.3d at 1074. Those conditions are absent here: The challenged features have been in place since the inception of the App Store (2-SER-377), and thus Apple has not terminated a prior "voluntary and profitable course of dealing" (*Qualcomm*, 969 F.3d at 993–94); Apple has not sacrificed short-term profits to quell competition in the long run (2-SER-388–89); and Apple's licensing policy is uniform as to all developers (1-ER-32). Under settled precedent, Apple has no duty to deal with Epic on its preferred terms. *See Qualcomm*, 969 F.3d at 995.[9]

The federal antitrust enforcers have issued antitrust guidance regarding intellectual property licensing reflecting this principle. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (2017). There is nothing remarkable or unlawful about the DPLA under the federal agencies' guidance. What is remarkable is that in a case centered around technology and intellectual property licensing, neither Epic nor the United States acknowledges this guidance, much less advances any argument that the DPLA runs afoul of it.

---

[9] Epic argued below that a so-called "conditional refusal to deal" is not subject to these established principles. D.C. Dkt. 777-3 COL ¶¶ 129–30 (emphasis omitted). That is wrong: It "makes no difference" that Epic is not challenging "an absolute refusal to license." *Image Tech.*, 125 F.3d at 1216 n.9; *see also Westinghouse*, 648 F.2d at 647–48; *New York v. Facebook, Inc.*, — F. Supp. 3d —, 2021 WL 2643724, at *15 (D.D.C. June 28, 2021).

The federal agencies' guidance expressly recognizes that "[f]ield-of-use" limitations like those in the DPLA serve to "increase the licensor's incentive to license." *Id.* § 2.3. Moreover, the guidance makes clear that the agencies "ordinarily will not require the owner of intellectual property to create competition in its own technology," and that antitrust concerns arise here only where "a licensing arrangement harms competition among entities that would have been actual or potential competitors . . . in the *absence* of the license." *Id.* § 3.1 (emphasis added); *see also* Herbert Hovenkamp et al., *IP and Antitrust* § 12.03[D][1] at 12-19 (3d ed. 2021) (compelling access to a firm's intellectual property "would present a fundamental conflict between the antitrust and intellectual property regimes because it would compel the licensing of an intellectual property right itself").

Below, Epic argued that intellectual property rights do not confer an unfettered privilege to violate the antitrust laws. *See* D.C. Dkt. 777-3 COL ¶¶ 251, 351 (citing *Microsoft*, 253 F.3d at 63). That is true, but irrelevant. Because the antitrust laws are meant to *encourage* innovation, "no decision ha[s] condemned a mere refusal to license a copyright as an antitrust violation." 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 711b (4th ed. 2021); *accord In re ISO Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000). Indeed, the lawfulness of limited licensing arrangements "has never been questioned" (*Gen. Talking Pictures Corp. v. W. Elec. Co.*, 305 U.S. 124, 127 (1938)) because they are part and parcel of a

patentee's "exclusionary right" to "subdivide markets" encompassed by a patent (*Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1305–06 (11th Cir. 2003)). A company's "desire to exclude others from its [protected] work is . . . a presumptively valid business justification" (*Image Tech.*, 125 F.3d at 1218 (alteration in original)), and the district court found that Apple's intellectual-property justification was legitimate and nonpretextual in this case (1-ER-150; *see also* 1-ER-161–62 & n.626; *Qualcomm*, 969 F.3d at 998).

By deriding Apple's conduct as "policy decision[s]," Epic acknowledges that Apple alone chose to design the App Store using an integrated business model. Br. 3, 9; *see also* 4-SER-899; 4-SER-901; 4-SER-904 (alleging Apple "designed technical restrictions into iOS that prevent users from downloading app stores or apps directly from websites"). And "any firm, even a monopolist, may generally bring its products to market whenever and however it chooses." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979). It is settled that introducing new and improved products "by itself does not violate Section 2, even if it is performed by a monopolist" (*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010)); the contrary view expressed by one *amicus* (COSAL Br. 18–30) contradicts precedent and is not espoused even by Epic. Because an alleged "monopolist has no duty to help its competitors survive or expand when introducing an improved product design"

(*Allied Orthopedic*, 592 F.3d at 1002), the challenged limitations are lawful under Section 2.

## III. Apple's Distribution Model Is Lawful Under the Rule of Reason

Since the App Store launched in 2008, output has increased and prices have declined. The App Store model has conferred incredible benefits on users, developers, and Apple alike. The district court correctly concluded that Apple's restrictions on the distribution of native iOS apps are lawful under the rule of reason. *See NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021).

### A. The App Store Distribution Requirement Is Reasonable Under Section 1

Even if Epic had proved that the challenged requirements are concerted action subject to Section 1 analysis, it also had the further burden to prove that they are unreasonable under the rule of reason. *Am. Needle*, 560 U.S. at 186 ("The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade."). As the district court recognized, "[u]nder this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." 1-ER-143 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007)). The court applied the three-step, burden-shifting framework set forth in *Amex* and *Qualcomm* (1-ER-136–52) in which the plaintiff must prove the

challenged restraint has substantial anticompetitive effects, the defendant may offer procompetitive justifications for the restraint, and the plaintiff must establish substantially less restrictive alternatives to achieve those justifications (*Amex*, 138 S. Ct. at 2284; *see also* 3-SER-665).

### 1. Epic Failed To Prove Substantial Anticompetitive Effects

Epic "ha[d] the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." Br. 39. It did not. The district court found only that "Apple's app distribution restrictions do have *some* anticompetitive effects" (1-ER-147)—short of the required *substantial* anticompetitive effects (*Amex*, 138 S. Ct. at 2284). That failure of proof, which Epic overlooks, is reason enough to affirm the ultimate conclusion that the challenged limitations satisfy the rule of reason. *See Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 958 (9th Cir. 2000). That is particularly so in "dynamic and rapidly changing technology markets," where "clearer proof of anticompetitive effect" is needed—including where (as here) there has been no "elaborate inquiry as to the *precise harm*" attributable to the supposed concerted conduct challenged under Section 1. *Qualcomm*, 969 F.3d at 990–91, 1003 (emphasis added).

In that regard, the district court, at Epic's invitation, did not "isolate[e] the effects" of the allegedly *concerted* "contractual restrictions" to determine whether they had any anticompetitive effects independent of the indisputably *unilateral*

67

"technical restrictions." 1-ER-147; *see also* 3-SER-697; D.C. Dkt. 779-1 COL ¶¶ 126–27. On the contrary, any "harm [to] competition" stemmed at least in large part from Apple's prohibition on sideloading—a technical design feature of iOS properly analyzed under Section 2. 1-ER-147. That does not and cannot support any finding of liability under Section 1, for "[u]nilateral conduct by a single entity does not implicate Sherman Act § 1 regardless of the magnitude of the restraint on competition." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1449–50 (9th Cir. 1988).

Even setting aside those incurable defects, Epic did not offer legally sufficient "direct and indirect evidence of anticompetitive effects under Section 1." 1-ER-148.

***"Direct" Evidence***. The only "direct" evidence relied on by the court was Apple's "maintenance of its commission rate," which "barely budged in over a decade" and "increased prices for developers." 1-ER-102; 1-ER-147. This is not sufficient.

*First*, to "prove an actual adverse effect on price, a plaintiff must show just that—that prices actually increased." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 184 (2d Cir. 2016); *see also 1-800 Contacts*, 1 F.4th at 118. Epic did not do so. The court rejected Epic's argument that Apple "repeatedly increased prices" because "Apple's rate has always been 30%." 1-ER-134. Nor did Epic even show the rate was supracompetitive from the start: Epic conceded that

Apple was no monopolist when the App Store opened, that the 30% commission was not anticompetitive when set, and that a 30% commission was (and is) commonly charged by game transaction platforms. 2-SER-388. And Apple's average commission on in-app transactions steadily declined from that point on:



4-SER-1042. That Apple's commission "barely budged" over time (1-ER-147) is not direct evidence of anticompetitive effects.

Moreover, "[s]upracompetitive pricing entails a restriction in output" (*Brooke Grp.*, 509 U.S. at 233), and the court found that output "exploded by 1,200%" in the relevant market during that same time (1-ER-102; 2-SER-381–84)—far outstripping the industry (2-SER-441–43; 2-SER-454–55). Indeed, this undisputed growth in output is irreconcilable with Epic's theory of the case. If the challenged restraints were anticompetitive as Epic contends, the growth in output would have decelerated

when Apple supposedly became a monopolist in 2010. Yet Epic could not discern even a "hiccup" in the data. 2-SER-385. And while the district court speculated that "the high output may have been even higher without Apple's restrictions," in fact "game revenue on iOS grew *faster than on Android*"—an ecosystem that did not have the challenged restrictions. 1-ER-102 (emphasis added). Epic's evidence on price and output is vastly weaker than what the Supreme Court rejected in *Amex*, 138 S. Ct. at 2288–89 (rejecting alleged anticompetitive effects given "dramatic[]" 30% growth in output).

Nor can Apple be faulted for not justifying the level of its commission rate with any "study or evaluation." 1-ER-147 n.603. Without evidence that it was set as "an anticompetitive exercise of market power" (*Amex*, 138 S. Ct. at 2287), the court "fail[ed] to recognize that the burden does not shift to [Apple] to provide such justifications unless and until [Epic] meets its initial burden of proving anticompetitive harm" (*Qualcomm*, 969 F.3d at 996). Epic was clear from the outset that it was not "actually challeng[ing] specifically the 30 percent" and instead was seeking "to distribute directly on the iPhone . . . without going through the app store." 3-SER-819. Epic's failure to prove that the commission is anticompetitive cannot be "avoided by implicit burden-shifting." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999).

The court also observed that Apple had not "set its 30% commission rate as a calculation related to the value of its intellectual property." 1-ER-117; *see also* 1-ER-149–50. But "the 'reasonableness' of a licensor's royalties" is "a determination that sounds in [intellectual property] law and not antitrust law." *Qualcomm*, 969 F.3d at 999 n.20. It is error to assume "that royalties are 'anticompetitive'—in the antitrust sense—unless they precisely reflect a patent's current, intrinsic value and are in line with the rates other companies charge for their own patent portfolios." *Id.* at 999.

*Second*, Epic "did not show that [Apple] charged more than its competitors." *Amex*, 138 S. Ct. at 2289. At the time of trial, *every* digital game transaction platform charged a 30% headline commission with one exception: Epic's EGS, which charges a money-losing 12% commission.



1-SER-127; 1-SER-54–56. The government's assertion that Apple's commission was "sustained . . . without regard to its competitors' prices" (U.S. Br. 8) is both unsupported and contrary to the evidence.

Apple's commission was set "as a corollary to other gaming commission rates" (1-ER-94; 1-SER-127) and was *below* the level that Apple would choose if it were a profit-maximizing monopolist (2-SER-374). Pricing by reference to prevailing rates "does not establish any suppression of competition." *Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522, 526 (9th Cir. 1987). Maintaining a price that was not anticompetitive when adopted and remains in line with competition is not direct evidence of anticompetitive effects.

Indeed, the court noted that "Google, Apple's main competitor . . . also charges a 30% commission rate" even though it "does not have the same app distribution restrictions." 1-ER-147. While the court thought this "suggest[s] prices are artificially high" (1-ER-147), identical pricing *without* the challenged restraints actually "cuts *against* the plaintiffs' view that [those] provisions are the cause of any increases in . . . fees" (*Amex*, 138 S. Ct. at 2288 (emphasis added)). Without "connect[ing] the prevailing prices to the challenged [restraints]," none of Epic's evidence is direct proof of harm to competition. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021).

*Third*, Epic's contention that Apple's commissions increase prices for developers is "wrongly focuse[d] on only one side of the two-sided" market. *Amex*, 138 S. Ct. at 2287. Epic had the burden to prove that the challenged requirements were harmful considering *both* sides of the platform. On the "user" side of the platform, "[t]he evidence was undisputed that over 80% of the apps in the App Store are free" (1-ER-126), providing massive *benefits* to users. *Cf. Amex*, 138 S. Ct. at 2288 ("Amex uses its higher merchant fees to offer its cardholders a more robust rewards program"). Indeed, Apple does not charge users anything to use the App Store—any fees paid by users are imposed by developers, not Apple—and there was no finding that Apple's conduct caused *developers* to raise prices to users. 1-ER-102; *see also* 1-SER-265 (Epic charges same price regardless of commission rate). Epic thus failed to prove harm to the market "as a whole." 1-ER-146.

*"Indirect" Evidence*. Epic also did not prove anticompetitive effects through "indirect" evidence. While "proving an adverse effect on competition without showing increased price, reduced output, or reduced quality in the market has remained possible in theory," it is "elusive in practice." *MacDermid*, 833 F.3d at 184. That task eluded Epic here.

The "indirect" evidence relied on by the court to show anticompetitive effects consisted of its own market share calculation and conjecture about the nature of competition in a "but-for" world absent the challenged requirements. 1-ER-147.

The court found only that those requirements "could" hypothetically have certain effects. 1-ER-147–48. That too is not enough. *See Aya Healthcare*, 9 F.4th at 1113 (plaintiff must proffer "sufficient indirect evidence that the . . . agreement has a substantial anticompetitive effect that harms consumers"); *MacDermid*, 833 F.3d at 182 (similar). It is particularly inadequate when, as here, there was no "reduced output, increased prices, or decreased quality in the relevant market." *Qualcomm*, 969 F.3d at 989; *see also MacDermid*, 833 F.3d at 184.

Epic nonetheless asserts that "[t]he court expressly found that Apple's scheme causes great harm to . . . innovation." Br. 4–5. That is false: The district court expressly found that the "final trial record did not include evidence of . . . decreasing innovation in the relevant market." 1-ER-4. At most, the court conjectured "that a third-party app store *could* put pressure on Apple to innovate" on a narrow subset of search "features that Apple has neglected." 1-ER-105 (emphasis added). But "[w]ithout a showing of actual adverse effect on competition, [Epic] cannot make out a case under the antitrust laws, and no such showing has been made." *Jefferson Par.*, 466 U.S. at 31.

## 2. Procompetitive Justifications Defeat Epic's Claims

The district court found that Apple's challenged requirements were supported by numerous "procompetitive rationale[s]" (*Amex*, 138 S. Ct. at 2284), *i.e.*, "nonpretextual claim[s] that [one's] conduct is indeed a form of competition on the

merits because it involves, for example, greater efficiency or enhanced consumer appeal" (*Qualcomm*, 969 F.3d at 991). Epic seeks to minimize the number, extent, and scope of Apple's justifications by pretending they encompass only malware security and intellectual property, each of which it says was found to be "largely pretextual" (Br. 43–44). That is incorrect in every respect. The district court found that Apple proved at least six nonpretextual justifications for its limitations on native app distribution—malware security, reliability, fraud protection, privacy, higher quality selection of apps, and protecting intellectual property—all of which are *factual* findings reviewed for clear error. *O'Bannon*, 802 F.3d at 1072; *see also* 1-ER-148–50 (grouping justifications into three categories).

Apple's centralized model technically blocks sideloading to ensure that each native iOS app is subject to robust technical and human app review. 1-ER-111; *see also* 2-SER-311; 2-SER-316–18; 2-SER-321–28; 2-SER-568–71. This leads not only to peerless security against malware (1-ER-108–09; 1-ER-148; 4-SER-946; 1-SER-181–82), but also allows for "checks" to improve apps' reliability (1-ER-108; *see also* 1-ER-86; 2-SER-572–74; 1-SER-174). The same restrictions also facilitate a more trustworthy ecosystem protected "against scams and other fraud," which in turn "encourages both users and developers to transact freely." 1-ER-112–13; 1-ER-148.

In addition, Apple's centralized model allows it to impose and enforce heightened privacy standards—"an important" feature to users. 1-ER-111–13; 1-ER-148; 1-SER-273–74; 3-SER-594–95. Apple also can and does improve app quality by culling apps with offensive content—such as pornography, violence, and bigotry—to which all users, including children, would otherwise be exposed. 1-ER-112; 1-ER-148; 1-SER-168; 2-SER-316–19; 2-SER-331–33. And the district court further found that the challenged requirements facilitate Apple's ability to protect and profitably license the technology and intellectual property that it invested billions to develop. 1-ER-149–50; *see also* 2-SER-546; 2-SER-588; 1-SER-195–96.

All six of these justifications—which the district court discussed in groups—"enhance[] the quality or attractiveness of a product, increase[] efficiency by reducing costs or otherwise benefit[] consumers." *Image Tech.*, 125 F.3d at 1220 n.12. Yet Epic ignores all but *two* of these justifications—malware security and intellectual property. Because the rule of reason demands only one justification, Epic's failure to challenge the others is alone dispositive. *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 369 (9th Cir. 1988).

Epic's arguments are wrong in any event. Epic's principal contention is that the district court found that Apple's desire to protect and profit from its intellectual property was pretextual. Br. 43. Epic misreads the decision: "[W]hile the Court

. . . found the *rate itself* pretextual, [it could not] conclude that Apple's protection of its intellectual property is pretextual." 1-ER-150. As noted, Epic did not even challenge the rate of the commission. 1-ER-172. Regardless, the court recognized that Apple's right to "license its intellectual property for a fee, and to guard its intellectual property from uncompensated use"—not the rate itself—was a procompetitive justification for Apple's restrictions. 1-ER-150. Epic objected to paying a fee at all; on that point, it unequivocally lost.

Critically, Epic does not challenge as clearly erroneous the district court's finding that Apple's protection of its technology and intellectual property rights is a nonpretextual procompetitive justification. *See O'Bannon*, 802 F.3d at 1074–79. Nor does it contest the longstanding precedent holding that efforts "to profit from . . . intellectual property rights . . . [are] legitimately procompetitive," as they incentivize companies to innovate while also enabling licensees to leverage that intellectual property into new and improved products—inuring to their and consumers' benefit. *Image Tech.*, 125 F.3d at 1218–19. By encouraging innovation, preventing companies like Epic from free-riding is itself procompetitive. *See Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013).

Epic is left with its request that this Court disregard the undisputed benefits of preserving privacy and improving security because the district court "made no

finding" that those justifications "advance *competition*." Br. 51. Epic never advanced this argument below, and its expert conceded that "[p]rotecting iPhone users from security threats is a procompetitive benefit." 2-SER-392. Epic cannot reverse course now. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999); *Yukon Recovery, L.L.C. v. Certain Abandoned Prop.*, 205 F.3d 1189, 1193 (9th Cir. 2000). Its new position also contravenes established antitrust jurisprudence. *See*, *e.g.*, *Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998) ("[I]ncreasing output, creating operating efficiencies, making a new product available, enhancing product or service quality, and widening consumer choice have been accepted by courts as justifications.").

Mobile devices include a host of features (including a camera, microphone, and GPS locator) that could be exploited for nefarious purposes by unscrupulous app developers. 1-SER-165. The suggestion that offering users the *option* to enjoy heightened protection against pervasive and increasing threats to security and privacy is not a "cognizable" competitive justification (Carrier Br. 6) is redolent of the ivory tower and has no connection to the trial evidence or the real world.

In denying that security and privacy can be procompetitive justifications, Epic and its *amici* make the blanket argument that a restraint of trade cannot be excused on the ground that it promotes public safety. Br. 52 (citing *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978)); *see also* Carrier Br. 8–12. Their principal

authority, however, holds only that a horizontal agreement that erases interbrand competition cannot be justified by a purported desire to enhance public safety. *Nat'l Soc'y*, 435 U.S. at 695. That is not an issue here—Apple is not a "benevolent overlord" of user safety (Br. 52), but rather is "improving the quality of its services" to *differentiate itself* as an ecosystem prioritizing safety and privacy (1-ER-149 & n.608).

The district court expressly found that Apple's focus on security and privacy "promote[s] interbrand competition." 1-ER-148. As the court explained, "users who value open distribution [can] purchase Android devices, while those who value security and the protection of a 'walled garden' [can] purchase iOS devices." 1-ER-149; *see also* 1-SER-273; 2-SER-392–93; 2-ER-480 (testimony from both Apple's and Epic's CEOs that security and privacy are competitive "differentiators" for Apple). Indeed, Epic's own CEO testified that he uses an iPhone *because* Apple's approach to security and privacy is superior to competitors. 1-SER-274. This kind of product differentiation has long been found procompetitive. *See*, *e.g.*, *Leegin*, 551 U.S. at 890–91 (the "primary purpose" of antitrust laws is "[t]he promotion of interbrand competition"); *Aerotec*, 836 F.3d at 1180 n.2 (similar).

Apple's requirements also prevent third parties from "free riding" on its investments in security and privacy. *Amex*, 138 S. Ct. at 2290. Such free-riding, if allowed, would threaten to erode Apple's "competitive differentiator[s]" that

"enhance[] consumer appeal" vis-à-vis Android. 1-ER-113; 1-ER-148. That is

because third-party app stores would sell unscrutinized apps to unsuspecting users

attracted to the platform by "the quality of [Apple's] services, here, privacy and

security" (and its hard-won reputation for the same). 1-ER-149 n.608; 1-SER-181–

82; *see also* Erika Douglas, *Data Privacy Protection as a Procompetitive*

*Justification*, Antitrust Mag. 14 (Dec. 2021) ("This adaptation of classic free-riding

arguments to the data privacy context [in this case] makes sense, satisfying the legal

requirement that a justification have a 'countervailing procompetitive virtue.'").

As Epic's own technical expert admitted, nobody "do[es] it better" than Apple

when it comes to security and privacy. 2-SER-490. Apple proved that the

challenged limitations have allowed it to differentiate itself from competitors,

ultimately giving users *more* choices. 1-ER-148–50; *see also* 1-SER-273. The

district court rightly refused to allow the antitrust laws to "artificially eliminate"

consumers' ability to choose best-in-class security and privacy. 1-ER-48.

### 3.      Epic Did Not Prove Viable Less Restrictive Alternatives

At the "third and final step of the Rule of Reason," the district court found

that Epic had proved no "means of achieving [Apple's] procompetitive purposes that

were 'substantially less restrictive.'" *O'Bannon*, 802 F.3d at 1060; *see also*

1-ER-152–53. This step requires the plaintiff to show the challenged restraints are

"patently and inexplicably stricter than is necessary to achieve the procompetitive

benefits" (*Alston*, 141 S. Ct. at 2162 (quotation marks omitted)) by proving alternatives exist that are "'virtually as effective' in serving the procompetitive purposes" *and* do so "without significantly increased cost" (*O'Bannon*, 802 F.3d at 1074). This is yet another question of *fact* reviewed for clear error. *Id.*

In its principal brief, Epic asserts at least three times that the district court "found less restrictive alternatives." Br. 44; *see also id.* at 13, 40. This is a blatant misrepresentation: The court actually found that Epic had failed to carry its burden of proving *any* less restrictive alternatives. 1-ER-150–52. Those factual findings were amply supported by the record, including testimony from numerous expert and lay witnesses on the merits of Epic's putative alternatives. *See*, *e.g.*, 1-SER-184; 1-SER-206; 2-SER-486–87; 2-SER-551–52; 3-SER-611–13. Epic has not shown and cannot show clear error, and its effort to rewrite the opinion on appeal highlights the weakness of its position.

Epic has abandoned almost all of its "alternatives" on appeal—pressing only a "'notarization' program" whereby native iOS apps could run on iOS only if they have been "notarized" by Apple. Br. 41. But the court found that Epic failed to prove notarization would be equally effective or could be implemented without added cost. 1-ER-107. Epic and its *amici* complain that these findings "cannot be squared" with others. Br. 42; *see also* EFF Br. 23 (similarly arguing that these findings "make[] no sense"). But those arguments are based on mischaracterizing

one half of the relevant record and ignoring the other. That does not demonstrate clear error. *See O'Bannon*, 802 F.3d at 1074.

*First*, "missing" from Epic's notarization model "is human app review which provides most of the protection against privacy violations, human fraud, and social engineering." 1-ER-151. Apple intentionally designed a *more* secure ecosystem for iOS by requiring human review of iOS apps. 1-ER-31; *see also Alston*, 141 S. Ct. at 2163 ("[A]ntitrust courts must give wide berth to business judgments before finding liability."). Epic's attempt to dismiss the significance of human app review by pointing to the Mac ecosystem (Br. 41) therefore misses the point—as the district court found in crediting Apple's "compelling explanation" that "Mac computers have more malware" than iPhones (1-ER-149). Apple intentionally designed iOS to be different, and more secure, than macOS.

Apple's iOS also performs better in this respect than its "main competitor" in the relevant market: Android. 1-ER-147. Google, which charges the same headline commission rate as Apple while allowing sideloading and alternative stores, has "higher malware rates" (1-ER-110; 1-ER-148):



4-SER-946. Tellingly, Google has increasingly moved toward more robust human review on its Google Play store. 1-SER-174.

Epic suggests human review could be *added* to the notarization model because "app review can be relatively independent of app distribution." Br. 41 (quoting 1-ER-116); *see also* 1-ER-151 n.611. But Epic never explained how that would work in practice, and its expert suggested that *the court* would head a council of "security" and "content moderation" experts to decide who could distribute apps and on what terms. 2-SER-491–94. Neither Epic nor its *amici* mention this damning revelation on appeal, undoubtedly recognizing that courts are not "central planners" suited to "identifying the proper price, quantity, and other terms of dealing." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *see*

*also Alston*, 141 S. Ct. at 2163 (as ineffective "day-to-day enforcer[s]," courts should not impose duties they cannot "reasonably supervise").

Epic ignores altogether its burden to prove that such an addition would not carry "significantly increased cost." *In re NCAA*, 958 F.3d at 1260. By failing to engage with this requirement in its opening brief, Epic has forfeited the point. *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1072 n.3 (9th Cir. 2014). Below, Epic offered *no* evidence about the cost of implementing, supervising, and maintaining its "underdeveloped" framework for balkanized app review. The district court found that Epic's proposed notarization model would lead to "dramatically higher" demands on app review (2-SER-583 (cited at 1-ER-151 n.611)) and would force Apple to rework "the amount of resources Apple allocates to the issue and supply of human reviewers" (1-ER-116). The court's comment that "scale itself does not appear to be a problem," cited by Epic (Br. 19 (quoting 1-ER-116)), suggests only that scaling is *possible*. The court found, however, that it would entail significantly increased cost. 1-ER-152; *see also County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159–60 (9th Cir. 2001) (rejecting more costly alternative).

*Second*, the district court found that Apple has the right to charge and collect a commission (1-ER-70; 1-ER-116–17; 1-ER-150), but that Epic's notarization model would be a less effective means of doing so and also entail substantial additional costs (1-ER-151–52). Epic never proved its alternatives would have even

allowed Apple to "collect licensing royalties" at all, much less "how it would do so." *Id.*; *see also 1-800 Contacts*, 1 F.4th at 121–22 (courts must consider "the practical implications of" an alternative "on the parties' ability to protect and enforce" their intellectual property).

Ignoring these findings, Epic suggests the court recognized "tiered licensing scheme[s]" or "audit[ing] developers" as viable alternatives. Br. 43. Not so. The district court found that auditing as proposed by Epic would "severely undermine" Apple's ability to collect a commission and further "impose both increased monetary and time costs" (1-ER-153 & n.617). Epic failed to propose any tiered licensing scheme below (D.C. Dkt. 777-3 COL ¶¶ 651–83; 3-SER-805), leading the court to find that Epic "ha[d] not sufficiently developed" any alternative licensing scheme (1-ER-152). "[P]laintiffs must make a strong evidentiary showing that its alternatives are viable" (*O'Bannon*, 802 F.3d at 1074); Epic's speculative proposals "do not offer even the thinnest reed of support" (*Hairston v. Pac 10 Conf.*, 101 F.3d 1315, 1319 (9th Cir. 1996)), much less show *clear* error.

### 4. The Court Undertook Every Step Required By The Rule Of Reason

Epic devotes an entire section of its brief to arguing that the district court erred in failing to conduct a "balancing" inquiry (Br. 47–55), a point echoed by several *amici* (U.S. Br. 19; State AG Br. 21). That argument is unavailable to Epic. When

asked at the conclusion of trial whether it was "equating . . . balancing with [the] least or less restrictive alternative [step]," Epic responded:

> Your Honor, I think they are largely the same. I know the courts have talked about them as different things, but I think in practice if what you are doing is you are looking to assess whether the restraint at issue is on balance a problem, one of the things that clearly you would do in making that judgment is think about what the alternatives are to achieving the procompetitive benefit that the defendant claims is the basis for the challenged restraint.
>
> So, although . . . there are cases that describe each of them. I think ultimately the inquiry . . . largely collapse[s].

2-ER-493–94; *see also* D.C. Dkt. 777-3 COL ¶ 170 (similar). Having "asked the district court to apply" one unified standard—an assessment of less restrictive alternatives with no separate balancing—Epic cannot "now argue against" it. *Yukon*, 205 F.3d at 1193–94.

Nor was the district court required to take a fourth step. Twice in the last five years, the Supreme Court has outlined the "three-step, burden-shifting framework" for assessing Section 1 claims under the rule of reason—articulating an additional "balancing" step in neither case. *Amex*, 138 S. Ct. at 2284; *accord Alston*, 141 S. Ct. at 2162. The government admits that "the Supreme Court's formulation of the burden-shifting framework in *Alston* and *Amex* . . . does not expressly reference weighing." U.S. Br. 18. That is because the three-step framework *is* the "means for distinguishing between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best

86

interest." *Alston*, 141 S. Ct. at 2160 (alteration and quotation marks omitted); *accord Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111–12 (9th Cir. 2021). Tellingly, neither Epic nor its *amici* acknowledge this Court's counsel that "weigh[ing] the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable." *Allied Orthopedic*, 592 F.3d at 1000; *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 n.11 (D.C. Cir. 1986).[10]

Epic's cases (Br. 48–51) simply explain that the rule-of-reason analysis *in its entirety* "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *Leegin*, 551 U.S. at 885; *see also L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1391 (9th Cir. 1984). For example, in one of those cases, this Court first analyzed intent, then anticompetitive effects, and merged all analysis of procompetitive justifications and alternatives into a "third and final component" that it called a "balancing test." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789–91 (9th Cir. 1996). In another, this Court analyzed less restrictive alternatives at length and then added in a single sentence that, for the same reasons,

---

[10] Although *Qualcomm* quoted *Microsoft*'s "balancing" formulation of the third step under the Section 2 burden-shifting test, this Court equated that framework with *Amex*'s Section 1 framework. 969 F.3d at 991. Moreover, the statement in *Qualcomm* was dicta, as was the third step in *Microsoft* itself. *See Allied Orthopedic*, 592 F.3d at 1000 (observing that the D.C. Circuit in *Microsoft* "nominally included a balancing component in its test, [but] it has not yet attempted to apply it").

it found "any anticompetitive harm is offset by the procompetitive effects." *County of Tuolumne*, 236 F.3d at 1159–60. Neither case conducted—much less required—residual balancing divorced from an analysis of less restrictive alternatives. *See* Herbert Hovenkamp, *The NCAA and the Rule of Reason*, 52 Rev. Indus. Org. 323, 327 (2016) (separate balancing would make "an inquiry into less restrictive alternatives . . . unnecessary").

Given the government's recognition that the three-step "framework resolves the vast majority of rule-of-reason cases" (U.S. Br. 16), it is beyond hyperbolic to suggest that the district court's adherence to precedent "rework[ed] core antitrust jurisprudence or displace[d] [the Ninth Circuit's] cases recognizing a weighing requirement" (*id.* at 18). The Supreme Court has never required a discrete balancing step, and neither Epic nor its *amici* offer any serious argument why an extra step is so clearly "required" in these circumstances that the district court abused its discretion in applying the three-step framework. *Alston*, 141 S. Ct. at 2160.

Nor can Epic or its *amici* come up with anything more the district court should (or could) have done. *See* U.S. Br. 18 n.1 (speaking merely of "a qualitative assessment"). The most they offer are musings about hypothetical cases in which "an egregious restraint with a minor procompetitive effect" would pass muster. Br. 49; *see also* U.S. Br. 16. But that is the converse of this case, where the court professed to find just "*some*" anticompetitive effects while recognizing the many

procompetitive benefits of the challenged restraints. In any event, this concern is dealt with at steps two and three. A fig-leaf justification would be a prime candidate for rejection as pretextual and invalid. *See Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994). And a justification that was wholly insufficient to outweigh an egregious anticompetitive effect would have the less restrictive alternative of dropping the restraint entirely. *Law*, 134 F.3d at 1021; *see also Alston*, 141 S. Ct. at 2162 (steps two and three "can be collapsed into one" since a "legitimate objective that is not promoted by the challenged restraint can be equally served by simply abandoning the restraint").

Even setting all that aside, the district court "carefully considered the evidence in the record and . . . determined, based on the rule of reason," that the alleged distribution restraints "have procompetitive effects that offset their anticompetitive effects." 1-ER-160; *see also* 1-ER-150–51 n.610. Indeed, the court found at three separate points that Apple's conduct overall was "more than 'not anticompetitive' but potentially beneficial to consumers." 1-ER-165; *see also* 1-ER-152; 1-ER-160. The court, in other words, did exactly what Epic and its *amici* accuse the court of not doing.

Epic attempts to dismiss this weighing as a "bare statement . . . without reference to any factual findings." Br. 50. But the court devoted dozens of pages to the merits of Apple's conduct, including its finding that any anticompetitive effects

failed to overcome Apple's procompetitive justifications. 1-ER-136–69. There was no need for the court to restate those findings *in toto* when rendering its bottom-line conclusion that Epic was challenging *not* anticompetitive restraints but "restraints stimulating competition that are in the consumer's best interest." *Alston*, 141 S. Ct. at 2160; *see also* 1-ER-168–69. This is the same approach this Court took in the case Epic touts as performing a balancing analysis. *See County of Tuolumne*, 236 F.3d at 1159–60. There is no error here.

## B. The App Store Distribution Requirement Is Reasonable Under Section 2

When "a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Qualcomm*, 969 F.3d at 991 (emphasis omitted). The district court applied that rule here (1-ER-155), and Epic does not challenge it. *See* Br. 56–57. The government, however, argues that "Section 2 is not categorically 'more exacting' on plaintiffs." U.S. Br. 25. Whether or not that is true in the abstract, it has no applicability here.[11]

*Qualcomm* squarely holds that Section 2 is more exacting in that a plaintiff may not rely on indirect evidence (969 F.3d at 991–92), making that part of Epic's Section 1 case inapplicable to its Section 2 claims. Moreover, even direct evidence

---

[11] The government also complains that the district court "equated" the rule-of-reason analysis under Sections 1 and 2. U.S. Br. 24. But that is exactly what Epic urged in the court below, as well as in this Court. Br. 40 ("The rule of reason tests for Section 1 and Section 2 are substantially the same").

of anticompetitive effects would not suffice because Epic challenges "product improvement[s]" that by themselves "do[] not violate Section 2, even if [they were] performed by a monopolist and harm[ed] competitors as a result." *Allied Orthopedic*, 592 F.3d at 999–1000; *see also Oahu*, 838 F.2d at 369. And as noted above (§ II.B), Apple has no duty to deal with Epic on its preferred terms—barring liability under Section 2.

Contrary to Epic's contention (Br. 57 n.4), "there is no least restrictive alternative requirement in the context of a Section 2 claim." *Image Tech. Servs. Inc., v. Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir. 1990); *accord Image Tech.*, 125 F.3d at 1212. Rather, courts typically "determine antitrust liability by asking whether there was a legitimate business justification." *Oahu*, 838 F.2d at 368; *accord Allied Orthopedic*, 592 F.3d at 1000. Apple is not a monopolist; even if it were, Section 2 "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Trinko*, 540 U.S. at 415–16. The legitimate, nonpretextual justifications proven at trial are yet another independent reason why Epic's claims of monopolization under Section 2 fail.

## IV. Apple's IAP Requirement Is Lawful Under The Rule Of Reason

The district court correctly sustained Apple's requirement that all in-app transactions involving digital content use the proprietary IAP functionality. 1-ER-119–21; 1-ER-152–53.

### A. There Is No Unlawful "Tie"

Epic seeks to revive its claim that Apple unlawfully "ties" iOS App Distribution to IAP. Br. 67–73; *see also* Microsoft Br. 21–29. This argument fails at the outset because the district court rightly found that Epic failed to prove its proposed iOS-only "Payment Solutions" market (1-ER-130–36); *see also supra* § I.A.2. Nor can Epic demonstrate clear error in the court's attendant finding that Epic adduced "no evidence" showing IAP is a "standalone product." 1-ER-157–58; *see also Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1354 (9th Cir. 1982) (clear error review applies to finding that products are not separate).

A necessary predicate to a tying claim is proof of "separate and distinct product[s]" (*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008)) in "two separate product markets" (*Jefferson Par.*, 466 U.S. at 21). As the parties, their experts, and the district court agreed, the App Store is a two-sided platform offering only one product—transactions. 1-ER-124–25. Both Epic (Br. 71) and the government (U.S. Br. 37) argue that *Amex* does not mean as a matter of law that IAP cannot be a separate product in a separate market. But the court applied

no such legal rule. Rather, it made findings on "[t]wo core *factual* issues"—"integration and consumer demand"—establishing that IAP was not a separate product in a separate market. 1-ER-157 (emphasis added); *see* 1-ER-130. Epic identifies no clear error in those findings.

*First*, and dispositively, the court found that IAP is not a distinct product "bought or sold but it is integrated into the iOS devices" as "a collection of software programs working together to perform several functions at once in the specific context of a transaction on a digital device" that "Apple uses . . . to manage transactions, payments, and commissions within the App Store" (among other platforms). 1-ER-68; 1-ER-157–58; *see also* 1-SER-249–51. IAP is therefore an "essential ingredient of [the iOS platform's] formula for success" and "there is but a single product." *Rick-Mik Enters.*, 532 F.3d at 974.

Epic suggests that app distribution and IAP "perform different functions" and "are used at separate times." Br. 68. That is not the test for a tying claim; the question is whether they are integrated. The district court found they were (1-ER-68; 1-ER-157–58), and Epic's suggestion that the court found they were merely "functionally linked" (Br. 73)—a phrase that appears nowhere in the opinion—distorts the record. Similarly, Epic's assertion that the court's finding is irreconcilable with its observation that IAP is not integrated into the App Store (Br. 70 (citing 1-ER-68)) is disingenuous, for that *same* paragraph explains that IAP is

integrated into iOS for app distribution (1-ER-68). As the court found, the App Store is a "vertically integrated" platform in which "distribution, content delivery, and payment functionalities" "cannot be broken into pieces to create artificially two products." 1-ER-157 & n.619; *see also* 2-SER-364–69 (Epic's expert admitting that other payment solutions are not separate products from their corresponding platforms).

*Second*, while Epic assures this Court that the "separate demand test . . . is easily satisfied here" (Br. 31), the district court made the factual finding that Epic "presented no evidence showing that demand exists for IAP as a standalone product" (1-ER-158). Epic cannot establish clear error in that finding. Epic retreads its argument that "many developers who sell digital goods on iOS have asked to use non-IAP payment solutions" (Br. 69), but ignores the central premise for the district court's conclusion:

> Epic Games' argument mischaracterizes IAP and its functionality. Payment processing is simply an input into the larger bundle of services provided by the IAP system. While there may be a market for payment processing, that fact is irrelevant as IAP is not just payment processing.

1-ER-158 (footnotes omitted); *see also* 3-ER-613 (IAP "enables additional content, functionality or services to be delivered or made available for use within an Application with or without an additional fee"). Epic does not engage with this finding *at all*, instead arguing that the district court "conflate[d]" procompetitive justifications with the separate-product inquiry by considering the additional

features IAP offers. Br. 72. That is wrong—the court simply relied on IAP's features to show that IAP is materially different from mere payment solutions. By contrast, Epic's pre-IAP examples (Br. 70) "only concern simple payment processing" (1-ER-68–70), which IAP does not even perform. They therefore prove nothing.

Epic further argues that the fact that some developers have attempted to bypass the IAP commission is evidence of separate demand. Br. 71–72. But the court found that these examples showed only that some developers would prefer not to pay Apple a commission at all, not that IAP is a separate product. 1-ER-158 n.621. As Epic's own expert conceded, IAP is an efficient means for Apple to collect its commission under the business model examined at trial. 2-SER-371. Epic offers no response to this finding, let alone a demonstration of clear error.

In addition, "[a] tie only exists where the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one." *Aerotec*, 836 F.3d at 1178 (quotation marks omitted). Even if IAP were a separate product, Epic still failed to prove a tie because developers are not required to use IAP to distribute game apps through the App Store. Epic admits this, observing that "[t]housands of developers that use Apple's app distribution platform (the App Store) do not use Apple's IAP, either because they offer no in-app purchase or offer physical goods and services." Br. 69. Nor does Apple dictate any

single monetization strategy to developers; many opt for advertising or other business models that do not use IAP. *See* 1-ER-32–36; 4-SER-1030–32. Because the majority of developers distribute apps without ever using IAP, Epic's tying claim is dead in the water.

## B.    There Is No Unreasonable Restraint

Whether analyzed as a tie or a standalone restriction, the required use of IAP—if Epic's challenge were not barred for all the above reasons—is lawful under the rule of reason. Although Epic incorrectly suggests its tying claim is suitable for *per se* analysis (Br. 67), "novel business practices—*especially* in technology markets—should not be conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Qualcomm*, 969 F.3d at 990–91 (quotation marks omitted); *see also Microsoft*, 253 F.3d at 89 (expressing concern that tying claims risk "chill[ing] innovation" by "preventing firms from integrating into their products new functionality"). Nothing like the IAP requirement has ever before been held unlawful, so it must be analyzed under the rule of reason. *See* Microsoft Br. 23.

The district court made no separate inquiry into IAP's purported anticompetitive effects (1-ER-152; *see* § III.A.1 above), but it did identify at least three distinct procompetitive benefits from the required use of IAP:

- IAP provides Apple an efficient means to collect its lawful commission for the use of its intellectual property (1-ER-153);

- IAP offers a more secure transaction and thus serves as another competitive differentiator that enhances user choice (1-ER-153; *see also* 1-SER-152–53; 2-SER-308–09; 3-SER-613); and

- IAP provides a suite of user-friendly services in the form of a centralized payment solution (1-ER-153).

Epic does not dispute these findings.

The only "less restrictive alternative" advanced by Epic below was precluding Apple "from restricting or deterring" developers from offering alternatives to IAP. 1-ER-153. The district court found that such a flat prohibition was not a viable less restrictive alternative, and Epic cannot show clear error in that finding.

*First*, the court found that Epic's "alternative" would weaken "Apple's competitive advantage on security," ultimately "decreas[ing] consumer choice in terms of smartphone devices and hardware." 1-ER-153. Ample evidence supported this finding. *See*, *e.g.*, 2-SER-422–23 (IAP was safer than third-party software); 1-SER-179; 1-SER-189–90 (IAP's centralization improved Apple's fraud-detection algorithms and techniques). Ignoring these findings, Epic takes out of context the statement that "other companies" that "process more transactions" could match Apple's scale-based advantages. Br. 45 (quoting 1-ER-119). This overlooks the preceding sentence, in which the court found Epic's proposal "may decrease security" in other respects. 1-ER-119. The single excerpt on which Epic focuses neither contradicts nor displaces the record as a whole—and does not demonstrate clear error. *O'Bannon*, 802 F.3d at 1074.

*Second*, the district court found that in the "absence of IAP," it would "be more difficult for Apple to collect [its] commission." 1-ER-153. Epic asserts that "[t]he court found that Apple has other ways to be compensated for its intellectual property" (Br. 46) but does not address whether purported alternatives would be "virtually as effective" as IAP or "without significantly increased cost" (*In re NCAA*, 958 F.3d at 1260). Regardless, the court made no such finding—the excerpt about the *amount* of Apple's commission comes from the court's discussion of the closed ecosystem, and does not relate to the *collection* of the commission at all. Br. 46 (citing 1-ER-117). With respect to IAP, by contrast, the court found that Epic did not "directly dispute" any of Apple's substantial evidence (1-ER-120; *see also* 2-SER-371–72; 2-SER-525–26; 2-SER-415, 2-SER-418), and that Epic's proposed alternative would, if anything, increase costs to developers and Apple (1-ER-153 n.617).

*Finally*, the district court found that some users would have a degraded experience if they could no longer choose the convenient, "centralized option of managing a single account through IAP" (1-ER-153), crediting evidence that Apple's current approach allows users to experience "safe and frictionless" transactions (2-SER-308; *cf. Amex*, 138 S. Ct. at 2289 (providing "frictionless transaction[s]" is procompetitive)). Epic's suggestion that the district court found competition would enhance these benefits of centralization (Br. 47 (quoting

1-ER-122)) rests on a statement regarding Apple's *anti-steering provisions* (addressed below); the court made no such finding as to IAP (1-ER-154). While Epic notes that the trial evidence showed IAP was not used for transactions in physical goods (Br. 69), this does not satisfy Epic's burden to prove that IAP provides no consumer benefits—it merely shows that Apple chose to treat two different kinds of transactions differently. *See O'Bannon*, 802 F.3d at 1074; *see also* 1-SER-153. And contrary to Epic's suggestion (Br. 69), its proposed alternative *would* deprive users of "the centralized option of managing a single account through IAP" (1-ER-153), to the extent developers elected to use other payment solutions. *See O'Bannon*, 802 F.3d at 1074 (less restrictive alternative must be "'virtually as effective' in serving the procompetitive purposes").

Epic's requested injunction against IAP "would harm both consumers and developers by weakening the quality of the App Store." 1-ER-153. Here, as elsewhere, Epic seeks only to enrich itself while both reducing competition and harming users.[12]

---

[12] Regulatory authorities in some jurisdictions—often at the behest of Coalition for App Fairness members—are considering requiring Apple to alter its IAP requirement, among other things. *See, e.g.*, *South Korea Approves Rules on App Store Law Targeting Apple, Google*, Reuters (Mar. 8, 2022), https://tinyurl.com/ydknbxyr. Any changes to its business model that Apple may make in response to such developments would say nothing about the past lawfulness (under U.S. law) of the restraints Epic challenged here. *See supra* note 5.

**V.    Epic Cannot Escape Liability For Its Breaches Of Contract.**

Epic *stipulated* that, by implementing the hotfix, it breached its contractual obligations to Apple.  3-SER-630–34.  Epic seeks to escape liability for those breaches by arguing that the DPLA violates the Sherman Act.  Br. 74.  If the Court affirms the Sherman Act judgment (as it should), then Epic's defense of illegality also fails, since enforcement of the DPLA would not "enforce conduct that the antitrust laws forbid."  *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 82 (1982).

Moreover, Epic breached provisions of the DPLA that it did not challenge under the Sherman Act.  1-SER-227–28 (listing numerous provisions Epic breached).  The district court found that Epic's "hotfix . . . clandestinely enabled substantive features in willful violation of the contractual obligations and guidelines" (1-ER-24), and that Epic "intentionally omitted the full extent and disclosure of this hotfix" when sharing the update for Apple's approval (1-ER-28).  This conduct breached Epic's contractual obligation not to "hide, misrepresent or obscure any features, content, services or functionality" in native iOS apps.  3-ER-635; *see also* 3-ER-683 ("If you attempt to cheat the system . . . you will be expelled from the Developer Program").  The defense of illegality thus provides no refuge for Epic:  Whether or not it prevails on any antitrust theory, these obligations would remain binding on Epic.  *Kec v. Super. Ct. of Orange Cnty.*, 51 Cal. App. 5th 972, 974–75 (2020) ("[W]here a single contract provision is invalid, but the balance of

the contract is lawful, the invalid provision is severed, and the balance of the contract is enforced.").

## ARGUMENT ON APPLE'S CROSS-APPEAL

Whereas Epic's appeal impermissibly asks this Court to re-weigh the evidence, Apple's cross-appeal is narrowly focused on two legal errors committed below.  First, the court erred in enjoining Apple's "anti-steering" provisions under the California UCL.  Second, the court misconstrued the DPLA's indemnity provision.

## I.   The UCL Injunction Cannot Stand

As explained above, Epic challenged two—and only two—limitations imposed by Apple:  App Store distribution and IAP.  In its complaint, Epic made passing reference to Apple's "anti-steering" provisions (4-SER-902–03), which help enforce the IAP requirement (and avert circumvention of Apple's commission) by preventing developers from advertising alternative purchase options within their iOS apps.  In particular, Guideline 3.1.1 prohibits developers from "includ[ing] buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [IAP]" within their iOS apps.  3-ER-697.  Epic did *not*, however, make a standalone challenge to the anti-steering provisions.  Nor could it have:  Because Apple would have no competitors under the single-brand markets Epic erroneously and unsuccessfully pursued at trial, anti-steering provisions can

have no anticompetitive effects in such markets (as there are no substitutes to which users could be steered)—as Epic's own expert admitted. 2-SER-476–78

Nevertheless, at trial, the district court took an interest in the anti-steering provisions and asked several witnesses about them. 2-SER-344; 2-SER-402; 2-SER-419. At the closing hearing, the court said that the "anti-steering provisions seem[] anticompetitive" but recognized "that *AmEx* held to the contrary" (3-SER-627–28), finding them lawful under the Sherman Act (1-ER-162–71). Despite this, the court found those same provisions "unfair" under the UCL (1-ER-162–71) based on an admittedly "less fulsome" record (1-ER-166).

The meager evidence adduced by Epic is legally insufficient to support the UCL judgment. Indeed, the pertinent parts of the court's opinion are nearly devoid of record support—a remarkable contrast from the court's earlier analysis. *See*, *e.g.*, 1-ER-167–70. Both the liability ruling and the injunction are beset with legal defects.

### A.  Epic Lacks Standing

Under Article III, Epic was (and is) required to prove that it (1) suffered injury (2) traceable to the anti-steering provisions (3) that can be redressed by the injunction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021). "In the context of injunctive relief, the plaintiff must demonstrate a *real or immediate threat* of an irreparable injury."

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (quotation marks omitted). Standing must exist at all stages of a lawsuit—including appeal. *See*, *e.g.*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67–69 (1997).

Epic cannot show injury or redressability. Shortly after Epic triggered the hotfix, Apple terminated the developer account of Epic Games, Inc.—the sole named plaintiff. 1-ER-28–29. The district court confirmed Apple's unqualified termination right (1-ER-176), and Apple will not revisit that decision until the judgment becomes final and nonappealable. C.A. Dkt. 19-10. As a result, Epic has no apps on the App Store and cannot be injured by rules applicable only to developers with apps on the App Store. *TransUnion*, 141 S. Ct. at 2211 ("mere risk of future harm" insufficient). Likewise, because Epic cannot benefit from an injunction allowing developers to "include[e] *in their apps*" links to external purchasing mechanisms (2-ER-195 (emphasis added)), it cannot show that the injunction will redress any injury to "the individual plaintiff[]" (*Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020)).

After trial, the district court ruled that Epic has Article III standing because it "and its related companies receive royalties from numerous companies who use the Unreal Engine for apps," and "Apple's commission rates depress those royalties." 2-ER-192 (citing 4-SER-1073–93). In so ruling, the court relied on Epic's representation that royalties for Unreal Engine—a software tool with no other

connection to this litigation, developed by a non-party Epic affiliate—are affected by Apple's commission rates.  2-ER-192; *see also* D.C. Dkt. 835 at 7:2–13.  The Unreal Engine license agreement, however, unequivocally establishes that Epic's royalties are based on gross sales—*not* net profits after commission.  4-SER-1079–80 ("[I]f your Product earns $10 on the App Store, Apple may pay you $7 (having deducted 30% as a distribution fee), but your royalty to Epic would still be 5% of $10 (or $0.50).").  Accordingly, the court's conclusion that Epic's and its subsidiaries' royalties could be affected by Apple's commission rates has zero evidentiary support.  Speculation that the UCL injunction would lower those rates does not injure Epic under Article III.  *Cf. Cont'l Auto. Sys., Inc. v. Avanci, LLC*, — F. 4th —, 2022 WL 594324, at *5 (5th Cir. Feb. 28, 2022).

## B. UCL Liability Is Foreclosed As A Matter Of Law

The district court applied both the "tethering" test and the "balancing" test for UCL liability.  The former requires "proof of some actual or threatened impact on competition"; the latter "balance[es] the harm to the consumer against the utility of the defendant's practice."  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735–36 (9th Cir. 2007).  The balancing test is inapplicable here as a matter of law because Epic seeks to compete with Apple.  *See id.*  And under either framework, the court's conclusion is legally flawed for three independent reasons.

*First*, Epic's failure to prove its Sherman Act claims forecloses liability under the UCL. As a matter of law, "if the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason[,] . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *City of San Jose*, 776 F.3d at 691–92 (alteration adopted). That is because "permit[ting] a separate inquiry into essentially the same question under the [UCL] would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).

This Court has uniformly applied the *Chavez* rule to reject UCL claims based on conduct that is not anticompetitive under the Sherman Act. *City of San Jose*, 776 F.3d at 691–92; *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008). The district court recognized this authority, but "respectfully disagree[d]" with it. 1-ER-166 n.632. Adherence to precedent is not optional, as a motions panel of this Court recognized. 2-ER-189–90 (citing *Chavez*). Indeed, other than the decision below, no court—state or federal—has imposed UCL liability for conduct found not to be anticompetitive under the antitrust laws, and a multitude have found that UCL claims fall with their companion antitrust claims. *See* William L. Stern, *Business & Professions Code Section 17200 Practice*, ¶ 3:152.4 (updated Mar. 2021) (collecting cases).

*Second*, the Supreme Court in *Amex* examined nearly identical anti-steering provisions in the context of a two-sided transaction platform for credit card transactions, concluding that such provisions are *pro*competitive because they "stem negative externalities in the [relevant] market and promote interbrand competition" while protecting the "promise of a frictionless transaction" and "the investments that [the platform provider] has made to encourage [customer] spending"—all of which are undermined by steering. 138 S. Ct. at 2289. This Court has recognized the same: "[W]hat appeared at first to be *anti*competitive—Amex's unique business model and its use of antisteering clauses—was actually *pro*competitive and innovative." *Qualcomm*, 969 F.3d at 989.

In upholding the IAP requirement, the district court found the *exact* same procompetitive justifications as in *Amex*: That "IAP is the method by which Apple collects its licensing fee from developers for the use of Apple's intellectual property" (*i.e.*, the return on Apple's investments); that "if Apple could no longer require developers to use IAP for digital transactions, Apple's competitive advantage on security issues" (*i.e.*, interbrand competition) "would be undermined"; and that "the use of different payment solutions for each app may reduce the quality of the experience for some consumers by denying users the centralized option of managing a single account through IAP" (*i.e.*, the promise of a frictionless transaction). 1-ER-153.

Despite finding that the *required* use of IAP was procompetitive, the district court nonetheless concluded that *enforcing* this requirement through the anti-steering provisions was somehow "unfair" under the UCL. 1-ER-166–69. That is an impermissible end-run around the legal principles endorsed by the Supreme Court in *Amex*. Indeed, virtually every digital transaction platform uses similar provisions (4-SER-997–1012)—"prior information that these practices are efficient" (2-SER-481)—and no appellate court has ever condemned them.

The district court attempted to distinguish *Amex* on the ground that Apple's anti-steering provisions are more akin to "a prohibition on letting users know that [other] options exist in the first place." 1-ER-167–68. But the court ignored the fact that "the restrictions at issue here are very far from a total ban on price or discount advertising." *Cal. Dental*, 526 U.S. at 773; *see also Cal. Dental*, 224 F.3d at 953. And although the court assumed that customers in technology markets are less likely to understand their options in the face of steering restrictions, "[r]evealingly, . . . there are no record citations" to substantiate that point. *Cal. Dental*, 224 F.3d at 954. The evidence actually shows that *Fortnite* players are well aware of off-platform purchase options, as the majority of iOS *Fortnite* players who purchased V-Bucks did so *exclusively* on platforms other than iOS. 1-SER-24–25. That undisputed fact is incompatible with the district court's speculation.

Moreover, developers have always been able to communicate options to customers outside their apps (2-SER-538–43), and Apple recently removed any remaining restrictions on out-of-app communications (*see supra* note 1). What developers cannot do is advertise or link to those alternatives *within* apps developed and distributed using Apple's proprietary software—just as an online bookseller cannot advertise its site inside an independent bookstore. 2-SER-536–37. "Where, as here, the circumstances of the restriction are somewhat complex, assumption will not do." *Cal. Dental*, 526 U.S. at 775 n.12. The district court's substitution of the actual record evidence with its own untested hypothesis about the effects of the anti-steering provisions is legal error. *See Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 766 (5th Cir. 2002) (evidence insufficient without "data demonstrating the anticompetitive effects of the advertising restrictions of which [plaintiff] complains").

*Third*, the district court failed to analyze the competitive effects of the anti-steering provisions in any relevant market, as the UCL requires. *See, e.g.*, *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-CV-7182, 2021 WL 2354751, at *15 (N.D. Cal. June 9, 2021); *Snapkeys, Ltd. v. Google LLC*, No. 19-CV-2658, 2020 WL 6381354, at *3 (N.D. Cal. Oct. 30, 2020); *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 666–67 (2005). The Supreme Court has instructed that "[w]ithout a definition of the market there is no way to measure the defendant's

ability to lessen or destroy competition" through anti-steering provisions. *Amex*, 138 S. Ct. at 2285 (alterations and quotation marks omitted); *see also Cal. Dental*, 224 F.3d at 951–52 ("[O]ur rule-of-reason case law usually requires the antitrust plaintiff to show some relevant data [of anticompetitive effects] from the precise market at issue in the litigation."). But the court did not analyze Apple's provisions using the market it defined for this case and ignored the reality (which Epic never contested) that anti-steering rules did not "stifle[] competition" with the competitors in that market. *Amex,* 138 S. Ct. at 2289.

The only fact witnesses Epic presented on the anti-steering provisions were developers of non-gaming *subscription* apps (1-ER-96)—which the district court expressly ruled "are not part of this case." 1-ER-36 n.198; *see also* 1-ER-35 n.194; 1-ER-126 n.571. In other words, the court looked outside the *relevant* market for effects, even though "actual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law." *Qualcomm*, 969 F.3d at 993. Without any evidence of effects *within* a relevant market, there can be no "incipient" antitrust violation cognizable under the UCL as a matter of law.

### C.     The Injunction Is Beyond The Authority Of The Court

The UCL injunction violates both California and federal law.

A plaintiff seeking relief on behalf of others under the UCL generally must comply with California's requirements for class certification. *See* Cal. Bus. & Prof.

Code § 17535; Cal. Civ. Code § 382.  There is a narrow exception to this rule for "public injunctive relief"—that is, "relief that by and large benefits the general public and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general public." *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017) (citation, alteration, and quotation marks omitted).  But as this Court recently reiterated, relief that is sought "for the benefit of a discrete class of persons" who are "similarly situated to the plaintiffs" is *not* public injunctive relief.  *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542, 543, 545 (9th Cir. 2021).  That is precisely what the district court awarded here—relief designed to benefit a discrete class of developers.  Yet even though an antitrust action on behalf of a putative class of all U.S. developers was pending at the time Epic triggered its hotfix (*see supra* note 1), Epic chose to go it alone.  1-SER-261; 2-ER-326–27.  Epic thereby disentitled itself from obtaining relief for anyone other than Epic.

This accords with federal limits on equitable authority, which apply to injunctive relief under the UCL.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837 (9th Cir. 2020).  The "Supreme Court has cautioned that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the Court."  *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  "Where relief can be structured on an individual basis, it must be narrowly

tailored to remedy the specific harm shown." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987). Any injunctive relief, therefore, must be limited "to apply only to" Epic, the "named plaintiff[]." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996).

Any injury to Epic from the anti-steering provisions would be remedied by an injunction prohibiting Apple from applying those provisions *to Epic*. Conversely, an injunction applicable to other developers provides no benefit to Epic. Such an injunction, however, subverts Federal Rule of Civil Procedure 23(b)(2), which expressly addresses injunctive relief extending beyond the named plaintiff. Allowing what is essentially classwide relief without certifying a class action creates an inequitable asymmetry whereby non-parties can claim the benefit of a single favorable ruling without being bound by it. Among other problems, this kind of one-way preclusion violates Apple's due process rights. *See Hansberry v. Lee*, 311 U.S. 32 (1940).

Finally, although the district court stated that "the elements for equitable relief are satisfied" (1-ER-169), it did not identify any irreparable injury to Epic from the anti-steering provisions (and Epic has never proved such an injury). Nor did the court explain why monetary relief—which Epic deliberately did not seek—would be inadequate. These are both prerequisites to injunctive relief. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Sonner*, 971 F.3d at 844.

The court also did not grapple with Apple's unclean hands defense, despite observing that "Epic Games never adequately explained its rush to the courthouse or the actual need for clandestine tactics." 1-ER-174. The UCL injunction cannot stand.[13]

## II. Epic Must Pay Apple's Attorneys' Fees

Section 10 of the DPLA requires Epic to indemnify Apple against "losses"— including "attorneys' fees"—"arising from or related to" six enumerated situations, including Epic's "breach of any certification, covenant, obligation, representation or warranty in this Agreement." 3-ER-642. The court ruled that Epic breached its contractual obligations to Apple (1-ER-176), yet refused to enforce the indemnity provision (1-ER-180).

Without disputing that the indemnity provision applies by its terms to Epic's adjudicated breaches of contract, the court relied on the general rule that an agreement to "indemnify" and "hold harmless" does not extend to actions between the parties to a contract "*if* the surrounding provisions describe third party liability." *Alki Partners, LP v. DB Fund Servs., LLC*, 4 Cal. App. 5th 574, 600 (2016) (emphasis added). Other authority makes clear, however, that such terms "in and of themselves, do not limit the scope of [an indemnification] clause to third party

---

[13] After the court entered the injunction *sua sponte*, Apple introduced evidence of irreparable harm to both Apple and its customers from its implementation. 1-SER-208–16. Epic offered no contrary evidence.

claims." *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 556 (2004); *see also Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1025 (2011). In particular, "this general rule does not apply if the parties to a contract use the term 'indemnity' to include direct liability as well as third party liability." *Dream Theater*, 124 Cal. App. 4th at 555.

The court said that "the surrounding provisions describe third-party liability," "suggest[ing]" that Epic's indemnity obligation "would arise only in the context of third-party claims, and not claims between the two." 1-ER-180. But the indemnity situations in the DPLA are set forth in the *disjunctive*. Some contemplate third parties, such as "claims" involving Epic's apps (subdivisions (ii) and (v)); others do not, including the one applicable to Epic's breaches of contract (subdivision (i)). Neither Epic nor the district court identified any instance in which a third party could assert breach of contract, and the DPLA itself provides that "[t]his Agreement is not for the benefit of any third parties." 3-ER-646. The indemnity provision's references to contract breaches can thus *only* refer to direct claims between the parties. Because Apple successfully pursued such a direct claim, Epic is contractually obligated to indemnify Apple for all losses it incurred because of Epic's intentional breaches of multiple DPLA provisions. The court's contrary conclusion misconstrues the indemnity provision in a way that renders it meaningless in the context of developer breaches.

113

As the district court found, Epic did not have to breach the contract to bring this lawsuit. 1-ER-174. Epic chose to do so, however, in order to garner press attention and publicity as part of its misnamed "Project Liberty"; Epic then refused to come back into compliance during trial, even under the supervision of the district court. 3-SER-823–24. Epic has to pay the price for its decisions under the plain language of the very contract that it elected to disregard. Apple is entitled to recover all of its attorneys' fees in this lawsuit, including this appeal.

## CONCLUSION

The judgment on Epic's Sherman Act claims should be affirmed; the judgment on Apple's claim for breach of contract should be affirmed; the judgment on Epic's UCL claim with respect to anti-steering should be reversed; and the judgment on Apple's indemnity claim should be reversed and remanded for an award of attorneys' fees.

Dated:  March 24, 2022

Respectfully submitted,

s/ *Mark A. Perry*
Mark A. Perry

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105

Mark A. Perry
Cynthia Richman
Joshua M. Wesneski
Anna Casey
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
MPerry@gibsondunn.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 25,480 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and is accompanied by a motion to file a longer brief pursuant to Circuit Court Rule 32-2(a).

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2019.

Dated: March 24, 2022

s/ *Mark A. Perry*_____
Mark A. Perry

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **Principal and Response Brief for Appellee/Cross-Appellant Apple Inc.** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 24, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  March 24, 2022

s/ *Mark A. Perry*
Mark A. Perry

## ADDENDUM

Pursuant to Federal Rule of Appellate Procedure 32.1(b) and Circuit Rule 28-2.7, this addendum includes the following pertinent statutory provision, reproduced verbatim:

**Exhibit A**:   Cal. Bus. & Prof. Code § 17200

# Exhibit A

**State of California**

**BUSINESS AND PROFESSIONS CODE**

**Section 17200**

---

17200.   As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

(Amended by Stats. 1992, Ch. 430, Sec. 2.  Effective January 1, 1993.)