Nos. 21-16506 & 21-16695

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff/counter-defendant,*
*Appellant/cross-appellee;*

*v.*

APPLE INC.,

*Defendant/counter-claimant,*
*Appellee/cross-appellant.*

On Appeal from the United States District Court
for the Northern District of California (Hon. Yvonne Gonzalez Rogers)
No. 4:20-cv-05640-YGR

**REPLY BRIEF FOR
APPELLEE/CROSS-APPELLANT APPLE INC.**

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

Cynthia Richman
Joshua M. Wesneski
Anna Casey
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036

*Attorneys for Apple Inc.*

# TABLE OF CONTENTS

Page

ARGUMENT .......................................................................................1

I.    The UCL Judgment Cannot Stand ........................................1

      A.    There Is No Case Or Controversy................................1

            1.    Epic Failed To Prove Direct Or Indirect Harm ...............1

            2.    Apple Disproved Redressability ......................................6

      B.    Epic's UCL Claim Fails As A Matter Of Law ........................8

            1.    The *Chavez* Doctrine Precludes UCL Liability...............9

            2.    Epic Failed To Prove Significant Harm To
                  Competition In Any Relevant Market ...........................13

            3.    The Anti-Steering Provisions Are Procompetitive
                  Under *Amex* ................................................................21

      C.    The Injunction Exceeded The Court's Authority ....................24

            1.    The Injunction Is Overbroad..........................................24

            2.    Epic Failed To Prove Irreparable Harm ........................26

II.   Epic Must Pay Apple's Attorneys' Fees ...........................................28

CONCLUSION ..................................................................................30

# TABLE OF AUTHORITIES

Page(s)

CASES

*Aguilar v. Atl. Richfield Co.*,
25 Cal. 4th 826 (2001) ...................................................................12

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) .............................................................15

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997).............................................................................2

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ...........................................................20

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
219 F. Supp. 3d 984 (N.D. Cal. 2017)..............................................16

*Brandwein v. Butler*,
218 Cal. App. 4th 1485 (2013) ........................................................28

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .........................................................19

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) .........................................................25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)..........................................................................18

*Cal. Dental Ass'n v. FTC*,
224 F.3d 942 (9th Cir. 2000) ....................................................18, 28

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)..........................................................................18

*California v. Texas*,
141 S. Ct. 2104 (2021).........................................................................5

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ................................... 8, 10, 13, 14, 22, 23, 24

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) ....................................................9, 10, 12

*Chi. Bd. of Trade v. United States*,
246 U.S. 231 (1918)....................................................................13

*City of San Jose v. Off. of the Comm'r of Baseball*,
776 F.3d 686 (9th Cir. 2015) ......................................................9, 10

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)......................................................................5

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2012) .........................................................5

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
329 F. Supp. 3d 1074 (N.D. Cal. 2017)...........................................16

*Dixon Gas Club, LLC v. Safeway Inc.*,
No. A139910, 2015 WL 4557388 (Cal. Ct. App. July 29, 2015)...............16

*Dream Theater, Inc. v. Dream Theater*,
124 Cal. App. 4th 547 (2004) .......................................................29

*Drum v. San Fernando Valley Bar Ass'n*,
182 Cal. App. 4th 247 (2010) .................................................11, 16

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
55 Cal. App. 5th 381 (2020) ....................................................15, 23

*Franchise Tax Bd. v. Alcan Aluminum Ltd.*,
493 U.S. 331 (1990).......................................................................5

*Freitag v. Ayers*,
468 F.3d 528 (9th Cir. 2006) ..........................................................7

*FTC v. Motion Picture Adv. Co.*,
344 U.S. 392 (1953).....................................................................13

*FTC v. Qualcomm*,
969 F.3d 974 (9th Cir. 2020) .................................................19, 20, 21

*Gerawan Farming, Inc. v. Rehrig Pac. Co.*,
 No. 11-CV-1273, 2013 WL 1934173 (E.D. Cal. May 9, 2013) ........................ 17

*Gregory v. Albertson's, Inc.*,
 104 Cal. App. 4th 845 (2002) ..................................................... 14, 19

*Hahn v. Or. Physicians' Serv.*,
 868 F.2d 1022 (9th Cir. 1988) ............................................................ 20

*Hangarter v. Provident Life & Accident Ins. Co.*,
 373 F.3d 998 (9th Cir. 2004) .............................................................. 26

*hiQ Labs, Inc. v. LinkedIn Corp.*,
 273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................................... 16

*Hodges v. Comcast Cable Commc'ns, LLC*,
 21 F.4th 535 (9th Cir. 2021) ............................................................... 25

*Hollingsworth v. Perry*,
 570 U.S. 693 (2013) ........................................................................... 3

*L.A. Haven Hospice, Inc. v. Sebelius*,
 638 F.3d 644 (9th Cir. 2011) .............................................................. 25

*Levitt v. Yelp! Inc.*,
 765 F.3d 1123 (9th Cir. 2014) ............................................................ 16

*LiveUniverse, Inc. v. MySpace, Inc.*,
 304 F. App'x 554 (9th Cir. 2008) ....................................................... 12

*Lozano v. AT&T Wireless Servs., Inc.*,
 504 F.3d 718 (9th Cir. 2007) .............................................................. 16

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ......................................................................... 1, 6

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
 200 Cal. App. 4th 480 (2011) ......................................................... 15, 16

*Meland v. WEBER*,
 2 F.4th 838 (9th Cir. 2021) ................................................................. 1

*Metricolor LLC v. L'Oreal S.A.*,
  No. 18-CV-364, 2020 WL 3802942 (C.D. Cal. July 7, 2020) ..........................16

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*,
  9 Cal. 5th 279 (2020) ..........................................................................................17

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)..........................................................................10, 21, 23

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)..............................................................................................11

*People's Choice Wireless, Inc. v. Verizon Wireless*,
  131 Cal. App. 4th 656 (2005) ....................................................................15, 16

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) ............................................................................5

*Racek v. Rady Children's Hosp. of San Diego*,
  No. D058173, 2012 WL 2947881 (Cal. Ct. App. July 20, 2012)................13, 16

*S. Or. Barter Fair v. Jackson County*,
  372 F.3d 1128 (9th Cir. 2004) ..............................................................................7

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)................................................................................................2

*Sun Microsys., Inc. v. Microsoft Corp.*,
  87 F. Supp. 2d 992 (N.D. Cal. 2000)..................................................................12

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021)...........................................................................................5

*UFCW & Employers Ben. Trust v. Sutter Health*,
  No. CGC-14-538451, 2019 WL 3856011 (Cal. Super. June 13,
  2019) ....................................................................................................................23

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)..............................................................................................10

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..............................................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Viazis v. Am. Assoc. of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) ...............................................................20

*W. Virginia v. EPA*,
    — S. Ct. —, 2022 WL 2347278 (U.S. June 30, 2022) ........................2

*Walker Process Equip., Inc. v. Food Mach. Corp.*,
    382 U.S. 172 (1965)...........................................................................15

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*,
    178 F. Supp. 2d 1099 (C.D. Cal. 2001) .............................................12

*Worldwide Travel, Inc. v. Travelmate US, Inc.*,
    No. 14-CV-155, 2015 WL 1013704 (S.D. Cal. Mar. 9, 2015)...........17

# ARGUMENT

## I.    The UCL Judgment Cannot Stand

The decision below marks the first time any court has enjoined as "unfair" under the UCL conduct found reasonable under the antitrust laws.  The district court reached that unprecedented result despite Epic's failure to prove harm from the anti-steering provisions three times over.  *First*, Epic did not prove *harm to itself*, rendering the UCL claim nonjusticiable.  *Second*, Epic did not prove *significant harm to competition*, precluding liability under the UCL.  *Third*, Epic did not prove *irreparable harm*, ruling out injunctive relief.  Apple challenged the district court's "findings" on these issues as unsupported by legally sufficient evidence.  Apple Br. 102.  Remarkably, Epic cites *no evidence* in response.

### A.    There Is No Case Or Controversy

Epic did not prove that it will suffer *injury-in-fact* from the anti-steering provisions, while Apple proved that Epic cannot receive *redress* from the injunction.  Accordingly, there is no Article III "case or controversy."

#### 1.    Epic Failed To Prove Direct Or Indirect Harm

It was Epic's burden to prove the irreducible minimum requirements of Article III.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021).  In the district court, Epic introduced no evidence of injury-in-fact *at any point in time*.  Apple Br. 102–04.  The UCL judgment should be reversed for that reason alone.

**a.** Epic quibbles with whether its failure to prove injury-in-fact is properly analyzed under the rubric of "standing" or, rather, "mootness at the appellate stage." Epic Resp. Br. 88. But the standing defect did not arise only on appeal: Epic introduced no evidence below that it *ever* suffered injury-in-fact from the anti-steering provisions, and it cites none on appeal. Having failed to prove such harm—before, during, or after litigation—Epic never had standing to sue under the UCL. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67–69 (1997) (courts must ensure a justiciable controversy exists at every stage in the litigation).

Epic's contention that "Apple never asserted Epic lacked standing at the outset of the case" (Epic Resp. Br. 87) is false: Apple asserted both lack of standing and nonjusticiability in its answer. 4-SER-867; 4-SER-869. And whatever bare allegations of harm the complaint contained, Epic did not *prove* any injury from the anti-steering provisions before judgment was entered. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (injury must be "concrete and particularized" and "actual or imminent" (quotation marks omitted)). Moreover, Epic's assertion that "[s]tanding is determined as of the date of the filing of the complaint" (Epic Resp. Br. 87 (citation omitted)) is wrong: "Although most disputes over standing concern whether a plaintiff has satisfied the requirement when filing suit, 'Article III demands that an actual controversy persist throughout all stages of litigation.'" *W. Virginia v. EPA*, — S. Ct. —, 2022 WL 2347278, at *10 (U.S. June 30, 2022)

(quoting *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013)). In the extensive record, there is not one speck of evidence that Epic will be harmed by the anti-steering provisions—and Epic cites none in its appellate brief.

According to Epic, "the district court found that Apple's anti-steering restraints lead to higher prices for consumers and developers, *including Epic*." Epic Resp. Br. 91 (emphasis added) (citing 1-ER-166–67). That is false: The court did *not* find (on the cited pages or elsewhere) that these provisions will lead to any harm *to Epic* in the future, and there is no evidence on which such a finding could be made. Epic's speculation that it might suffer injury as "a potential competing provider of in-app payment solutions" (*id.*) likewise has no evidentiary support; indeed, Apple's Guideline concerning *out-of-app* purchase options does not address the provision of *in-app* payment solutions. *See* Part I.C.1.b, *infra*. Moreover, this argument assumes that Epic will succeed in its Sherman Act appeal—an assumption already refuted by Apple and its supporting *amici*.

**b.** The district court's post-judgment finding of injury-in-fact was based entirely on a misrepresentation by Epic regarding the operation of the *Unreal Engine* license agreement. 2-ER-192 (citing 4-SER-1073). The court found that the anti-steering provisions could help Apple maintain its commission rate, resulting in reduced licensing royalties to Epic because (according to Epic's representation) such royalties were paid on sales *net* of commissions. *Id.*; *see also* D.C. Dkt. 835 at 7:2–

3

13.  These supposedly reduced royalties constituted the sole harm identified by the district court.  As Apple has explained, however, the license agreement makes clear that Epic's royalties are calculated based on *gross* (pre-commission) sales, and thus are entirely unaffected by the amount of the commission or, under the district court's reasoning, the anti-steering provisions.  Apple Br. 103–04.  Tellingly, Epic does not deny that it misrepresented the agreement's operation to the district court, or that the assumption on which the court below found standing is false.  The Article III ruling constitutes invited error and cannot stand.

Epic now changes tack, arguing that "marketplace dynamics" and "basic economics" are sufficient for this Court to find injury-in-fact in the first instance.  Epic Resp. Br. 90.  That new argument turns not on any economic principle, but on a series of unproven factual assumptions, including that (1) enjoining the anti-steering provisions would lead Epic's independent licensees to steer consumers to alternative purchase options; (2) those developers would lower prices on other platforms rather than pocket the difference from (supposedly) lower commissions; and (3) users would (notwithstanding the added transaction friction caused by steering) increase their total number of purchases to offset the lower per-transaction royalty Epic would receive.  None of these cascading conjectures has any evidentiary support—because this theory appeared for the first time in Epic's appellate brief.

Courts have made clear that "theoretical effects stated only at the highest level of abstraction" without "specific examples of such effects" do not suffice to establish justiciability. *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085 (11th Cir. 2016); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (where injury is contingent on actions of third parties, a plaintiff must prove that they would "react in predictable ways"). A "speculative" risk of harm cannot sustain Article III justiciability (*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021)), and courts are rightly "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors" (*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)). Yet Epic's submission to this Court is based on *nothing but* speculation.

**c.** Epic also invokes purported harm to its subsidiaries. Epic Resp. Br. 89–90 (citing *Franchise Tax Bd. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990)). Even if harm to such non-parties could suffice (*but see Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1037 (9th Cir. 2010)), Epic presented no *evidence* of harm to any of its subsidiaries. The screenshot cited by Epic (Epic Resp. Br. 89 (citing FER-10–11)) shows only that some Epic subsidiaries have developed iOS apps, *not* that any of them will ever be harmed by the anti-steering provisions. Epic failed to carry its burden of proving injury-in-fact.

## 2. Apple Disproved Redressability

Even if Epic at some point had standing to sue to enjoin the anti-steering provisions, events that transpired at the very outset of this litigation rendered that claim moot. As relevant to this appeal, the UCL injunction precludes Apple from enforcing its Guideline prohibiting "developers" from using in-app "buttons, external links, or other calls to action" to steer consumers to out-of-app purchase options. 1-ER-171; 2-ER-195. Epic, however, is no longer an iOS developer and has no apps on the App Store because Apple terminated its developer account. 1-ER-29. The district court refused to preliminarily enjoin the termination (D.C. Dkt. 118 at 38) and subsequently confirmed that Apple was entitled to terminate Epic for breach of contract (1-ER-176). Accordingly, Apple proved at trial that neither the district court's *sua sponte* injunction nor any other prospective judicial action could provide any redress to Epic. *See* CJAC Br. 10–11. Redressability is an independent requirement of Article III (*Lujan*, 504 U.S. at 568), yet Epic fails to demonstrate how it could benefit from the UCL injunction.

Epic argues that "Apple's own conduct cannot moot Epic's claim." Epic Resp. Br. 88. But Epic expected that the misconduct comprising "Project Liberty" would result in the removal of *Fortnite* from the App Store (1-ER-26) and invite termination of its developer account (3-ER-635; 3-ER-683). Indeed, Epic *stipulated* that, antitrust allegations aside, termination was a permissible exercise of Apple's

authority to enforce the DPLA.  3-SER-631.  To be sure, Apple offered before judgment was entered to reinstate Epic's account on the condition that Epic adhere to the Guidelines (1-ER-29; FER-19), but Epic repeatedly refused Apple's offer (1-ER-29).  It was thus the foreseeable consequences of Epic's own actions, including Epic's refusal to cure its breach, that mooted the UCL claim.[1]

Epic remonstrates that "Apple changed course after judgment and refused to reinstate Epic's developer account."  Epic Resp. Br. 88.  But it is hardly "manipulat[ive]" (*id.* at 89) for Apple to rely on a hard-won judgment that expressly confirmed Apple's right to terminate Epic's developer account for breaching the DPLA and Guidelines.  1-ER-2; 1-ER-182.  In any event, the UCL claim had already been mooted at the time judgment was entered; Apple's post-judgment refusal to reinstate Epic's account does not give rise to a justiciable controversy.

Epic complains that finding mootness here would allow Apple to avoid developer claims by "simply terminat[ing] that developer's account."  Epic Resp. Br. 89.  But there will be vanishingly few cases in which the developer waives all monetary relief, commits an intentional breach of contract for which its account is terminated, refuses to cure the breach, and then receives an unasked-for injunction

---

[1]  Epic's cases are inapposite.  Epic Resp. Br. 88–89 (citing *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1133–34 (9th Cir. 2004) (failure to continue applying for a permit did not moot applicant's request for prospective injunctive relief); *Freitag v. Ayers*, 468 F.3d 528, 548 (9th Cir. 2006) (finding standing based on state employees' unique "property interest . . . guaranteed by statute")).

against a Guideline applicable only to active developers. While any such claim would also be moot, that does not mean that Apple's Guidelines are insulated from review. *See Cameron v. Apple Inc.*, No. 19-CV-3074 (N.D. Cal. June 10, 2022), Dkt. 491 (approving settlement with class of developers under which Apple amended a second anti-steering Guideline that addressed targeted out-of-app communications and is no longer at issue).

In sum, whether analyzed as standing or mootness, there is no justiciable claim with respect to the anti-steering provisions.

## B.    Epic's UCL Claim Fails As A Matter Of Law

Purportedly anticompetitive conduct can be enjoined as "unfair" under the UCL *only* if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). "Courts may not simply impose their own notions of the day as to what is fair or unfair." *Id.* at 182.[2]

---

[2]    Because the *Cel-Tech* standard controls, Apple agrees with Epic that certification to the California Supreme Court is unnecessary. Epic Resp. Br. 91 n.28.

### 1.    The *Chavez* Doctrine Precludes UCL Liability

California law is pellucid:  "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason— because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).  This Court has recognized and applied the *Chavez* rule (*see City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 691–92 (9th Cir. 2015)), and the motions panel cited it in an order that Epic studiously ignores (2-ER-189–90).

**a.**  The district court recognized that Epic "seeks relief [under the UCL] for the same conduct that it challenged"—unsuccessfully—"under the Sherman and Cartwright Acts."  1-ER-165.  A straightforward application of the *Chavez* doctrine thus precludes a finding that the same conduct is "unfair" under the UCL.  Epic does not really dispute this point; instead, it contends that the *Chavez* rule should be limited to cases involving a "safe-harbor provision."  Epic Resp. Br. 94; *see also* Cal. Br. 17–18 (same).  This argument reflects a misunderstanding of UCL precedent.

*Cel-Tech* established two separate principles regarding the UCL's application to competition cases.  First, "[w]hen *specific legislation* provides a 'safe harbor' [for

specific conduct], plaintiffs may not use the [UCL] to assault that harbor." *Cel-Tech*, 20 Cal. 4th at 182 (emphasis added). This applies only when the "other provision" actually bars the claim, "not merely fail[s] to allow it." *Id.* at 184. Second, "any finding of unfairness to competitors under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Id.* at 186–87.

*Chavez* and *City of San Jose* involved the second of these principles, not the first. Neither case found that "specific legislation" provided a statutory "safe harbor" for the challenged conduct. Rather, in each case the conduct was found reasonable based on existing *judicial precedent*. Specifically, the conduct challenged in *Chavez* was reasonable under *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), which held that the antitrust laws do "not restrict the long recognized right of [a] trader . . . [to] announce in advance the circumstances under which he will refuse to sell." 93 Cal. App. 4th at 375. Similarly, the antitrust analysis in *City of San Jose* was "governed by three Supreme Court cases." 776 F.3d at 688–89. In each instance, conduct found reasonable under judicially created doctrines—not statutory safe harbors—could not be "unfair" under the UCL.

The same is true here: As discussed in Apple's principal brief, multiple lines of binding precedent confirm that Apple's conduct is reasonable under the Sherman Act. *See*, *e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289–90 (2018) ("*Amex*")

(anti-steering provisions on two-sided transaction platforms cannot be condemned without proof of net anticompetitive effects); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 n.2, 457 (2009) ("[A]n antitrust duty to deal . . . requires a showing of monopoly power," and even a monopolist "has no duty to deal under the terms and conditions preferred by [its] rivals"); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415–16 (2004) (firm cannot be ordered to "alter its way of doing business whenever some other approach might yield greater competition"). Just as in *City of San Jose* and *Chavez*, the applicability of these doctrines—not a statutory safe harbor—both precludes antitrust liability and forecloses a parallel UCL claim. *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 254 (2010) (no UCL claim based on conduct reasonable under antitrust precedent providing that "a private party generally may choose to do or not to do business with whomever it pleases").

**b.** Epic argues that an antitrust violation is not a prerequisite to a UCL unfairness finding. Epic Resp. Br. 92–94; *see also* Cal. Br. 12–16.[3] That is a straw man: The court in *Chavez* carefully explained that it was not "hold[ing] that in all circumstances an 'unfair' business act or practice must violate an antitrust law to be

---

[3] Epic also suggests that the Cartwright Act "could support a UCL claim regardless of whether a Sherman Act claim succeeds." Epic Resp. Br. 96. But Epic, which abandoned its Cartwright Act claims on appeal (Apple Br. 29), provides no substantiation for this contention. Its untimely *amici* cannot advance arguments not preserved by Epic. *See* UCL Practitioners' Br. 5 n.3, 20–26.

actionable under the unfair competition law," but rather only that once conduct *challenged as anticompetitive* "is deemed reasonable and condoned under the antitrust laws," it cannot be condemned under the UCL. 93 Cal. App. 4th at 375. Where, as here, a plaintiff's UCL claim depends on the same theories of harm to competition that give rise to a failed antitrust claim, the UCL claim must fall as well. *See Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 866–67 (2001).

Epic does not dispute that "other than the decision below, no court—state or federal—has imposed UCL liability for conduct found not to be anticompetitive under the antitrust laws." Apple Br. 105; *see also* CJAC Br. 11. California cites two cases "in which a federal court within the Ninth Circuit allowed a UCL unfairness claim alleging anticompetitive conduct to proceed without a concurrent unlawful claim." Cal. Br. 14–15 (citing *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099 (C.D. Cal. 2001); *Sun Microsys., Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992 (N.D. Cal. 2000)). Those decisions are inapposite: The question here is not whether a plaintiff may *plead* a UCL claim without a parallel antitrust claim, but rather whether a plaintiff who *loses* its antitrust claim after a full trial on the reasonableness of challenged conduct can enjoin the exact same conduct as unfair under the UCL. *See* CJAC Br. 13. The answer is unequivocally "no." *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557–58 (9th Cir. 2008).

The district court expressly found—after a full trial under the rule of reason—that the design of the App Store offers legitimate procompetitive justifications not reasonably achievable through other means. *See* Apple Br. 92–99. Epic says it "is not challenging these findings." Epic Resp. Br. 31. Apple's conduct is therefore reasonable under the antitrust laws' "true test of legality" (*Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)); as a matter of law, it cannot be condemned as unfair under the UCL.

### 2. Epic Failed To Prove Significant Harm To Competition In Any Relevant Market

*Cel-Tech* identified three ways that competitive conduct may be condemned as "unfair" under the UCL: an "incipient violation" of the antitrust laws, conduct that violates the "policy [and] spirit" of those laws, or conduct that "otherwise significantly threatens or harms competition." 20 Cal. 4th at 187. The concept of "incipient" violations derives from cases interpreting Section 5 of the Federal Trade Commission Act as allowing regulators to "stop in their incipiency acts and practices which, when full blown, would violate [the antitrust laws]." *FTC v. Motion Picture Adv. Serv. Co.*, 344 U.S. 392, 394–95 (1953). Such a violation requires proof of "threatened injury to competition in a[] relevant market." *Racek v. Rady Children's Hosp. of San Diego*, No. D058173, 2012 WL 2947881, at *5 n.4, *6 (Cal. Ct. App. July 20, 2012). "To come within the letter or policy of [the antitrust] laws" (the second approach identified in *Cel-Tech*), the plaintiff must prove that the defendant's

"conduct had an adverse effect on competition." *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 856 (2002). And the third path reinforces the first two by referring to conduct that "otherwise" significantly harms competition. Under any rubric, a UCL plaintiff *must* prove significant harm to competition. *Cel-Tech*, 20 Cal. 4th at 186.

Apple's anti-steering provisions have been in place for more than a decade; there is nothing "incipient" about them. Moreover, while the district court invoked the "incipiency" and "policy [and] spirit" language from *Cel-Tech* (1-ER-165–67), it did not find significant harm to competition in a relevant market. Because there is not legally sufficient evidence of such harm (and Epic cites no such evidence in its appellate brief), the UCL liability judgment must be reversed.

a. The district court erred by refusing to evaluate the effects of the anti-steering provisions in *any* relevant market. Apple Br. 108–09. Epic does not dispute that the district court failed to do so, arguing instead that the UCL does not require a "comprehensive market analysis." Epic Resp. Br. 86, 92, 101. That is a canard: The court's discussion of the anti-steering provisions includes no market analysis *at all*.

Epic contends that analyzing effects within a relevant market would be "illogical" because the UCL is "broader and more flexible than antitrust statutes." Epic Resp. Br. 101; *see also* Cal. Br. 20. But as *Cel-Tech* itself holds, the UCL's

breadth is not unlimited in competition cases. Epic never tries to explain how significant harm to competition could be shown without a market analysis, nor could it: Law and policy dictate (with rare exceptions not relevant here) that courts cannot analyze "competition" without a defined market. *See*, *e.g.*, *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the relevant] market there is no way to measure [a defendant's] ability to lessen or destroy competition."); *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996) (similar); *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 5th 381, 413–14 (2020) (similar). As California courts recognize, "the relevant market demarcates 'objective benchmarks' for separating reasonable and unreasonable restraints." *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 496 (2011). Indeed, Epic itself asserts that the anti-steering provisions are the "result" of "'Apple's market power'" (Epic Resp. Br. 85 (quoting 1-ER-168)), yet there is no evidence of anticompetitive effects within that "market" (for digital game transactions).

Epic and its *amici* cite *no case* entering judgment on a UCL claim tethered to the antitrust laws without proof of anticompetitive effects in a relevant market. Epic says that *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668 (2005), only requires a trial court to "look at the alleged impact of the conduct, and . . . consider any countervailing policies." Epic Resp. Br. 103–04 (omission in

original).  *People's Choice*, however, conducted an extended analysis of "the relevant market" before dismissing the claim for failing to allege that "competition *in the relevant market . . .* was diminished."  131 Cal. App. 4th at 666–67 (emphasis added).  Indeed, California courts have regularly engaged in relevant market analysis to decide UCL cases.  *See*, *e.g.*, *Marsh*, 200 Cal. App. 4th at 500–02; *Drum*, 182 Cal. App. 4th at 255–56; *Dixon Gas Club, LLC v. Safeway Inc.*, No. A139910, 2015 WL 4557388, at *6 (Cal. Ct. App. July 29, 2015); *Racek*, 2012 WL 2947881, at *6.[4]

Epic argues that the consumer balancing test applies here because Epic literally "consume[s]" Apple's products and services.  Epic Resp. Br. 98.  That contention contravenes this Court's recognition that the tethering test applies to "actions based on unfairness to competitors" (*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735–36 (9th Cir. 2007)), even where the plaintiff is technically a "consumer" of the defendant's products.  *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014) (tethering test applied to claim against online service provider

---

[4]  Epic's decisions are inapposite.  Epic Resp. Br. 101–02.  In one, the claim tethered to the antitrust laws failed.  *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1090–91 (N.D. Cal. 2019).  Another considered a trade secrets theory and derived its commentary about markets from an inapt case.  *Metricolor LLC v. L'Oreal S.A.*, No. 18-CV-364, 2020 WL 3802942, at *17 (C.D. Cal. July 7, 2020) (citing *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 219 F. Supp. 3d 984 (N.D. Cal. 2017)).  And Epic's final citation is just wrong:  The plaintiff there alleged "dominant power *in the market of professional networking.*"  *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1118 (N.D. Cal. 2017) (emphasis added).

16

by business owners); *Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279, 303 (2020) (choice of test turns on whether the action involves a claim by a rival "alleging anticompetitive practice" or "other kinds of violations of the unfair competition law").  Only the tethering test can be applied here.  *See* AFPF Br. 11–17.[5]  In any event, the district court's balancing analysis rested on the same flaws as its application of the tethering test (Apple Br. 104)—as evident from Epic's own intermingling of the two analyses.  *See* Epic Resp. Br. 98–101.  Under any test, Epic's failure to prove significant harm to competition is fatal.

    **b.**  As Apple explained in its opening brief, the record does not contain legally sufficient *evidence* of significant anticompetitive effects flowing from the anti-steering provisions.  Apple Br. 108–09.  Indeed, there is a stark contrast between the many pages the district court devoted to the antitrust claims, replete with citations to the extensive record, and the few pages addressing the UCL claim, almost entirely devoid of citations.  *See* 1-ER-162–71.  Having been put to the challenge, Epic devotes just one paragraph to repeating the court's statements—without citing *any* supporting evidence.  Epic Resp. Br. 99–100.  Epic thereby underlines this fatal

---

[5] Epic's decisions do not suggest otherwise.  *See Worldwide Travel, Inc. v. Travelmate US, Inc.*, No. 14-CV-155, 2015 WL 1013704, at *11–12 (S.D. Cal. Mar. 9, 2015) (tethering test applies where plaintiffs pursue an "unfair" claim "on the basis the parties are direct competitors"); *Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No. 11-CV-1273, 2013 WL 1934173, at *3–4 (E.D. Cal. May 9, 2013) (confirming that "dispute[s] between competitors" are subject to the tethering test).

evidentiary deficiency. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 232 (1993) (judgment requires "competent evidence . . . necessary to allow a reasonable inference that [challenged conduct] poses an authentic threat to competition").

*i.* Epic relies primarily on the district court's statements that the anti-steering provisions "block[] the flow of information to consumers," thereby "prevent[ing] [users] from making informed choices," and "may create 'lock-in'" and "prevent[] substitution among platforms for transactions." Epic Resp. Br. 99 (quoting 1-ER-166–67). These statements are unsupported by legally sufficient evidence.

The court did not cite any testimony or documents to support its statement that the anti-steering restrictions "blocked" the flow of information to consumers or "may" create "lock-in." 1-ER-166–67. The anti-steering provisions "are very far from a total ban on price or discount advertising" (*Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 773 (1999)), and thus cannot be presumed to bar effective "advertising [about] discounts" where "there are no record citations" to substantiate that point (*Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 954 (9th Cir. 2000)). In fact, the Epic-specific evidence contradicts the district court's statement: The majority of iOS *Fortnite* players who purchased V-Bucks did so *only* on platforms other than iOS (1-SER-24–25), demonstrating that the anti-steering provisions neither "blocked" nor "locked" such transactions.

Moreover, "reduc[ing] market choices otherwise available to consumers does not imply a diminution of competition" as a matter of law. *Gregory*, 104 Cal. App. 4th at 856 (quotation marks omitted); *accord FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). That is because "the effect of reducing consumers' choices . . . [is] fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). Thus, even provisions that "eliminat[e] downward competitive pressure on price and thereby result[] in higher consumer prices . . . are not unlawful absent a showing of actual anticompetitive effect." *Id.* No such showing was made here. Indeed, the only factual finding based on record evidence in the relevant market was that Apple's restrictions "ultimately increase[] consumer choice." 1-ER-149.

*ii.* Epic also invokes a generic statement regarding "harm to users and developers." Epic Resp. Br. 103 (quoting 1-ER-168). The evidence cited by the court is not legally sufficient to support a finding of harm to *competition*.

The court first cited testimony from a developer of subscription apps (1-ER-168 n.639), which the court found are "distinct" and part of "a separate submarket for which there is insufficient evidence" (1-ER-126 n.571). In fact, there is a *different* "anti-steering provision . . . relate[d] to subscriptions" that the court did not even consider because "subscriptions are not part of the action." 1-ER-35 n.194. Any anecdotal observations about subscription apps are irrelevant to Epic's UCL

claim, because such apps are part of a "substantial[ly] distinct[]" market from which, as the district court recognized, competitive effects could not be "extrapolat[ed]." 1-ER-67; 1-ER-127 n.574; *see also Qualcomm*, 969 F.3d at 992–93 (legal error to premise liability on effects outside the relevant market).

The second testimony excerpt is from Epic's principal economist, Dr. Evans, who testified that the "problem here is a *combination*" of requiring IAP and "a whole set of barriers." 2-SER-402 (emphasis added) (cited at 1-ER-168 n.639). This testimony does not attribute any anticompetitive effects to the anti-steering provisions standing alone, and Dr. Evans admitted he had not "done any study" or "any real analysis" that could isolate the actual competitive effects of Apple's anti-steering provisions from other requirements that Epic (and Evans) claimed were far more restrictive (and the court found to be procompetitive). 2-SER-344; 2-SER-403. Accordingly, this testimony cannot support a finding of anticompetitive effects. *See Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 766 (5th Cir. 2002) (failing "to present data demonstrating the anticompetitive effects" of a challenged restraint is fatal to any attempt "to demonstrate that the restrictions have a net anticompetitive effect"). Without "economic analysis" "connect[ing] the prevailing prices to the challenged [conduct]" (*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021)), the district court could not rely on "the inherent anticompetitive potential of an activity" (*Hahn v. Or. Physicians' Serv.*, 868

F.2d 1022, 1026 (9th Cir. 1988) (court must "examin[e] [the conduct's] actual effect in practice")).

It should come as no surprise that Epic failed to prove significant harm to competition. Epic premised its lawsuit on a proposed single-brand market in which Apple supposedly has no competitors. D.C. Dkt. 1 ¶¶ 51–57; D.C. Dkt. 777-3 FOF ¶¶ 218, 227. But if there are no meaningful competitors to which users may be steered, then anti-steering provisions do not harm *competition*. *See* 2-SER-356. Indeed, Epic did not advance a standalone challenge to the anti-steering provisions, and never developed a "cogent theory of anticompetitive harm" specific to the anti-steering provisions under the UCL or antitrust laws. *Qualcomm*, 969 F.3d at 998. The UCL judgment is not supported by legally sufficient evidence.

### 3. The Anti-Steering Provisions Are Procompetitive Under *Amex*

In *Amex*, the Supreme Court held that anti-steering provisions employed by the operator of a two-sided transaction platform are procompetitive because they "stem negative externalities in the [relevant] market and promote interbrand competition," while also protecting "the promise of a frictionless transaction" and "the investments that [the platform provider] has made to encourage [customer] spending." 138 S. Ct. at 2289.

Epic's assertion that the district court rejected Apple's "sole proffered justification" for the anti-steering provisions (Epic Resp. Br. 100) ignores that Apple

offered the same panoply of procompetitive justifications for the anti-steering provisions as it did for IAP. *See* D.C. Dkt. 779-1 COL ¶ 350.3. The district court accepted those justifications with respect to IAP, finding that IAP facilitates the efficient collection of Apple's commission, enhances interbrand competition by offering a superior security experience, and improves the customer experience by providing a centralized payment option. 1-ER-153. Thus, as Apple explained—and as Epic conspicuously does not dispute—the court found that the required use of IAP provides the *exact same* procompetitive benefits as those found by the Supreme Court in *Amex*. Apple Br. 106. The court erred in ignoring those same justifications in the context of the anti-steering provisions. As Epic's own expert witness testified, the anti-steering provisions simply prevent circumvention of the IAP requirement, because "in the absence of the anti-steering rules," the developer "has an incentive . . . to try to encourage the consumer not to purchase on . . . the App Store, not to use IAP, but to instead make that purchase somewhere else." 2-SER-477–78. Accordingly, the anti-steering provisions (which enforce the IAP requirement) provide the same benefits—a return on investment, competitive differentiation, and facilitation of a frictionless transaction—recognized as procompetitive in *Amex*.

Epic argues that *Amex* has "no bearing" on Apple's anti-steering provisions because it involved federal law and not the UCL. Epic Resp. Br. 104; *see also* Cal. Br. 22–23 (similar). But federal precedent is "persuasive" under the UCL (*Cel-Tech*,

20 Cal. 4th at 185–86 & n.11), and California decisions cite *Amex* with approval (*see Flagship Theatres of Palm Desert*, 55 Cal. App. 5th at 413, 417; *UFCW & Emp'rs Ben. Tr. v. Sutter Health*, No. CGC-14-538451, 2019 WL 3856011, at \*3 n.2 (Cal. Super. June 13, 2019)).   More importantly, *Amex* speaks directly to whether anti-steering provisions significantly harm competition or violate a "legislatively declared [competition] policy," as required by *Cel-Tech*.   20 Cal. 4th at 186–87.   It also explains how courts draw "mistaken inferences" when, as below, they fail to "analyze the two-sided market for . . . transactions . . . to determine whether the plaintiffs have shown that . . . antisteering provisions have anticompetitive effects." *Amex*, 138 S. Ct. at 2287.   *Amex* is the clearest guide available to judges and litigants regarding the competitive effects of anti-steering provisions, and it points in the opposite direction from the UCL judgment here.

Nor is Epic correct that the anti-steering provisions in *Amex* "differ greatly" from Apple's.   Epic Resp. Br. 104.   Both cases involved two-sided transaction platforms in which the anti-steering provisions help channel commerce through the platform operator's system, enhancing indirect network effects on both sides of the platform.   *Compare Amex*, 138 S. Ct. at 2289–90, *with* 1-ER-153.   Apple introduced evidence that no fewer than *twenty* digital transaction platforms have anti-steering provisions comparable to or stricter than Apple's (4-SER-997–1012)— demonstrating, as Epic's own expert conceded, that such provisions are efficient

(2-SER-481).  Epic was unable to identify even a single profitable transaction platform that *doesn't* use anti-steering provisions.  Yet the decision below implies that every platform can now be sued under the UCL for this commonplace (and procompetitive) conduct.  *See Cel-Tech*, 20 Cal. 4th at 185 (the UCL should not be used to "enjoin[] . . . *pro*competitive conduct").

## C.  The Injunction Exceeded The Court's Authority

Even assuming that UCL liability could be imposed on this record, the district court erred in entering a broad, nationwide injunction applicable to all developers.  Apple Br. 109–12.  Indeed, Epic's own proposed injunction did not even address the anti-steering provisions.  3-SER-802–05.

### 1.  The Injunction Is Overbroad

**a.**  Under California law, private injunctive relief may not extend beyond the named plaintiff in the absence of a certified class.  Apple Br. 111.  Epic responds that the exception for "public injunctive relief" is applicable here because the injunction could benefit "hundreds of millions of consumers and tens of thousands, if not more, of third-party app developers."  Epic Resp. Br. 106–07 (quotation marks omitted).  But the trial involved Epic alone, without a shred of evidence about consumers or other (non-subscription) developers, whose interests have been or are being pursued in separate class actions.

This Court recently held that injunctive relief "sought . . . for the benefit of a discrete class of persons"—millions of consumers who contracted for service with a particular cable company—is *private* injunctive relief. *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 543 (9th Cir. 2021). The injunctive relief here is indistinguishable from that in *Hodges*, as evidenced by the fact that two putative classes have sought or are seeking related relief against Apple. Epic attempts to cabin *Hodges* as holding that only relief sought for "past harms" requiring "consideration of the private rights and obligations of individual non-parties" constitutes private injunctive relief. Epic Resp. Br. 109. That is flat wrong: The relief sought in *Hodges* was purely prospective, and was private injunctive relief because it was sought for a discrete class of persons (including the plaintiff). 21 F.4th at 537–38, 543.

**b.** The injunction also exceeds the district court's equitable authority under federal law. Epic does not dispute that injunctive relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the Court" (*L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quotation marks omitted)), and that "[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown" (*Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987)). The UCL injunction is not limited to Epic, however, and the notion that the anti-steering

provisions "can be severed without any impact on the integrity of the [iOS] ecosystem" (1-ER-167) is not just unsupported, but also contrary to the undisputed evidence (1-SER-208–16; *see also* 1-ER-190).

Epic contends that a broad injunction is warranted because it wants to make its own payment solution available to other developers. Epic Resp. Br. 110. This made-for-appeal argument is baseless. The anti-steering provisions limit one avenue for developers to steer users to alternative *out-of-app* purchase options (e.g., their own websites). As "Project Liberty" illustrates, what Epic wants to offer is its own *in-app* payment solution, as a means to evade IAP. 2-ER-313–16. The reason Epic cannot offer Epic Direct Pay to other iOS developers for in-app digital transactions has nothing to do with the anti-steering provisions; it is because of the IAP requirement itself, which was held lawful by the district court. *See* 1-ER-194. Enjoining the anti-steering provisions would not allow Epic to offer its in-app payment solution.

## 2. Epic Failed To Prove Irreparable Harm

A court must find "irreparable injury" to the plaintiff before ordering injunctive relief. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004). Even assuming, *arguendo*, that reduced royalties from *Unreal Engine* licensees are sufficient to establish Article III justiciability, they cannot establish irreparable injury to Epic because damages would be an adequate remedy

at law.  Yet Epic waived any damages claim and sought only injunctive relief, taking on the burden of showing irreparable harm to itself in the future.  Epic failed to carry that burden, and the district court never found that it did.

Undaunted, Epic urges that the court *must* have concluded there was irreparable injury because it found that "the elements for equitable relief are satisfied" and that Apple "hides information for consumer choice which is not easily remedied with money damages."  1-ER-169.  The first contention is an admission that the court did not make the required finding; the second repeats Epic's error of focusing only on alleged harm to *others*.  Contrary to Epic's misstatement, the district court made no finding regarding *Epic's* ability to "engage with its consumers and offer lower prices" (Epic Resp. Br. 111), nor could it have—Epic is no longer an iOS developer, and when *Fortnite* was on the App Store, Epic charged the same price for V-Bucks across platforms.  Apple Br. 18; *see also* 1-ER-14.  Epic has no *evidence* of irreparable harm to itself in the future.

\* \* \*

All of this comes full circle:  Epic failed to prove at trial—and is unable to identify any evidence on appeal—that the anti-steering provisions had any adverse effect whatsoever on Epic.  Whether the Court analyzes this evidentiary deficiency

through the lens of Article III justiciability, UCL liability, or the proper scope of any injunction, the result is the same:  The UCL judgment must be reversed.[6]

## II.    Epic Must Pay Apple's Attorneys' Fees

Epic expressly "agree[d] to indemnify and hold harmless . . . Apple . . . from any and all claims . . . arising from or related to . . . [Epic's] breach of any certification, covenant, obligation, representation or warranty" in the DPLA. 3-ER-642.  This case arises from and is related to Epic's breach of the DPLA and Guidelines.  Accordingly, Epic must indemnify Apple, including for attorneys' fees.

Epic urges that subdivision (i) (relating to breaches of the DPLA) "must be read as referencing costs from *third-party* claims relating to [a] developer's breach." Epic Resp. Br. 115.  The DPLA, however, is clear that its provisions are "not for the benefit of any third parties" (3-ER-646), and thus the third-party claims for breach of contract hypothesized by Epic will never arise.  Notably, Apple challenged Epic to come up with a single example of a covered claim under its erroneous interpretation (Apple Br. 113); Epic was unable to do so, and its interpretation therefore fails (*see Brandwein v. Butler*, 218 Cal. App. 4th 1485, 1507 (2013) (courts

---

[6]   There is no basis for a remand on Epic's UCL claim:  Epic cannot win on the extant record (and does not identify any evidence not considered by the district court), while "a remand for further factfinding would give [Epic] an unwarranted second bite at the apple."  *Cal. Dental*, 224 F.3d at 959.

must "avoid interpretations that render any portion [of a contract] superfluous, void, or inexplicable")).

The same principle also dooms Epic's broader argument that the *entire indemnification clause* covers only third-party claims. Epic Resp. Br. 114. Subdivision (v) (dealing with claims regarding the developer's products or applications) explicitly refers to "any claims, *including but not limited to any end-user claims*" (3-ER-642 (emphasis added)) that would be unnecessary under Epic's reading. *See Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 555–57 (2004) (the term "[i]ndemnification" does not itself "limit the scope [of an indemnification] clause to third party claims" where statutory language and context dictate otherwise).

# CONCLUSION

The judgment on Epic's UCL claim with respect to anti-steering should be reversed, and the judgment on Apple's indemnity claim should be reversed and remanded for an award of attorneys' fees.

Dated: July 15, 2022

Respectfully submitted,

s/ *Mark A. Perry*
Mark A. Perry

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

Cynthia Richman
Joshua M. Wesneski
Anna Casey
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 6,994 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and is accompanied by a motion to file a longer brief pursuant to Circuit Court Rule 32-2(a).

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2019.

Dated:  July 15, 2022

s/ <em>Mark A. Perry</em>       <br>
Mark A. Perry

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **Reply Brief for Appellee/Cross-Appellant Apple Inc.** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 15, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 15, 2022

s/ <em>Mark A. Perry</em>

Mark A. Perry