NO. 21-16506 and 21-16695

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

EPIC GAMES, INC.,

PLAINTIFF, COUNTER-DEFENDANT - APPELLANT, CROSS – APPELLEE,

V.

APPLE INC.,

DEFENDANT, COUNTERCLAIMANT – APPELLEE, CROSS-APPELLANT.

On Appeal from the United States District Court
for the Northern District of California
20-cv-05640-YGR-TSH
The Honorable Yvonne Gonzalez Rogers

# BRIEF OF AMICUS CURIAE THE ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF APPELLANT EPIC GAMES, INC'S PETITION FOR PANEL REHEARING OR REHEARING EN BANC

Mitchell L. Stoltz
*Counsel of Record*
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: mitch@eff.org
Telephone: (415) 436-9333
Fax: (415) 436-9993
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: June 16, 2023          By: /s/ *Mitchell L. Stoltz*
                                                Mitchell L. Stoltz

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

STATEMENT OF INTEREST OF AMICUS .......... 1

INTRODUCTION .......... 1

ARGUMENT .......... 2

A. "Intellectual Property Compensation" is Part of the Rule of Reason Analysis But Does Not Necessarily Justify Anticompetitive Conduct… .......... 3

B. The Panel Acknowledged the Limited Impact of Apple's "Intellectual Property." .......... 5

C. The Panel's Treatment of Epic's Less Restrictive Alternative Did Not Account for the Limited Impact of Apple's "Intellectual Property." .......... 6

D. This Error Will Set a Harmful Precedent. .......... 8

CONCLUSION .......... 8

CERTIFICATE OF COMPLIANCE .......... 9

CERTIFICATE OF SERVICE .......... 10

# TABLE OF AUTHORITIES

## Cases

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .......... 4

*Apple Inc. v. Corellium, Inc.*,
No. 21-12835, 2023 WL 3295671 (11th Cir. May 8, 2023) .......... 5

*Cal. Dental Ass'n. v. FTC*,
224 F.3d 942 (9th Cir. 2000) .......... 3

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) .......... 5, 6

*Google LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021) .......... 4, 5

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .......... 3

*In re Indep. Serv. Orgs. Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000) .......... 4

*Nat'l Collegiate Athletic Ass'n v. Alston*,
141 S. Ct. 2141 (2021) .......... 7

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......... 4

## Statutes

17 U.S.C. § 102(a) .......... 8

17 U.S.C. § 107 .......... 4

## Constitutional Provisions

U.S. Const. art. 1 § 8 cl. 8 .......... 4

## STATEMENT OF INTEREST OF AMICUS

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 28,000 dues-paying members. EFF has worked for 33 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF and its members have an interest in ensuring that the technology-using public receives all the benefits of robust competition in high-tech markets, including the ability to choose products that meet consumers' individual needs for privacy, security, and functionality, and ensuring that innovation from diverse sources has a chance to flourish.

Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amicus certifies that no person or entity, other than amicus, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

## INTRODUCTION

Mobile apps, and mobile games in particular, are a multibillion-dollar market with an outsized impact on American commerce. Apple's app distribution policies in that market have substantial anticompetitive effects, as the district court found and a panel of this Court affirmed. Opinion at 47-50. Those policies cause consumers to pay more and forego other benefits of competition, including better privacy and security. *Id.* at 49. The panel also held that the alternative proposed by Appellant

Epic Games—competition in mobile app distribution plus a "notarization" model for evaluating app security—would be as effective as Apple's current model at protecting users' security and privacy, making Epic's proposal a less restrictive alternative under the rule of reason. *Id.* at 63. But the panel went on to reject Epic's alternative, reasoning that Epic didn't prove it would be "virtually as effective" in "allow[ing] Apple to be compensated for developers' use" of Apple's "intellectual property." *Id.* As a result, the panel upheld the dismissal of Epic's Sherman Act claims against Apple.

That holding was a significant error. It did not account for the limits that Congress and the Constitution have placed on "intellectual property," i.e., patents and copyrights. And it ignored the panel's own holding about the limited impact on the rule of reason analysis of simply offering products that contain "intellectual property." Instead, the panel should have found that Epic's alternative was sufficient to demonstrate that Apple's IP interests could be sufficiently met without it having total control over the market for app distribution. The panel's holding will cause substantial harm across the tech economy, including to consumer privacy and security, unless it is corrected on rehearing.

## ARGUMENT

A central issue in this appeal is whether Apple's desire to be compensated for the use of its "intellectual property" justifies the anticompetitive restrictions it places

on app developers. Op. 51-52. But the importance of "intellectual property" to the analysis is, like all rule of reason analysis, highly fact-dependent and requires careful inquiry. *Cal. Dental Ass'n. v. FTC*, 224 F.3d 942, 947 (9th Cir. 2000).

### A. "Intellectual Property Compensation" is Part of the Rule of Reason Analysis But Does Not Necessarily Justify Anticompetitive Conduct.

This Court has held that a defendant's "desire to profit from . . . intellectual property" is a "legitimately procompetitive" justification for conduct that harms competition in other ways. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997). But selling products that contain "intellectual property rights" means only that a court may not ignore those rights entirely in the rule of reason analysis. *See id.* The weight given to "intellectual property" may be, and often should be, quite small.

In *Kodak*, this Court held that the "failure to give *any* weight to . . . intellectual property rights" was error. *Id.* at 1218 (emphasis added). But the Court found that error harmless, in part because the defendant's patents covered only 65 of the thousands of parts that made up the product at issue (photocopiers). Anticompetitive conduct relating to the parts market generally, not just parts that were covered by patents or copyrights, could not be justified by pointing to "intellectual property rights" generally. *Id.* at 1220.

There are at least two reasons why the strength of the "intellectual property"

justification must vary with the specificity and relevance of the actual patents and copyrights in the defendant's product.

First, treating the mere presence of patents and copyrights in a product as a weighty presumption that justifies anticompetitive conduct would make the second step of the rule of reason analysis into a mechanical box-checking exercise, instead of the searching, fact-specific inquiry that the rule requires. "Intellectual property rights do not confer a privilege to violate the antitrust laws." *United States v. Microsoft Corp.,* 253 F.3d 34, 63 (D.C. Cir. 2001) (quoting *In re Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1325 (Fed. Cir. 2000)).

Second, patent and copyright law put limits on a rightsholder's ability to demand compensation. Congress established these rights for a specific purpose: to "promote the Progress of Science and useful Arts" so that the public benefits from innovation and creativity. U.S. Const. art. 1 § 8 cl. 8. The rights conferred by patent and copyright law are limited when the rightsholder's desire for compensation (or to exclude others) conflicts with that public benefit. For example, patents are not granted for abstract ideas, even if they are implemented in computer programs. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 212 (2014). And a copyright owner cannot enjoin, and has no right to compensation, for uses of a copyrighted work that the law deems *fair use*. 17 U.S.C. § 107; *see Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1198 (2021). Fair use includes, in many instances, writing new software

that uses the necessary parts of an existing software program in order to interoperate with it. *Id.* at 1201-03; *see Apple Inc. v. Corellium, Inc.,* No. 21-12835, 2023 WL 3295671, at *9 (11th Cir. May 8, 2023). Fair use therefore limits the ability of a computing device and operating system maker like Apple to exclude application developers from its platform—or to demand payment.

Moreover, creating new software almost always requires using elements of existing copyrighted software to achieve interoperability—including the interoperability between apps and the operating system they run on. The law recognizes that copyright should not inhibit such interoperability, because doing so would limit the creation of new software that copyright is intended to promote. *Oracle*, 141 S. Ct. at 1196.

### B. The Panel Acknowledged the Limited Impact of Apple's "Intellectual Property."

Both the district court and the appellate panel in this case acknowledged the limited and conditional effect of Apple's "intellectual property" at the second step of the rule-of-reason analysis. The district court "agree[d] with the general proposition that Apple is entitled to be paid for its intellectual property," but found that this entitlement did not justify Apple's 30% commission on app transactions, a rate that the court had already found to be supracompetitive. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1009-10 (N.D. Cal. 2021). The district court noted that Apple had developed innovative new tools and features for its devices that app

developers could make use of, but that the record did not establish how much of that "intellectual property" pertained specifically to the App Store or the value that app developers derived from Apple's tools. *Id.* In fact, the court found that Apple's "apparent investment in App Store-specific intellectual property" was low. *Id.* at 993. The court also noted evidence that Apple believes the "purpose in the App Store is to add value to the iPhone" and ultimately "sell more iPhones," thus receiving compensation for any App Store-related "intellectual property" directly from consumers. *Id.* at 946.

On appeal, the panel affirmed the "partial acceptance" of Apple's "IP-compensation rationale," and that Apple was "entitled to *some* compensation." Op. 51-52. It found that Apple's "general" rationale was sufficient to satisfy the second step of the rule-of-reason analysis, but that the weakness of Apple's proof at the second step meant Epic should be given "more flexibility at step three to fahion less restrictive alternatives." *Id.* Epic did *not*, according to the panel, need to present an alternative that would achieve the same "level of compensation that Apple currently achieves." *Id.* at 52. The third step, said the panel, "will necessarily take that partial finding into account." *Id.*

**C. The Panel's Treatment of Epic's Less Restrictive Alternative Did Not Account for the Limited Impact of Apple's "Intellectual Property."**

The panel did not follow through with its own analysis in step three.

Considering Epic's alternative proposal—open competition in app distribution with security "notarization" by Apple and a tiered licensing model for developers—the panel faulted Epic for not presenting "concrete guidance" on a tiered licensing model, and because auditing license compliance could impose costs. Op. 63-64. That conclusion simply ignores the "flexibility" that the panel had already concluded was due in step three. The panel, in effect, demanded a particularized showing that a hypothetical alternative model would meet Apple's desire for compensation at a level comparable to its current supracompetitive levies—indeed, that any "increased monetary and time costs" invalidated Epic's alternative. *See id.* at 64. The panel's inconsistent approach at step three treats Apple's "intellectual property," and its desire for compensation, as something close to a conclusive presumption that Apple's anticompetitive conduct is lawful.

In short, the panel erred by treating Apple's desire for compensation at or near its current supracompetitive levels as a "reasonable necessity," *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2161 (2021), based upon no more than a "general" showing that Apple's "IP-compensation rationale" was a valid justification. Instead, the panel should have held that the alternative proposed by Epic was sufficient to meet Apple's legitimate "IP compensation" needs, and therefore, Apple's challenged policies violate the Sherman Act.

### D. This Error Will Set a Harmful Precedent.

This error at the end of the panel's analysis will have wide-ranging, harmful implications unless it is corrected on rehearing. Copyrights are ubiquitous in mobile computing devices and apps. Essentially all software is subject to copyright law from the moment it is "fixed in a tangible medium," regardless of whether it is registered or labeled. 17 U.S.C. § 102(a). As a consequence, smartphones, including Apple iPhones, contain thousands of copyrighted software programs that range from highly valuable to commercially worthless.

Creating a strong presumption that "IP compensation" justifies anticompetitive practices with respect to smartphone apps, without due consideration of what the relevant "IP" is and what its limits are would put a heavy thumb on the scales in favor of anticompetitive conduct in these markets.

## CONCLUSION

This Court should grant rehearing to correct its error regarding the required showing at step three of the rule of reason analysis.

Dated: June 16, 2023

By: /s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz

ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
mitch@eff.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1. This Brief of Amicus Curiae the Electronic Frontier Foundation in Support of Appellant Epic Games, Inc's Petition for Panel Rehearing or Rehearing En Banc with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 1,798 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: June 16, 2023      By: */s/ Mitchell L. Stoltz*
                                                  Mitchell L. Stoltz

                                        *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 16, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 16, 2023

By: /s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz

*Counsel for Amicus Curiae*