Nos. 21-16506 & 21-16695

# United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff/counter-defendant,*
*Appellant/cross-appellee,*

v.

APPLE INC.,

*Defendant/counter-claimant,*
*Appellee/cross-appellant.*

Appeal from the United States District Court for the
Northern District of California (Hon. Yvonne Gonzalez Rogers),
No. 4:20-cv-05640-YGR

## APPLE INC.'S MOTION TO STAY MANDATE PENDING PETITION FOR A WRIT OF CERTIORARI

Cynthia Richman
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071

Mark A. Perry
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105

*Counsel for Apple Inc.*

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Background ................................................................................................. 3

Legal Standard .......................................................................................... 8

Reasons To Stay The Mandate .............................................................. 8

   I.    Apple's Petition Will Present Substantial Questions
        of Law ............................................................................................ 8

     A.    Nationwide Injunctions Are Controversial, and
          the Supreme Court Is Poised To Address the Issue ................. 9

     B.    The Panel's Decision Raises a Substantial Question
          About the Proof Necessary for Article III Injury ..................... 18

   II.   There Is Good Cause for a Stay ................................................... 21

Conclusion ................................................................................................ 24

Certificate of Compliance ...................................................................... 25

Certificate of Service .............................................................................. 26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .................................................................. 22

*In re Apple iPhone Antitrust Litig.*,
    11-cv-06714-YGR (N.D. Cal.) .................................................................. 3

*Ariz. Dream Act Coalition v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .................................................................. 22

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976) .................................................................................. 9

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir. 1987) .................................................................. 10

*Brown v. Trs. of Bos. Univ.*,
    891 F.2d 337 (1st Cir. 1989) .................................................................... 10

*Bryant v. Ford Motor Co.*,
    886 F.2d 1526 (9th Cir. 1989) .................................................................. 8

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .......................................................................... 9, 12, 13

*Cameron v. Apple Inc.*,
    19-cv-03074-YGR (N.D. Cal.) ........................................................... 3, 6, 14

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .................................................................................. 18

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) ................................................................................ 15

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
    92 F.3d 1486 (9th Cir. 1996) .................................................................... 10

*Fox v. Saginaw County*,
    67 F.4th 284 (6th Cir. 2023) ..................................................................... 16

*Garcia v. Google,*
    786 F.3d 733 (9th Cir. 2015) ................................................................ 23

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) .............................................................................. 16

*Hangarter v. Provident Life & Accident Ins. Co.,*
    373 F.3d 998 (9th Cir. 2004) ................................................................ 19

*Hansberry v. Lee,*
    311 U.S. 32 (1940) ................................................................................ 14

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976) .............................................................................. 23

*L.A. Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ................................................................ 10

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................ 18, 19

*Meyer v. CUNA Mut. Ins. Soc'y,*
    648 F.3d 154 (3d Cir. 2011) ................................................................. 10

*Microsoft Corp. v. Baker,*
    582 U.S. 23 (2017) ................................................................................ 14

*Nat'l Pork Producers Council v. Ross,*
    143 S. Ct. 1142 (2023) .......................................................................... 12

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274 (2018) .......................................................................... 18

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*
*Progress,*
    613 F. Supp. 3d 1190 (N.D. Cal. 2020) ................................................ 13

*Powers v. Ohio,*
    499 U.S. 400 (1991) ................................................................................ 9

*Regents of Univ. of Cal. v. Am. Broad. Cos.,*
    747 F.2d 511 (9th Cir. 1984) ................................................................ 23

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
 944 F.2d 597 (9th Cir. 1991) ................................................................ 22

*Rogers v. Lyft, Inc.*,
 452 F. Supp. 3d 904 (N.D. Cal. 2020)................................................. 12

*Sharpe v. Cureton*,
 319 F.3d 259 (6th Cir. 2003) ................................................................ 10

*Trump v. Hawaii*,
 138 S. Ct. 2392 (2018)............................................................................ 15

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) ................................................................ 12

*United States v. Pete*,
 525 F.3d 844 (9th Cir. 2008) .................................................................. 8

*United States v. Texas*,
 No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023) ....................... 14, 17

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)................................................................... 11, 13, 16

*Yazzie v. Hobbs*,
 977 F.3d 964 (9th Cir. 2020) ................................................................ 19

## Other Authorities

9th Cir. R. 41-1 ........................................................................................ 1

Fed. R. Civ. P. 23.............................................................................. *passim*

Fed. R. App. P. 41............................................................................... 1, 8

Nicholas Bagley, *A Single Judge Shouldn't Have This Kind of National Power*, The Atlantic (Apr. 14, 2023)....................................... 15

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017) .............................. 15

iv

Ronald Cass, *Nationwide Injunctions' Governance Problems: Forum-Shopping, Politicizing Courts, and Eroding Constitutional Structure*, 27 Geo. Mason L. Rev. 29 (2019) ............... 15

Bradford C. Mank, Clapper v. Amnesty International: *Two or Three Competing Philosophies of Standing Law?*, 81 Tenn. L. Rev. 211 (2014) .................................................................... 21

Michael T. Morley, *Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts*, 97 B.U. L. Rev. 615 (2017) .......................................................... 10, 15, 16

Carolyn Shapiro*, Democracy, Federalism, and the Guarantee Clause*, 62 Ariz. L. Rev. 183 (2020) ........................................ 17

Benjamin C. West, *No Harm, Still Foul: When an Injury-in-Fact Materializes in a Consumer Data Breach*, 69 Hastings L.J. 701 (2018) ........................................................ 21

*The Supreme Court — Leading Cases: Standing — Challenges to Government Surveillance —* Clapper v. Amnesty International USA, 127 Harv. L. Rev. 298 (2013) ................ 20

Editorial Board, *The Judicial Injunction Dysfunction*, Wall St. J. (July 28, 2019) ............................................................. 16

Apple Inc. respectfully requests that this Court stay the mandate pending the resolution of a petition for a writ of certiorari that Apple intends to file in the Supreme Court. The petition will raise substantial questions of law and there is good cause for a stay. Fed. R. App. P. 41(d)(1). The petition will not be frivolous or filed for purposes of delay. 9th Cir. R. 41-1. Epic Games, Inc. has not consented to the relief requested.

## INTRODUCTION

The district court issued a sweeping injunction prohibiting Apple from enforcing its anti-steering rules against *all* developers of iOS apps offered for distribution in the United States, even though the sole named plaintiff (Epic Games, Inc.) did not seek or obtain class certification, and did not prove that an injunction running in favor of non-parties was necessary to make it whole. The injunction cannot be reconciled with Federal Rule of Civil Procedure 23(b)(2), which expressly addresses injunctive relief extending beyond the named plaintiff, and exceeds the district court's authority under Article III, which limits federal court jurisdiction to actual cases and controversies.

The panel's decision affirming the injunction departs from Supreme Court and Circuit precedent holding that an injunction cannot be any broader than necessary to make the plaintiff whole, and that relief cannot otherwise extend beyond the named plaintiff without class certification

under Rule 23. The Supreme Court has recently and repeatedly signaled concern with the use of such universal injunctions in single-plaintiff actions and is poised to resolve this controversial practice. The panel's decision on Article III injury, based on unsubstantiated economic theories proffered on appeal—but never advanced, let alone proven, at trial—runs headlong into the Supreme Court's repeated pronouncements that a federal-court plaintiff must prove the prerequisites to standing. These weighty legal questions warrant review by the Supreme Court and, at the very least, constitute substantial questions of law.

There is good cause for the stay because if the mandate issues, Apple will be required to change its business model to comply with the injunction before judicial review has been completed. The undisputed evidence establishes that the injunction will limit Apple's ability to protect users from fraud, scams, malware, spyware, and objectionable content. On the other hand, there would be no prejudice to Epic from a stay: Epic is not an iOS app developer and does not stand to benefit from the injunction. Given these extraordinary circumstances, a stay pending Apple's petition for a writ of certiorari is warranted.

## BACKGROUND

The iOS App Store is a two-sided transaction platform that connects app developers with iPhone and iPad users through simultaneous transactions (1-ER-97–98; 1-ER-124), including both initial downloads and subsequent in-app purchases (1-ER-37; 1-ER-68–70). Apple requires that all native iOS apps be distributed through the App Store (1-ER-21 n.124; 1-ER-95–96), and that all in-app transactions for digital content be executed using Apple's proprietary IAP functionality (1-ER-34; 2-SER-526).

Bypassing then-pending class action lawsuits brought by consumers and other developers, Epic filed this lawsuit only on its own behalf and not a putative class. 4-SER-895; *see also Cameron v. Apple Inc.*, 19-cv-03074-YGR (N.D. Cal.); *In re Apple iPhone Antitrust Litig.*, 11-cv-06714-YGR (N.D. Cal.). Epic alleged that the App Store distribution and IAP requirements are anticompetitive and violate the antitrust laws. 4-SER-895–907. Epic also pointed to Apple's anti-steering provisions—which prohibit developers from "steering" users away from the App Store through links or communications within the app (1-ER-34)—as one way that Apple allegedly enforces the challenged requirements, but did not bring a standalone challenge to these provisions (4-SER-902–03; D.C. Dkt. No. 1 ¶¶ 184–291). In addition to nine antitrust counts focused on the distribution and IAP requirements, Epic summarily alleged that "Apple's conduct, as described

3

above, [also] violates California's Unfair Competition Law." D.C. Dkt. No. 1 ¶ 286.

After a bench trial, the court found that Epic failed to carry its burden of proof on its antitrust claims (1-ER-4), but concluded that Apple's anti-steering provisions are "unfair" under California's Unfair Competition Law ("UCL") (1-ER-168–69). Epic had introduced almost no evidence regarding these anti-steering provisions at trial, because they were at the periphery of its case. *See* 1-ER-166 (noting the record on the anti-steering provisions was "less fulsome"). The district court did not hold a post-trial evidentiary hearing to determine the appropriate remedy or its scope.

The court entered a permanent injunction *sua sponte*, enjoining Apple from prohibiting developers from (1) "[i]ncluding in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing," or (2) "[c]ommunicating with customers through points of contact obtained voluntarily from customers through account registration within the app." 2-ER-195. Although the case involved a single plaintiff and no putative (much less certified) class, the court applied the injunction to *all* developers of U.S.-based apps. *Id*; *see also* 1-ER-167; 1-ER-171.

The court did not cite any evidence or make any findings that extending injunctive relief to non-parties was necessary to make Epic whole—as

Epic never made such an argument at trial. In its Rule 52 order, the court explained only that a state-law-based injunction could extend geographically beyond California's borders under the Commerce Clause. 1-ER-170. It did not address the reach to non-parties or the strictures of Rule 23, even though Apple raised these arguments in its post-trial submission. *See* D.C. Dkt. No. 779-1 ¶ 73 (arguing that because Epic brought the lawsuit in its own capacity, not as a class cation, it could assert only harm accruing to it, not to other market participants); *id.* ¶ 721 (noting that Epic had opted out of developer class action and "cannot assume the mantle of a 'pseudo-private attorney general' and purport to vindicate the interests of all developers" in an individual action); *cf. id.* ¶ 542.25. Indeed, the district court explicitly recognized that Epic was differently situated than other developers and was pursuing only its own interests. 1-ER-27 ("Mr. Sweeney admitted while testifying under oath that he 'would have' accepted a deal 'for [Epic Games] and no other developers'"); *id.* ("Epic Games sought a 'side letter' or other special deal from Apple that would provide plaintiff with unique, preferable terms"); *see also* 1-ER-6 (acknowledging the related class action lawsuits).

With regard to standing, Epic offered no evidence at trial that it had ever been injured by the anti-steering provisions, much less that it was *continuing* to suffer irreparable injury such that injunctive relief would be

warranted. Moreover, based on Epic's intentional breach of contract, Apple had lawfully terminated Epic's developer program account and removed all of its apps from the App Store. 1-ER-181–82. Epic therefore cannot benefit from the injunction. After entering the injunction, the district court said that Apple's anti-steering provisions helped Apple maintain its commission rate, resulting in reduced royalties paid to Epic by non-party affiliates that use Epic's licensed software, *Unreal Engine*. 2-ER-192 (citing 4-SER-1073–93). But the court's conclusion was based on Epic's misrepresentation that royalties are paid on net profits after commission, when Epic's license agreement actually provides for royalties based on gross sales. 4-SER-1079–80.

This Court stayed the injunction pending appeal on December 8, 2021. 2-ER-189. That stay remains in place until the mandate issues. *Id.*

Shortly before judgment in the district court, Apple entered into a settlement in one of the related class actions, resolving the antitrust and unfair competition law claims of the majority of U.S. app developers. *See Cameron v. Apple Inc.*, 19-cv-03074-YGR (N.D. Cal. Nov. 5, 2021), Dkt. No. 451-1. That settlement required Apple to permit out-of-app communications (the subject of clause 1(ii) of the injunction in this case), but was silent as to in-app links, buttons, or calls to action (the subject of clause 1(i)). *Id.* ¶ 5.1.3.

6

On April 24, 2023, the panel affirmed the UCL judgment and injunction. C.A. Dkt. No. 222 ("Op.") 77. It offered little analysis or consideration of the district court's authority to extend an injunction to non-parties without a certified class (*id.* at 85), despite Apple's argument that "an injunction applicable to other developers provides no benefit to Epic" and thus "subverts Federal Rule of Civil Procedure 23(b)(2)." Apple Br. 111. In one short paragraph, the panel approved the universal injunction based on the notion that the anti-steering provisions could increase costs to Epic's subsidiaries and prevent more app users from becoming Epic Game Store consumers. Op. 85. But the panel did not cite any cases or explain why these supposed harms to Epic and its subsidiaries would permit an injunction affecting the rights of thousands of non-party app developers, which have no affiliation or relationship with Epic. *Id.* The panel held only that "the district court did not abuse its discretion when setting the scope of the injunctive relief because the scope is tied to Epic's injuries." *Id.*

As to Epic's supposed injuries, Epic did not defend the district court's ruling or argue that the anti-steering provisions had harmed it directly, including by reducing the amount of royalties that Epic could earn—tacitly conceding its misrepresentation to the district court. Instead, Epic argued that the Court could find Article III standing based on theories of "marketplace dynamics" and "basic economics" advanced for the first time

7

on appeal. Epic Resp. Br. 90. The panel affirmed, reasoning that removing the anti-steering provisions *could* affect the earnings of Epic's subsidiaries and/or the Epic Games Store. Op. 77, 79–80. The panel cited no trial evidence or findings by the district court in support. There are none.

## LEGAL STANDARD

Federal Rule of Appellate Procedure 41(d) permits the Court to stay the issuance of the mandate pending the filing and disposition of a petition for a writ of certiorari upon the applicant's showing "that the petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). The Court's standard for granting such a stay is lenient. The Court "often" stays the mandate pending certiorari, as parties "need not demonstrate that exceptional circumstances justify a stay." *United States v. Pete*, 525 F.3d 844, 851 & n.9 (9th Cir. 2008) (quoting *Bryant v. Ford Motor Co.*, 886 F.2d 1526, 1528–29 (9th Cir. 1989)).

## REASONS TO STAY THE MANDATE

## I.  Apple's Petition Will Present Substantial Questions of Law

The panel affirmed a universal injunction in a case brought by an individual, non-representative plaintiff that did not even try to prove Article III injury in the district court. Apple intends to seek review in the Supreme Court because the panel's decision raises far-reaching and important questions about (A) the limits of a federal court's authority to issue

an injunction extending to non-parties, without certifying a class or finding that the relief is necessary to make the plaintiff whole, and (B) the plaintiff's obligation to prove its own Article III injury sufficient for prospective relief. Both questions are "substantial" under this Court's rules and precedent.

### A. Nationwide Injunctions Are Controversial, and the Supreme Court Is Poised To Address the Issue

**1.** The panel's decision affirming the injunction departs from Supreme Court and Circuit precedent, and cannot be reconciled with Federal Rule 23, which sets the requirements for obtaining classwide injunctive relief. It does so at a time when class actions and universal injunctions are receiving close scrutiny from Supreme Court Justices, legal scholars, and knowledgeable observers. This is precisely the type of legal issue for which a stay of the mandate is appropriate. The Supreme Court has cautioned that injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs.*" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added). And it has held that, in the absence of class certification under Rule 23, an "action is not properly a class action" and should not be treated like one. *Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1 (1976). Absent class certification, individuals generally lack standing to seek relief on behalf of others. *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

9

Thus, the uniform rule among the circuits is that "[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987); *see also Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 169–71 (3d Cir. 2011); *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003); *Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 361 (1st Cir. 1989). This rule "applies with special force where there is no class certification." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (vacating a nationwide injunction as overbroad); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) (injunctive relief must be limited "to apply only to named plaintiffs"); *see also* Michael T. Morley, *Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts*, 97 B.U. L. Rev. 615, 634 (2017) (explaining that Rule 23(b)(2) is the "main restriction" on a district court's power to issue nationwide injunctive relief).

To obtain class certification and represent non-parties, the named plaintiff in a lawsuit must satisfy the requirements of Rule 23(a). Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members *only if*: . . ." (emphasis added)). And to maintain an action for classwide injunctive relief, the plaintiff must show that "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) thus "applies *only* when a single injunction or declaratory judgment would provide relief to *each* member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (emphases added). "It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

**2.** Here, the panel decision created a circuit split by holding that, as long as an injunction is somehow "tied to" the named plaintiff's supposed injury, then the district court does not abuse its discretion in extending the injunction, universally, to non-parties. Op. 78. The panel's approach contravenes the binding precedent above—which requires a narrow tailoring to the plaintiff's injury—as well as the strictures of Rule 23—which permits classwide relief only when the plaintiff makes the necessary showing.

Applying its new rule here, the panel affirmed the district court's injunction because it found the anti-steering provisions might make it more difficult for Epic to attract consumers to its competing game distribution store. *Id.* But the panel never explained why this supposed harm to Epic and its subsidiaries justified an injunction applicable not only to Epic and

its subsidiaries, but also to all other U.S. developers. *Id.* Nor did the panel address whether it was necessary for Epic to satisfy Rule 23(a) or (b) to obtain such relief. *Id.*; *see also* Apple Br. 111 (arguing that the injunction constituted *de facto* classwide injunctive relief).

And, critically, the panel affirmed even though the district court never found that it was, in fact, necessary to enjoin Apple's conduct as to all U.S. app developers in order to make Epic whole (*Califano*, 442 U.S. at 702)—as the district court never held an evidentiary hearing to determine whether such relief was appropriate and there was no such evidence at trial (*see United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) (a separate evidentiary hearing is required when, after trial, there are disputed factual issues regarding the scope of relief)). Indeed, the court held only that it had authority to issue the injunction *nationally* (as opposed to globally) under the Commerce Clause (1-ER-170)—thereby revealing the court's fundamental misunderstanding and failure to address whether it had power to extend the injunction to *non-parties* without certifying a class under Rule 23. And as to both points, the court was wrong. *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1156–57 (2023) (discussing the dormant Commerce Clause and horizontal separation of powers); *see also Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 919–921 (N.D. Cal. 2020) (without

a certified class, a federal court lacks Article III power to issue a UCL public injunction to redress injuries of non-parties); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 613 F. Supp. 3d 1190, 1218 (N.D. Cal. 2020) (refusing to extend a UCL injunction to non-plaintiff affiliates), *aff'd*, 2022 WL 13613963 (9th Cir. Oct. 21, 2022).

By affirming an injunction applicable to all U.S. developers without requiring the rigors of class certification under Rule 23, the panel's decision greenlights overbroad injunctions in individual cases where the rights and obligations of non-parties are not even considered, let alone represented—rather than either putting parties through the proper class-action procedures or otherwise circumscribing equitable orders to only that which is "necessary to provide complete relief to the plaintiffs" before the court. *Califano*, 442 U.S. at 702. The panel's new rule allows district courts to issue de facto classwide relief so long as the relief is "tied to" the plaintiff's injury. But, by definition, a *universal* injunction will always be tied to the plaintiff's injury.

The panel's ruling not only expands the district court's equitable power beyond and in contravention of Rule 23, it also creates an inequitable asymmetry whereby non-parties can claim the benefit of a single favorable ruling without being bound by it. *Cf. Wal-Mart Stores*, 564 U.S. at 348. Among other problems, this kind of one-way preclusion violates

13

Apple's due process rights. *See Hansberry v. Lee*, 311 U.S. 32, 45 (1940). Indeed, here, U.S. app developers had already brought a nationwide class challenging restrictions on Apple's iOS platform; and, as part of the settlement there, Apple agreed to undertake changes to its platform requirements that are covered by the district court's injunction (but not all of them). *Cameron v. Apple Inc.*, 19-cv-03074-YGR (N.D. Cal. Nov. 5, 2021), Dkt. No. 451-1. The injunction thus undercuts the entire class-action process because it gave Epic the ability to obtain broader relief in a standalone lawsuit, when a class actually certified under Rule 23 was unable to secure that relief for itself. *Cf. Microsoft Corp. v. Baker*, 582 U.S. 23, 27 (2017) (parties may not exploit Rule 23(f) to "subvert the balanced solution" that the rule "put in place for immediate review of class-action orders").

**3.** The Supreme Court is poised to take up the important legal question of whether and when a court may issue a universal injunctions outside of the Rule 23 class action context.

The recent and controversial proliferation of this type of remedy has already caught the Justices' attention. In a case from this Term, Justice Gorsuch—joined by Justices Thomas and Barrett—observed that "a number of lower courts have asserted the authority to issue decrees that purport to define the rights and duties of sometimes millions of people who are not parties before them" and that these "[m]atters have not improved

with time." *United States v. Texas*, No. 22-58, 2023 WL 4139000, at *13 (U.S. June 23, 2023) (Gorsuch, J., concurring). Justice Gorsuch had previously noted that widespread use of nationwide injunctions "is not normal," as they "have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). And, in his view, the Supreme Court "must, at some point, confront these important objections to this increasingly widespread practice." *Id.*; *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (expressing "skeptic[ism] that district courts have the authority to enter universal injunctions").

Scholars and other observers are increasingly paying attention as well. *See* Samuel L. Bray*, Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 419 & n.6 (2017) (collecting recent articles); *see also* Ronald Cass, *Nationwide Injunctions' Governance Problems: Forum-Shopping, Politicizing Courts, and Eroding Constitutional Structure*, 27 Geo. Mason L. Rev. 29 (2019); Morley, *supra*, at 632 (allowing federal district courts "to grant nationwide injunctions [under Rule 23(b)(2)] creates inconsistencies concerning the scope of their powers"); Nicholas Bagley, *A Single Judge Shouldn't Have This Kind of National Power*, The Atlantic (Apr. 14, 2023), https://www.theatlantic.com/ideas/ar-

chive/2023/04/mifepristone-case-problem-federal-judiciary/673724/; Editorial Board, *The Judicial Injunction Dysfunction*, Wall St. J. (July 28, 2019).

This case provides the Supreme Court with an ideal vehicle for addressing this issue. Here, the district court did not make a specific finding that a universal injunction was necessary to provide complete relief to Epic, and there was no class certification under Rule 23. Thus, the case concerns the very outer limits of the district court's equitable powers and how that power is circumscribed by Rule 23. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (a court has no power to issue an equitable remedy that was "historically unavailable from a court of equity"); *Wal-Mart Stores*, 564 U.S. at 348. Relatedly, there is currently a circuit split over the relationship between Article III standing and a plaintiff's ability to seek classwide relief. *See Fox v. Saginaw County*, 67 F.4th 284, 288, 293 (6th Cir. 2023) (noting split over the "juridical link" doctrine, which allows a plaintiff to sue defendants on behalf of absent class members, even if those defendants did not specifically injure the named plaintiff); *see also* Morley, *supra*, at 656–57 (questioning district court use of Rule 23(b)(2) to issue nationwide injunctions).

Further, the case puts into focus the separation-of-powers and federalism principles that have animated the Justices' concerns about universal injunctions. *See Texas*, 2023 WL 4139000, at \*17 (Gorsuch, J., concurring) ("[U]niversal relief . . . exaggerates the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide"). Here, the court issued the injunction under California state law, but made it applicable to all developers around the country, thereby allowing California policy to override any contrary policy of the 49 other states (and federal government)—which might permit or even *encourage* Apple's anti-steering requirements. *See, e.g.*, Carolyn Shapiro, *Democracy, Federalism, and the Guarantee Clause*, 62 Ariz. L. Rev. 183, 225 (2020) (observing shift of power at the state level, with attorneys general using nationwide injunctions to exert "more immediate effects on nationwide policy than can governors and state legislatures"); Michael Acton, *Epic Games-Apple US Appeals Court Ruling Shows Power of California's Competition Law, Blizzard Says*, MLex (May 10, 2023) (the *Epic* decision has emboldened California's chief antitrust enforcer to "seek nationwide injunctions" under the UCL, targeting "conduct which may not clearly be illegal under federal antitrust laws"); *see also* WLF Amicus Br. 21–28 (noting differences in state law and policy on "unfair competition").

Indeed, the evidence is undisputed that virtually every digital platform enforces anti-steering (or anti-circumvention) rules analogous to Apple's. 4-SER-982–1029. The Supreme Court has sustained such rules as procompetitive under the federal antitrust laws. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018) ("[T]here is nothing inherently anticompetitive about Amex's antisteering provisions."). The issuance of a nationwide injunction here supplants state and federal policy in favor of a single judge's determination, but without any of the procedures that Congress has provided for class actions.

In short, the injunction approved by the panel undermines the use and purpose of class actions, and upsets the balance of federal and state power. This case thus raises important—and highly controversial—questions of law that the Supreme Court is likely to review.

## B. The Panel's Decision Raises a Substantial Question About the Proof Necessary for Article III Injury

The panel's holding also raises important questions about Article III standing—in particular the plaintiff's burden to prove standing at each successive step of the litigation and the nature of an "actual or imminent" injury when a party is seeking prospective, injunctive relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) (a threatened injury must be "certainly

impending"). Like nationwide injunctions, Article III standing is an important topic and one the Supreme Court is poised to revisit.

Epic did not *prove* at trial that it had been injured by the anti-steering provisions in the past *or* that it would experience injury prospectively if the anti-steering provisions were not enjoined. On the contrary, Epic's developer program account has been terminated, and it has no apps on the App Store. It is suffering no harm, now or in the future, from the anti-steering provisions, negating standing to seek injunctive relief. *See Yazzie v. Hobbs*, 977 F.3d 964, 965 (9th Cir. 2020); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021–22 (9th Cir. 2004) (plaintiff no longer insured by defendant lacks standing to seek injunctive relief). In the face of this indisputable *fact*, Epic advanced on appeal a *theory* of injury based on "marketplace dynamics" and "basic economics." Epic Resp. Br. 90. But it offered no evidence to substantiate this theory, yet the panel affirmed on the ground that Epic *might* be injured by losing commissions on sales through the Epic Games Store or by its subsidiaries. Op. 78. No evidence in the record supports this conclusion.

The Supreme Court's jurisprudence is clear that Article III requires the proponent of federal jurisdiction to *prove* particularized and concrete injury at each successive stage of litigation. *See Lujan*, 504 U.S. at 560–61. The panel decision raises a substantial legal question about the degree

of proof necessary to establish an actual or imminent injury at trial and the appellate court's ability to make findings of fact regarding injury based on economic theory not supported by the trial record.

Epic cannot cite *any* evidence in the trial record establishing current and/or prospective injury to itself from the anti-steering provisions. There is no evidence supporting the argument it made in the district court (which it has now abandoned). There is no evidence supporting the argument it made in this Court (which the panel accepted). There is no evidence, indeed, to support Article III injury under any theory. That ought to be the end of the injunction as a matter of law.

In addition, the lower courts are in disarray with respect to two issues presented by Epic's unsupported theory for standing—the nature of an Article III injury (*see, e.g.*, *Pierre v. Midland Credit Mgmt.*, Inc., 29 F.4th 934, 940 (7th Cir. 2022) (Hamilton, J., dissenting) (noting a "growing circuit split" on intangible injuries)), and the concept of "imminence" for prospective relief (*see The Supreme Court — Leading Cases: Standing — Challenges to Government Surveillance — Clapper v. Amnesty International USA*, 127 Harv. L. Rev. 298, 303 (2013) ("Language in *Clapper* leaves the scope of future applicability of 'certainly impending' unclear")). Observers have accordingly advocated for the Supreme Court to revisit these issues

and clarify its standards. *See* Bradford C. Mank, Clapper v. Amnesty International: *Two or Three Competing Philosophies of Standing Law?*, 81 Tenn. L. Rev. 211, 274 (2014); Benjamin C. West, *No Harm, Still Foul: When an Injury-in-Fact Materializes in a Consumer Data Breach*, 69 Hastings L.J. 701, 720 (2018). This case presents an excellent vehicle for doing so.

## II. There Is Good Cause for a Stay

Because the injunction will have far-reaching consequences to both Apple and to non-parties, there is good cause for a stay of the mandate (and hence the injunction) pending disposition of Apple's petition for a writ of certiorari. This case is important, not only for Apple and its business model, but also for thousands of developers and millions of iPhone users around the country. This Court should not allow a single-plaintiff action to dictate Apple's policies nationwide while serious legal questions remain unresolved.

As both the panel and district court recognized, Apple distinguishes itself from Google—and promotes interbrand competition—by providing greater security and privacy for iOS users than Android users. 1-ER-149; Op. 53 ("Users who value security and privacy can select (by purchasing an iPhone) Apple's closed platform"). Apple has "stud[ied] the effect of" the injunction and submitted unrebutted evidence after the trial that, if

implemented, the injunction "will harm users, developers, and the iOS platform more generally," in several ways. 1-SER-208–16 ("Kosmynka Decl.") ¶ 10. This evidence has never been disputed by Epic.

In particular, external links will expose users to new and significant privacy risks and substantially increase the risk of fraud. Kosmynka Decl. ¶¶ 13–16. Because external links operate outside the App Store ecosystem, Apple has no meaningful visibility into their operations, and little ability to redress fraud by identifying and removing fraudulent actors from the App Store. *Id.* ¶¶ 13–14. Through external links, developers may be able to deceive users—who may believe links to be safe and secured through the App Store—into providing personal information to a malicious website or platform that is not, in fact, part of the curated App Store ecosystem. *Id.* ¶¶ 15–16. These and other potential harms to millions of consumers demonstrate that the public interest weighs heavily in favor of a stay. *See Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1139–39 (9th Cir. 2011).

There is also potential harm to Apple and its reputation if users are needlessly subjected to scams, fraud, and objectionable content. Such reputational damage constitutes irreparable harm warranting equitable relief. *See, e.g., Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental,*

*Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 519–20 (9th Cir. 1984). Additionally, the injunction requires Apple to modify various provisions of its licensing agreement with thousands of developers. This is a substantial undertaking that requires Apple to invest time and resources, which will be unrecoverable if the injunction ultimately is reversed.

There is no corresponding prejudice to Epic, which has no apps on the App Store that could be affected by the now-enjoined provisions. Indeed, the Court stayed the injunction more than 18 months ago (2-ER-189), yet Epic never sought relief from the stay. Accordingly, a temporary stay of the mandate would not cause Epic any prejudice. *Cf. Kleppe v. Sierra Club*, 427 U.S. 390, 407–08 (1976) (affirming denial of equitable relief where the movant could show no harm and the non-movant suffered irreparable harm); *Garcia v. Google*, 786 F.3d 733, 744–46 (9th Cir. 2015) (a party was not entitled to injunctive relief when her "harms [were] untethered from—and incompatible with" the legal basis for the injunction she sought). The mandate should be stayed to give the Supreme Court the opportunity to consider Apple's substantial legal arguments *before* the injunction goes into effect.

## CONCLUSION

The Court should stay issuance of the mandate pending the filing and disposition of the petition for a writ of certiorari.

Respectfully submitted,

Cynthia Richman
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071

*/s/ Mark A. Perry*

Mark A. Perry
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105

July 3, 2023

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies that the Motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) and 9th Cir. R. 27-1(1) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 5,188 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

/s/ *Mark A. Perry*

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

July 3, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ Mark A. Perry

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

July 3, 2023